# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SIERRA CLUB and CALIFORNIA
COMMUNITIES AGAINST TOXICS,

         Petitioners,

        v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY and LEE ZELDIN, in his
official capacity as Administrator of the
United States Environmental Protection
Agency,

         Respondents.

No. 25-1182

## PETITION FOR REVIEW

Pursuant to Clean Air Act § 307(b)(1), 42 U.S.C. § 7607(b)(1), Rule 15 of

the Federal Rules of Appellate Procedure, and Circuit Rule 15, Sierra Club and

California Communities Against Toxics hereby petition this Court to review of the

final action (including the promulgation of regulations) taken by Respondents at

90 Fed. Reg. 27,910 (June 30, 2025) and entitled "Standards of Performance for

New Stationary Sources and Emission Guidelines for Existing Sources: Other

Solid Waste Incineration Units Review; Final Rule" (Attachment 1).

1

Dated: August 29, 2025                    Respectfully submitted,

                                          /s/ John E. Bies
                                          John E. Bies
                                          James Pew
                                          Earthjustice
                                          1001 G Street, NW
                                          Suite 1000
                                          Washington, DC 20001
                                          Phone: (202) 667-4500
                                          jbies@earthjustice.org
                                          jpew@earthjustice.org

                                          *Counsel for Sierra Club and*
                                          *California Communities Against*
                                          *Toxics*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SIERRA CLUB and CALIFORNIA
COMMUNITIES AGAINST TOXICS,

                Petitioners,

        v.                                            No.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY and LEE ZELDIN, in his
official capacity as Administrator of the
United States Environmental Protection
Agency,

                Respondents.

## RULE 26.1 DISCLOSURE STATEMENT OF SIERRA CLUB

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioner Sierra Club makes the following disclosures:

Sierra Club states that they are a non-governmental organization with no parent companies, and no publicly held corporation has a ten percent or greater ownership interest in Sierra Club.

Sierra Club, is a nonprofit corporation organized and existing under the laws of the State of California, and Sierra Club's general nature and purpose is dedicated to the protection and enjoyment of the environment.

1

Dated: August 29, 2025          Respectfully submitted,

/s/ John E. Bies
John E. Bies
James S. Pew
Earthjustice
1001 G Street, NW
Suite 1000
Washington, DC 20001
Phone: (202) 667-4500
jbies@earthjustice.org
jpew@earthjustice.org

*Counsel for Sierra Club and*
*California Community Against Toxics*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

SIERRA CLUB and CALIFORNIA
COMMUNITIES AGAINST TOXICS,

          Petitioners,

        v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY and LEE ZELDIN, in his
official capacity as Administrator of the
United States Environmental Protection
Agency,

          Respondents.

No.

## RULE 26.1 DISCLOSURE STATEMENT OF
## CALIFORNIA COMMUNITIES AGAINST TOXICS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1,

Petitioner California Communities Against Toxics makes the following

disclosures:

California Communities Against Toxics states that they are a non-

governmental organization with no parent companies, and no publicly held

corporation owns ten percent or greater ownership interest in California

Communities Against Toxics.

California Communities Against Toxics is a nonprofit organization organized and existing under the laws of California. The general nature and purpose of the organization is an environmental justice network that aims to reduce exposure to pollution, to expand knowledge about the effects of toxic chemicals on human health and the environment, and to protect the most vulnerable people from harm.

Dated: August 29, 2025                    Respectfully submitted,

                                          /s/ John E. Bies
                                          John E. Bies
                                          James S. Pew
                                          Earthjustice
                                          1001 G Street, NW
                                          Suite 1000
                                          Washington, DC 20001
                                          Phone: (202) 667-4500
                                          jbies@earthjustice.org
                                          jpew@earthjustice.org

                                          *Counsel for Sierra Club and
                                          California Communities Against
                                          Toxics*

## CERTIFICATE OF SERVICE

I hereby certify that I have served copies of the foregoing Petition for

Review and Rule 26.1 Disclosure Statements on Respondents by sending a copy

via First Class Mail to each of the following addresses on this 29th day of August,

2025:

Lee Zeldin, Administrator
U.S. Environmental Protection Agency
Office of the Administrator, 1101A
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Correspondence Control Unit
Office of General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Pamela Bondi
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

Dated: August 29, 2025                    /s/ John E. Bies_____
                                          John E. Bies

3

# ATTACHMENT 1

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 60**

**[EPA–HQ–OAR–2003–0156; FRL–7547–02–OAR]**

**RIN 2060–AU60**

**Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This action finalizes the periodic review by the U.S. Environmental Protection Agency (EPA) of the emissions standards and other requirements for Other Solid Waste Incineration (OSWI) units in the OSWI New Source Performance Standards (NSPS) and Emission Guidelines (EG). The EPA is finalizing applicability-related and definitional changes; changes to OSWI subcategories and the standards for the new subcategories; changes to the startup, shutdown, and malfunction (SSM) provisions; and changes to testing, monitoring, recordkeeping, and reporting requirements. We are also making other miscellaneous technical and editorial changes to the regulatory text.

**DATES:** This final rule is effective August 29, 2025. The incorporation by reference (IBR) of certain publications listed in the regulation is approved by the Director of the Federal Register as of August 29, 2025.

**ADDRESSES:** The Environmental Protection Agency (EPA) has established a docket for this rulemaking under Docket ID No. EPA–HQ–OAR–2003–0156. All documents in the docket are listed on the *https://www.regulations.gov/* website. Although listed, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *https://www.regulations.gov/*.

**FOR FURTHER INFORMATION CONTACT:** For questions about this final action, contact Felica Davis, Ph.D., Sector Policies and Programs Division (E143–05), Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, 109 T.W. Alexander Drive, P.O. Box 12055, Research Triangle Park, North Carolina, 27711; telephone number: (919) 541–4857; and email address: *davis.felica@epa.gov.*

**SUPPLEMENTARY INFORMATION:**
*Preamble acronyms and abbreviations.* Throughout this preamble the use of "we," "us," or "our" is intended to refer to the EPA. We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

ACI   air curtain incinerator
ANSI   American National Standards Institute
AOGA   Alaska Oil and Gas Association
ASME   American Society of Mechanical Engineers
AWC   alternative waste characterization
Cd   cadmium
CAA   Clean Air Act
CBI   Confidential Business Information
CDX   Central Data Exchange
CEDRI   Compliance and Emissions Data Reporting Interface
CEMS   continuous emissions monitoring systems
CFR   Code of Federal Regulations
CISWI   commercial and industrial solid waste incineration
CO   carbon monoxide
$CO_2$   carbon dioxide
CRA   Congressional Review Act
D.C.Circuit   United States Court of Appeals for the District of Columbia Circuit
DCOT   digital camera opacity technique
EG   emission guidelines
EPA   Environmental Protection Agency
ERT   Electronic Reporting Tool
FR   Federal Register
HCl   hydrochloric acid
Hg   mercury
HMIWI   hospital, medical, and infectious waste incineration
ICR   Information Collection Request
IWI   institutional waste incineration
MACT   maximum achievable control technology
MSW   municipal solid waste
MWC   municipal waste combustor
NESHAP   national emission standards for hazardous air pollutants
ng/dscm   nanograms per dry standard cubic meter
NO   nitric oxide
$NO_2$   nitrogen dioxide
$NO_X$   oxides of nitrogen
NSPS   New Source Performance Standards
NTTAA   National Technology Transfer and Advancement Act
$O_2$   oxygen
OSWI   other solid waste incineration
Pb   lead
PDF   portable document format
PM   particulate matter
ppm   parts per million
ppmvd   parts per million dry (volume basis)
PRA   Paperwork Reduction Act
RCRA   Resource Conservation and Recovery Act
RFA   Regulatory Flexibility Act
SMCD   substitute means of compliance demonstration

$SO_2$   sulfur dioxide
SRI   small remote incinerator
SSI   sewage sludge incinerator
SSM   startup, shutdown, and malfunction
TEQ   toxic equivalency factor
TMB   total mass basis
TPD   tons per day
tpy   tons per year
µg/dscm   micrograms per dry standard cubic meter
UMRA   Unfunded Mandates Reform Act
VCS   voluntary consensus standards
VSMWC   very small municipal waste combustion
XML   extensible markup language

*Organization of this document.* The information in this preamble is organized as follows:

I. General Information
  A. Does this action apply to me?
  B. How do I obtain a copy of this document and other related information?
  C. Judicial Review and Administrative Reconsideration
II. Background
  A. What is the statutory authority and regulatory history for this action?
  B. What changes did we propose for the OSWI source category in our August 31, 2020, proposal and subsequent notices?
  C. What outreach and engagement did we conduct?
III. Summary of Final Action
  A. What are the final rule amendments based on the CAA section 129(a)(5) review?
  B. What are the final rule changes involving the applicability of OSWI requirements?
  C. What are the final rule amendments addressing OSWI subcategories and related MACT floor redeterminations?
  D. What are the final rule amendments addressing other definitions for the OSWI category?
  E. What are the final rule amendments addressing emissions during periods of SSM?
  F. What are the final rule amendments addressing testing, monitoring, and reporting requirements?
  G. What are the effective and compliance dates of the standards?
IV. Public Comments and Responses
  A. What key comments did we receive on the applicability of OSWI requirements, and what are our responses?
  B. What key comments did we receive on the OSWI subcategories and related MACT floor redeterminations?
  C. What key comments did we receive on other amendments, and what are our responses?
  D. What key comments did we receive on effective and compliance dates?
V. Summary of Cost, Environmental, and Economic Impacts
  A. What are the affected facilities?
  B. What are the air quality impacts?
  C. What are the cost and economic impacts?
  D. What are the benefits?
VI. Statutory and Executive Order Reviews
  A. Executive Orders 12866: Regulatory Planning and Review and Executive

Order 13563: Improving Regulation and Regulatory Review
B. Executive Order 14192: Unleashing Prosperity Through Deregulation
C. Paperwork Reduction Act (PRA)
D. Regulatory Flexibility Act (RFA)
E. Unfunded Mandates Reform Act (UMRA)
F. Executive Order 13132: Federalism
G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51
K. Congressional Review Act (CRA)

## I. General Information

### A. Does this action apply to me?

Categories and entities potentially affected by this final action are those that operate OSWI units. OSWI units are not commercial and industrial solid waste incineration units (CISWI), hazardous waste combustors (HWC), hospital/medical/infectious waste incinerators (HMIWI), sewage sludge incinerators (SSI), or other incinerators regulated elsewhere under section 129 of the CAA. Although there is no specific North American Industry Classification System (NAICS) code for OSWI units, the units subject to the New Source Performance Standards (NSPS) and Emission Guidelines (EG) for OSWI, hereinafter referred to as "the OSWI standards," may be operated by the categories of sources listed in table 1 of this preamble:

TABLE 1—INDUSTRIAL SOURCE CATEGORIES AFFECTED BY THIS ACTION

| Source category | NAICS code [1] | Examples of potentially regulated entities |
|---|---|---|
| Any state, local, or tribal government using a very small municipal waste combustion (VSMWC) unit. | 562213, 92411 | Solid waste combustion units burning municipal solid waste (MSW). |
| Any correctional institutions using an institutional waste incineration (IWI) unit. | 922, 7213 | Correctional institutions. |
| Any nursing or residential care facilities using an OSWI unit. | 623 | Any nursing care, residential intellectual and developmental disability, residential mental health and substance abuse, or assisted living facilities. |
| Any Federal government agency using an OSWI unit ....... | 928, 7121 | Department of Defense (labs, military bases, munition facilities) and National Parks. |
| Any educational institution using an OSWI unit ................ | 6111, 6112, 6113 | Primary and secondary schools, universities, colleges, and community colleges. |
| Any church or convent using an OSWI unit ...................... | 8131 | Churches and convents. |
| Any civic or religious organization using an OSWI unit ..... | 8134 | Civic associations and fraternal associations. |
| Any industrial or commercial facility using a VSMWC unit | 114, 211, 212, 221, 486 | Oil and gas exploration operations; mining; pipeline operators; utility providers; fishing operations. |

[1] North American Industry Classification System.

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be regulated by this action. To determine whether your entity is regulated by this action, you should carefully examine the applicability criteria found in 40 Code of Federal Regulations (CFR) 60.2885, 60.2981, and 60.2991. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section of this preamble, your delegated authority, or your EPA Regional representative listed in 40 CFR 60.4 (General Provisions).

### B. How do I obtain a copy of this document and other related information?

The docket number for this final action regarding the OSWI EG and NSPS is Docket ID No. EPA–HQ–OAR–2003–0156. In addition to being available in the docket, an electronic copy of this final action will also be available on the internet. Following signature by the EPA Administrator, the EPA will post a copy of this final action at: *https:// www.epa.gov/stationary-sources-air-pollution/other-solid-waste-incinerators-oswi-new-source-performance.* Following publication in the **Federal Register** (FR), the EPA will post the FR version and key technical documents at this same website.

### C. Judicial Review and Administrative Reconsideration

Under Clean Air Act (CAA) section 307(b)(1), judicial review of this final action is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit (the D.C. Circuit) by August 29, 2025. Under CAA section 307(b)(2), the requirements established by this final rule may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce the requirements.

Section 307(d)(7)(B) of the CAA further provides that only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. This section also provides a mechanism for the EPA to reconsider the rule if the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within the period for public comment or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule. Any person seeking to make such a demonstration should submit a Petition for Reconsideration to the Office of the Administrator, U.S. EPA, Room 3000, WJC South Building, 1200 Pennsylvania Ave. NW, Washington, DC 20460, with a copy to both the person(s) listed in the preceding **FOR FURTHER INFORMATION CONTACT** section and the Associate General Counsel for the Air and Radiation Law Office, Office of General Counsel (Mail Code 2344A), U.S. EPA, 1200 Pennsylvania Ave. NW, Washington, DC 20460.

## II. Background

### A. What is the statutory authority and regulatory history for this action?

Section 129 of the CAA, entitled "Solid Waste Combustion," requires the EPA to develop and adopt NSPS and EG for solid waste incineration units, in accordance with CAA sections 129 and 111. Section 129(a) of the CAA requires the EPA to establish NSPS for new

sources, and CAA section 129(b) requires the EPA to establish procedures for states to submit plans for implementing EG for existing sources. The EPA initially proposed NSPS and EG for OSWI units on December 9, 2004 (69 FR 71472), and finalized them on December 16, 2005 (70 FR 74870), at 40 CFR part 60, subparts EEEE and FFFF. The 2005 OSWI standards applied to an incineration unit with a capacity of less than 35 TPD burning MSW (as defined in 40 CFR 60.2977 of subpart EEEE, and 40 CFR 60.3078 of subpart FFFF) or an incineration unit located at an institutional facility burning institutional waste (as defined in 40 CFR 60.2977 of subpart EEEE and 40 CFR 60.3078 of subpart FFFF) generated at that facility. The 2005 rule has yet to be fully implemented for existing sources because most states have not developed and submitted state plans for approval and EPA has not promulgated an implementing Federal plan. Following that final action, the Administrator received a petition for reconsideration of the OSWI standards, and on June 28, 2006, the EPA announced reconsideration of the final OSWI rules (71 FR 36726). After consideration of comments and information received through the reconsideration process, we concluded that no additional changes were necessary to the final OSWI rules (72 FR 2620, January 22, 2007).

In addition to the administrative reconsideration request, some entities petitioned for judicial review of the 2005 OSWI standards. The judicial review proceedings were initially stayed and, ultimately, the EPA requested a voluntary remand of the OSWI standards. By an order dated April 21, 2016, the D.C. Circuit granted the EPA's request for a remand. Order, *Sierra Club* v. *EPA*, No. 06–1066 (D.C. Cir. April 21, 2016). The remand was requested to allow the EPA to consider potential revisions, if any, to the OSWI standards that might be appropriate in light of certain legal developments, including 2007 and 2008 decisions from the D.C. Circuit.[1]

The OSWI NSPS establishes maximum achievable control technology (MACT) emission limits for new or modified OSWI units. For new sources, the CAA requires that MACT limits be no less stringent than the emissions control achieved in practice by the best-controlled similar unit. The OSWI EG establishes MACT emission

limits for existing OSWI units. For existing sources, the CAA requires that MACT limits be no less stringent than the average emissions limitation achieved by the best-performing 12 percent of units in a source category. The EPA must determine some measure of the average emissions limitation achieved by the best-performing 12 percent of units to form the floor regulatory option.

Under the 2005 OSWI standards, the term "OSWI unit" means either a very small municipal waste combustion (VSMWC) unit or an institutional waste incineration (IWI) unit. A VSMWC unit is any municipal waste combustion unit that has the capacity to combust less than 35 tons per day (TPD) of municipal solid waste (MSW) or refuse-derived fuel. An IWI unit is any combustion unit that combusts institutional waste and is a distinct operating unit of the institutional facility, such as a university or prison, that generated the waste.

As required by section 129 of the CAA, the OSWI NSPS and EG rules set emission standards for nine pollutants: cadmium (Cd), carbon monoxide (CO), dioxins/furans (D/F), hydrochloric acid (HCl), lead (Pb), mercury (Hg), oxides of nitrogen ($NO_X$), particulate matter (PM), and sulfur dioxide ($SO_2$). They also established opacity standards.

CAA section 129(a)(5) requires the EPA to review and, if appropriate, revise the requirements for solid waste incineration units no later than five years following the initial promulgation of any performance standards and at periodic five year intervals after that. However, in 2018, the D.C. Circuit found that the EPA had failed to undertake the periodic review of the OSWI standards and placed the EPA on a schedule to issue a proposed rulemaking and a final rulemaking.[2] The EPA published a proposed rule on August 31, 2020, for the OSWI NSPS and EG rules that addressed the requisite CAA section 129(a)(5) periodic review (85 FR 54178, hereafter referred to as the "2020 Proposed Rule"). The EPA subsequently published three actions to address issues raised in the 2020 Proposed Rule: (1) withdrawal of

certain provisions included in the 2020 Proposed Rule which proposed modifying the definition of "municipal waste combustion unit," by removing pyrolysis/combustion units from the definition (88 FR 36524, June 5, 2023, hereafter referred to as the "2023 Withdrawal"); (2) a final rule promulgating certain provisions for OSWI air curtain incinerators (ACI) to remove the title V permitting requirements for ACIs that only burn wood waste, clean lumber, yard waste, or a mixture of those, and are not located at title V major sources or subject to title V for other reasons (89 FR 27392, April 17, 2024, hereafter referred to as the "2024 ACI Rule"); and (3) a supplemental notice of proposed rulemaking (SNPRM) to add a definition for "rudimentary combustion device" (89 FR 60342, July 25, 2024, hereafter referred to as the "2024 SNPRM").

*B. What changes did we propose for the OSWI source category in our August 31, 2020, proposal and subsequent notices?*

The EPA published the 2020 Proposed Rule in the **Federal Register** to address the requisite CAA section 129(a)(5) periodic review (85 FR 54178). We proposed that no new developments in practices, processes, or control technologies existed for any OSWI units and that it was not necessary to revise the OSWI standards for new and existing units under CAA section 129(a)(5). In addition, we proposed some changes to the OSWI standards that were occasioned by the 2016 voluntary remand of the OSWI standards (and the legal developments related to that request for a remand). In accordance with the EPA's general authority under CAA section 129(a), we proposed: (1) revised subcategories and MACT standards that better reflect actual emissions test data from OSWI units and the population of OSWI; (2) changes to applicability provisions for the EG and NSPS including definitional changes; (3) revisions to regulatory provisions related to emissions during periods of startup, shutdown, and malfunction (SSM); (4) testing and monitoring flexibilities so that VSMWC or IWI units with capacities less than or equal to 10 TPD can demonstrate compliance with the rule; (5) provisions for electronic reporting of certain notices and reports; (6) revisions to recordkeeping and reporting provisions consistent with the revised testing and monitoring; (7) changes to title V permitting requirements for air curtain incinerators that burn less than 35 TPD and burn only only wood waste, clean lumber and yard waste; and (8) other technical edits, clarifications, and

---

[1] *Sierra Club* v. *EPA*, 479 F.3d 875 (D.C. Cir. 2007)); *NRDC* v. *EPA*, 489 F.3d 1250 (D.C. Cir. 2007); *Sierra Club* v. *EPA*, 551 F.3d 1019 (D.C. Cir. 2008).

[2] Order, *Sierra Club* v. *Wheeler*, no. 16–2461 (D.D.C. filed Sept. 14, 2018) (ordering the EPA publish a notice of proposed rulemaking by August 21, 2020, and promulgate a final rulemaking by May 31, 2021); Order *Sierra Club* v. *Wheeler*, no. 16–2461 (D.D.C. filed April 22, 2021) (extending the EPA's deadline for a final rulemaking to October 31, 2021); Order, *Sierra Club* v. *Wheeler*, no. 16–2461 (D.D.C. filed Oct. 14, 2021) (extending the EPA's deadline for a final rulemaking to March 1, 2024); Order, *Sierra Club* v. *Wheeler*, no. 16–2461 (D.D.C. filed Nov. 7, 2023) (extending the EPA's deadline to promulgated a final rulemaking to June 30, 2025).

revisions intended to improve the understanding of the rules and improve consistency with other CAA section 129 rules. For a more detailed discussion of these revisions, see section II.B of the proposal preamble (85 FR 54178; August 31, 2020).

In the 2020 Proposed Rule, the EPA proposed to change the applicability of the OSWI standards to remove the reference to pyrolysis/combustion units from the definition of "municipal waste combustion unit." At that time, we considered that the reference to a pyrolysis/combustion unit as a municipal waste combustor (MWC) should not apply to OSWI units because such units are used to combust uncontained gases and do not involve the combustion of solid waste as defined in the OSWI rule.

The EPA published an advanced notice of proposed rulemaking on September 8, 2021 (86 FR 50296), to gather more details on pyrolysis/combustion units, including how they are used, the inputs and products of the processes, and emissions from these processes. In response to significant adverse comment, the EPA subsequently withdrew the proposed revisions to the definition of "municipal waste combustion unit" (88 FR 36524, June 5, 2023). Accordingly, the EPA will not be taking additional action related to pyrolysis/combustion units in this action.

The EPA published the 2024 ACI Rule promulgating certain provisions related to the title V permitting requirements for OSWI air curtain incinerators (ACI) (89 FR 27392, April 17, 2024). Based on available data, ACIs that combust less than 35 TPD of wood waste, clean lumber, and yard waste are commonly located at facilities that would not otherwise require title V operating permits. Further, these types of ACIs are typically used temporarily at the locations for things like land clearing or storm cleanup. The EPA received overwhelming support from states and industry stakeholders to remove the title V permitting requirement for ACIs that only burn wood waste, clean lumber, yard waste, or a mixture of these wastes, and received no adverse comments on these revisions in the 2020 Proposed Rule. These changes were finalized, and a subsequent technical correction was published November 14, 2024 (89 FR 89928), to address inadvertent errors in the regulatory text in order to make the rule consistent with the description in the April 17, 2024, final rule preamble.

Following the EPA's analysis of comments received after the 2020 Proposed Rule, and discussions with the state of Alaska and Tribes, the EPA

published the 2024 SNPRM on July 25, 2024, which proposed to add a definition for "rudimentary combustion device" to address the unique issues associated with these units. The EPA proposed to define a rudimentary combustion device as a combustion device with a capacity less than or equal to 10 TPD that is designed and constructed without one or more of the following elements: (1) a stack, chimney, or pipe designed for the purpose of managing air flow and discharging flue gases from combustion; (2) mechanical draft to provide air flow; (3) burners designed to manage the combustion process; (4) an ancillary power supply to operate; or (5) supplemental fuel burners or nozzles. Because rudimentary combustion devices lack one or more of these elements, the EPA proposed the emissions information, limits, and controls developed for the 2020 Proposed Rule would not be appropriate for them. Most rudimentary combustion devices are not equipped with stacks from which to sample emissions during a performance test, and a stack or extension would be needed in order to perform the testing required by the OSWI standards. Many of these devices are located within Native American villages and other remote or difficult to access areas of the country with limited road access to haul waste to a larger community for burning or landfilling. As a result, local waste disposal is the only option available, and these communities face significant challenges and constraints in addressing this issue. Given the numerous challenges regarding these units, in the 2024 SNPRM the EPA proposed postponing development of standards for units that meet the definition of rudimentary combustion devices at this time.

*C. What outreach and engagement did we conduct?*

In developing this rule, the EPA conducted outreach activities with states, Tribes, and communities located near OSWI facilities. In addition to public comments received, we obtained feedback from interested parties and evaluated and considered the information received as we developed this action. In June 2020, the EPA conducted four pre-proposal informational calls for federally recognized Tribes, including an overview presentation during the June 25, 2020, National Tribal Air Association call. On August 31, 2020, the EPA sent an email notification to stakeholders announcing that the action had been published with a 45-day comment period and an opportunity to

request a public hearing. In September 2020, the EPA held six consultation meetings with Tribes including meetings with Northway Village, Qagan Tayagungin, Louden Tribe, and the Mescalaro Apache Tribe to give an overview of the OSWI proposal and provide instructions on how and when comments on the rule should be submitted to the docket (see Docket ID No. EPA–HQ–OAR–2003–0156). The EPA also conducted four informational calls on the OSWI rule in September 2020 including an overview at the Small Business Environmental Assistance Program (SBEAP) Annual Training, Alaska Air Workgroup call, Tribal Environmental Leaders Summit call, and an update at the National Tribal Air Association (NTAA) call. Although a public hearing was not requested, the EPA continued to seek out additional opportunities for interested parties to be informed about potential requirements of this action. This outreach has included a presentation to the Small Business Environmental Assistance Program on June 5, 2023; regular meetings with the state of Alaska to discuss the operation of incineration units; and a presentation on this action during the National Association of Clean Air Agencies (NACAA) Permitting and New Source Review Committee meeting. In March 2025, the EPA held several informational calls with AOGA and industry to discuss their comments submitted on the 2020 Proposed Rule.

## III. Summary of Final Action

This action provides the EPA's final determination pursuant to the requisite CAA section 129(a)(5) periodic review for the OSWI standards and requirements in the NSPS and EG rules (see section III.A of this preamble). This action also finalizes applicability-related and definitional changes, changes to OSWI subcategories, and related MACT floor redeterminations, as well as several changes from the 2020 Proposed Rule and changes from the 2024 SNPRM (see sections III.B through D of this preamble). In addition, we are finalizing changes to the SSM provisions (see section III.E of this preamble). Lastly, we are finalizing revisions to the testing, monitoring, recordkeeping, and reporting requirements; and miscellaneous other technical and editorial changes to the regulatory text (see sections III.F.1 through III.F.4 of this preamble). The effective and compliance dates for these actions are discussed in section III.G of this preamble.

*A. What are the final rule amendments based on the CAA section 129(a)(5) review?*

After considering the public comments received, we are finalizing our results of the CAA section 129(a)(5) periodic review for the OSWI standards as proposed (85 FR 54178). We have determined there are no developments in practices, processes, or control technologies that warrant revisions to the OSWI standards and requirements. Consistent with the 2020 Proposed Rule, we are not revising the OSWI standards and requirements for new or existing sources based on our review under CAA section 129(a)(5).

For a detailed discussion of our review pursuant to CAA section 129(a)(5), see section II.A of the preamble to the 2020 Proposed Rule. Comments on the CAA section 129(a)(5) review and our responses can be found in section IV of this preamble and in the document, Summary of Public Comments and Responses for the Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review, which is available in the docket (see Docket ID No. EPA–HQ–OAR–2003–0156) for this rulemaking.

*B. What are the final rule changes involving the applicability of OSWI requirements?*

Although not predicated on the CAA section 129(a)(5) review, in this rule, we are finalizing certain changes to the OSWI standards. The EPA proposed several changes involving the applicability requirements for OSWI in the 2020 Proposed Rule and the 2024 SNPRM. The EPA is finalizing proposed changes to the applicability of the OSWI standards following our consideration of comments received on the 2020 Proposed Rule, the 2024 SNPRM, and data provided by the Alaska Oil and Gas Association (AOGA) for small remote incinerators (SRIs) located in Alaska. As discussed below in this section, we are finalizing the proposed removal of the definition of the term "collected from" as used in the definition of "municipal solid waste"; the addition of a new definition for certain small units that were included in the 2024 SNPRM as "rudimentary combustion units"; and associated edits to the applicability requirements of 40 CFR 60.2885 and 40 CFR 60.2991.

In the 2020 Proposed Rule, the EPA proposed changes to the applicability of the OSWI standards. At that time, the EPA intended to resolve inconsistent definitions between OSWI and other

CAA section 129 rulemakings and to update aspects of the OSWI rule based on new data used to develop revised emission limits for OSWI units with capacity less than or equal to 10 TPD.

We are finalizing the proposed removal of the definition of the term "collected from" as used in the definition of "municipal solid waste" to place the focus on the source and type or nature of the waste. The term collected from (as defined in the OSWI rule) means the transfer of material from the site at which the material is generated to a separate site where the material is burned. We noted that the 2005 OSWI rule finalized a definition of "municipal solid waste" (refuse and refuse-derived fuel "collected from" the general public and from residential, commercial, institutional, and industrial sources) that was similar to the definition of "municipal waste" provided in CAA section 129(g)(5), but was interpreted for the purposes of VSMWC applicability under OSWI, to mean that the municipal waste must be "collected from" certain types of sites or from multiple sites. Specifically, the 2005 OSWI rule stated that "small incinerators" that are located at commercial businesses (such as stores, restaurants and apartments) or industrial sites are not VSMWC units because they do not burn waste which has been "collected from" a site that generated the waste and transferred to a separate site where the waste is burned (70 FR 74882). The 2020 Proposed Rule reevaluated this interpretation, noting that other existing CAA section 129 incinerator rules (such as the municipal waste combustor (MWC) rules) do not necessarily place the same emphasis on where the waste is collected.

By removing the definition of "collected from", such small incinerators located at commercial businesses or industrial sites would no longer be subject to this limitation and would qualify as VSMWC (provided these units burn more than 30-percent MSW) under OSWI. The CISWI NSPS and EG currently regulate small remote incinerators (SRIs) at commercial and industrial facilities that combust at least 30-percent MSW, but they would now qualify as VSMWC under OSWI in the final rule. These incinerators are primarily owned by oil and gas companies and burn municipal-type solid waste that is generated by the oil and gas workers and is not associated with oil and gas activities. The EPA's decision to regulate these SRI units located at commercial businesses under the OSWI standards is discussed further in sections III.C and IV.A of this preamble.

We are finalizing as proposed new subcategories and revised emission limits for new and existing OSWI units with capacities less than or equal to 10 TPD. In the 2020 Proposed Rule, the EPA proposed new emission standards for OSWI units with capacity less than or equal to 10 TPD, based on analysis of data collected during the development of the CISWI rules and data subsequently provided by AOGA for SRI units located in Alaska (see section III.C of this preamble for further discussion). In response to the 2020 Proposed Rule's new subcategories and emission standards for new and existing OSWI units with capacities less than or equal to 10 TPD, the EPA received numerous comments noting that it would be nearly impossible for most rural Alaskan communities to comply with the proposed requirements. Units in rural Alaskan communities are often very basic in design and function. Commenters stated that the proposed requirements are inapplicable or impractical for these types of small units (*e.g.,* burn boxes), which do not have stacks or other incinerator design elements, such as waste feed or flue gas systems, heat recovery, and bottom ash systems. Commenters stated that due to these limitations and other challenges, including the associated costs of compliance, rural communities operating these units would be unable to meet the proposed requirements and may be forced to return to less environmentally friendly waste disposal methods, such as open burning, barrel burning, or loose filling waste which could also attract wildlife that may present immediate health and safety risks. These comments are summarized in detail in the 2024 SNPRM (see section III, 89 FR 60345–60347).

Subsequent discussions with state and tribal agencies in Alaska demonstrated that most of these units have a capacity of less than or equal to 10 TPD, are rudimentary in design and function, and are generally located in remote areas. These units are not equipped with stacks with which to sample emissions during performance testing, likely cannot be physically modified to equip the unit with a stack, and may be difficult to access for testing due to their physical location.

Based on this new information, the EPA proposed a new definition for "rudimentary combustion devices" and associated edits to 40 CFR 60.2885 and 40 CFR 60.2991. Units that fall under the definition of rudimentary combustion devices are not considered VSMWC or IWI, and so are not required to comply with the emission standards for VSMWC or IWI (see section III.D of

this preamble for further discussion). As noted in the 2024 SNPRM, the EPA does not consider the emissions information, limits, and controls developed for the proposed OSWI rule to be appropriate for these devices, which lack one or more of these elements, and is therefore not setting standards for rudimentary combustion devices in this rulemaking. Further, these rules do not usurp existing local or state regulations that apply to these units, which will continue to apply as they currently do.

Comments on the proposed changes to applicability, including comments received on the 2024 SNPRM, and our responses can be found in section IV.A of this preamble and in the document, *Summary of Public Comments and Responses for the Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review,* which is available in the docket (see Docket ID No. EPA–HQ–OAR–2003–0156) for this rulemaking.

*C. What are the final rule amendments addressing OSWI subcategories and related MACT floor redeterminations?*

The EPA is finalizing, as proposed, the revisions to the OSWI subcategories for both new and existing units and associated MACT floor recalculations included in the 2020 Proposed Rule. For the 2005 OSWI standards, the EPA lacked emissions data from OSWI units, and the emission limits were based on information for similar sources in the HMIWI unit source category, as discussed in the preamble to the proposed rule (85 FR 54183). During the

development of the 2020 Proposed Rule, the EPA collected additional information on two new OSWI units (constructed after the current OSWI standards were issued) with capacities greater than 10 TPD and emissions information for certain existing small remote incineration units located in Alaska that historically have been regarded as SRIs under CISWI, but which we proposed to treat as OSWI VSMWC units.

The EPA proposed to reconsider the dividing line between the OSWI and CISWI standards and to treat these existing units as VSMWC based on data submitted by AOGA showing that most of these units burn more than 30 percent municipal type solid waste generated by staff/personnel at commercial or industrial facilities (discussed in section III.B of this preamble). Because the data indicated that SRI units combust more than 30 percent MSW, even though they are located at commercial or industrial facilities and currently subject to CISWI, we proposed that they would be subject to the OSWI rule. As discussed in the 2020 Proposed Rule, this approach is more consistent with the EPA's other CAA section 129 MWC rules and the CAA definition of ''municipal waste'' in CAA section 129(g)(5), which defines the term ''municipal waste'' to mean refuse ''collected from the general public and from residential, commercial, institutional, and industrial sources consisting of paper, wood, yard wastes, food wastes, plastics, leather, rubber and other combustible materials and non-combustible materials such as metal, glass and rock.'' We did not read

this definition as necessitating that, to constitute MSW, that the waste must be transferred from one site and burned at another site. Additionally, the information gathered for the two new OSWI units (VSMWC with capacities greater than 10 TPD located in Arizona and Texas) indicated that these units are continuously fed rotary combustors that use add-on pollution controls to comply with the OSWI standards.

For incineration units, differences in size typically reflect differences in operation and equipment complexity. Units with capacities less than or equal to 10 TPD typically feed waste to the unit in batches and some units may not even be equipped with stacks. Units larger than 10 TPD typically feed waste to the unit continuously or semi-continuously and also typically have stacks or flues that can be routed to air pollution control devices. Based on the differences in size, design, and operation of the SRI units and the two new OSWI units, the EPA proposed to subcategorize IWI and VSMWC units under OSWI based on size. These subcategories included VSMWC units with a capacity to combust less than or equal to 10 TPD of MSW or refuse-derived fuel; IWI units with a capacity to combust less than or equal to 10 TPD of institutional waste; VSMWC units with a capacity to combust greater than 10 TPD but less than 35 TPD of MSW or refuse-derived fuel; and IWI units with a capacity to combust greater than 10 TPD of institutional waste. The proposed and final subcategories for VSMWC and IWI units are summarized in table 2 of this preamble.

TABLE 2—OSWI CATEGORIES AND NEW SUBCATEGORIES

| 2005 Final rule | | 2020 Proposed rule | | 2025 Final rule | |
|---|---|---|---|---|---|
| Subcategory | Capacity | Subcategory | Capacity | Subcategory | Capacity |
| VSMWC ..................... | <35 TPD ................... | Small VSMWC .......... | ≤10 TPD .................... | VSMWC with capacity ≤10 TPD. | ≤10 TPD. |
| IWI ............................. | No capacity threshold | Large VSMWC .......... | >10 but <35 TPD ...... | VSMWC with capacity >10 TPD. | >10 but <35 TPD. |
| | | Small IWI .................. | ≤10 TPD .................... | IWI with capacity ≤10 TPD. | ≤10 TPD. |
| | | Large IWI .................. | >10 TPD .................... | IWI with capacity >10 TPD. | >10 TPD. |

The EPA subsequently proposed revised MACT floor emission limits for existing and new VSMWC and IWI units with capacities less than or equal to 10 TPD based on the updated inventory, emissions, and waste data provided by AOGA. We did not propose any revisions to the MACT floor emission limits for existing and new ''large'' OSWI units (greater than 10 TPD).

Section II.B. of the preamble to the 2020 Proposed Rule provides additional information on the EPA's rationale for the proposed revisions to subcategorize OSWI units and the proposed emission limits.

Following review of the comments received on the 2020 Proposed Rule, we are finalizing the proposed subcategories and related MACT floor

recalculations for new and existing VSMWC and IWI units with capacities less than or equal to 10 TPD based on the data gathered during the 2020 Proposed Rule, which includes data collected for SRI units previously regulated under CISWI, and which better reflects the actual emissions test data from similar units. The final subcategories for OSWI units remain

appropriate based on the differences in the size, design, and operation of the units with capacity less than or equal to 10 TPD and the two new OSWI units, that have capacities greater than 10 TPD. In addition, consistent with the proposal, we are not finalizing any changes to the 2005 OSWI emission limits for VSMWC and IWI units with capacities greater than 10 TPD (new and existing). Also, we conclude, as proposed, that revised beyond-the-floor limits are not appropriate for the OSWI subcategories (see section II.B.1 of the proposal preamble (85 FR 54178).

We have developed revised emission limits for existing OSWI units with capacities less than or equal to 10 TPD using the average emission limitation of the best performing 12 percent of such sources and also considering variability in emissions, consistent with CAA section 129(a)(2). The revised standards better reflect actual emissions test data from OSWI units and are more representative of and better reflect the emissions achievable for new and existing units in each category required under CAA section 129(a)(2) and (4).

To calculate the MACT floor emission limits for these existing OSWI sources, we considered the available test run data provided in response to a 2010 information collection request (ICR) and test data from 2014 submitted in June 2017 by AOGA in their attempt to address concerns that they had with the 2010 ICR data pertaining to the emissions test data representativeness and waste variability. In the MACT floor analysis, we used the run data from the 2010 and 2014 emission tests to calculate the 99th percentile upper limits (UL) statistical interval for the best 12 percent of such incineration units for each pollutant to address the range of operating conditions of the incinerator. The UL is a common statistical interval used to address

variability and was the same statistical interval used to calculate the CISWI SRI emission limits (76 FR 15723, March 21, 2011). We also applied a waste variability factor to account for variability in emissions expected to result from the varying waste profiles of OSWI units.

We are also finalizing revised MACT floors for new OSWI units with capacities less than or equal to 10 TPD. Section 129(a)(2) of the CAA requires that MACT for new sources be no less stringent than the emissions control achieved in practice by the best controlled similar unit. Therefore, the approach for new sources was similar to that used with the existing sources (*i.e.,* UL with a waste variability factor applied for the pollutants influenced by waste composition), except the top performing unit's data were used to calculate the MACT floor emission limit instead of the average of the best performing 12 percent of units and a 95 percentile UL was used instead of a 99 percentile UL.

We also examined whether it was appropriate to adopt more stringent "beyond-the-floor" regulatory options to determine MACT. Unlike the floor minimum stringency requirements, the EPA must consider various impacts of the more stringent regulatory options in determining whether MACT standards are to reflect "beyond-the-floor" requirements, including considering the costs, non-air quality health and environmental impacts, and energy requirements of such more stringent control. OSWI units with capacities less than or equal to 10 TPD often are of very basic, rudimentary design and function. Requiring additional controls on these units is infeasible or simply would be cost prohibitive. For OSWI units with capacities greater than 10 TPD, the 2005 final rule already incorporated beyond-the-floor requirements. We do not have

sufficient information for OSWI units with capacities greater than 10 TPD that would enable us to revise the beyond the floor limits. However, based on the information we have from the 2005 rule, requiring any further controls would likely only provide minimal emissions reductions with substantial cost investments. Considering these factors, we concluded that revised beyond-the-floor limits are unreasonable for the OSWI subcategories.

The final emission limits, including the new limits for VSMWC and IWI units with capacities less than or equal to 10 TPD and the unchanged limits for units with capacities greater than 10 TPD, are summarized in table 3 of this preamble. The limits for the VSMWC and IWI with capacities less than or equal to 10 TPD are less stringent than the corresponding limits for VSMWC and IWI with capacities greater than 10 TPD. However, the VSMWC and IWI with capacities less than or equal to 10 TPD operate intermittently (average 2,620 hours or 109 days per year) with a relatively low stack gas flow rate (average 686 dry standard cubic feet per minute at 7 percent oxygen), and so the actual emissions of pollutants are relatively low for these units.[3] For example, the EPA estimates that a representative VSMWC with capacity greater than 10 TPD may emit between 0.006 and 0.01 tons of Cd per year while meeting its limit of 18 µg/dscm,[4] while the highest-emitting VSMWC with capacity less than or equal to 10 TPD emitting at the level of the standard (2,000 µg/dscm) would only emit 0.007 tons of Cd per year.[5]

---

[3] See Docket Item No. EPA–HQ–OAR–2003–0156–0143.

[4] See Docket Item No. EPA–HQ–OAR–2003–0156–0011.

[5] See Docket Item No. EPA–HQ–OAR–2003–0156–0143.

TABLE 3—FINAL EMISSION LIMITS FOR OSWI UNITS

| Pollutant | Concentration units | Existing VSMWC and IWI units[1] | | New VSMWC and IWI units[1] | |
|---|---|---|---|---|---|
| | | ≤10 TPD | >10 TPD[2] | ≤10 TPD | >10 TPD[2] |
| Cd | µg/dscm | 2,000 | 18 | 400 | 18 |
| HCl | ppmvd | 500 | 15 | 210 | 15 |
| Pb | µg/dscm | 32,000 | 226 | 26,000 | 226 |
| Hg | µg/dscm | 69 | 74 | 12 | 74 |
| SO₂ | ppmvd | 130 | 3.1 | 38 | 3.1 |
| NOₓ | ppmvd | 210 | 103 | 180 | 103 |
| PM | mg/dscm | 280 | 30 | 210 | 30 |
| DF (TMB)[2] | ng/dscm | 4,700 | 33 | 3,100 | 33 |
| DF (TEQ)[3] | ng/dscm | 86 | (4) | 40 | (4) |
| CO | ppmvd | 220 | 40 | 69 | 40 |

[1] Limits are based on TPD capacity.
[2] Limit remains unchanged from 2005 OSWI Rule. For PM, the 2005 OSWI standard was converted from grains per dscf to mg/dscm.
[2] TMB = Total mass basis.
[3] TEQ = Toxic equivalency basis.
[4] DF TEQ basis was not calculated for the 2005 rule.

Comments on the proposed revisions to the MACT floor recalculations and OSWI subcategories and our responses can be found in section IV.B of this preamble. Additional information on the development of the emission limits may be found in section II.B. of the preamble to the 2020 Proposed Rule and in the memorandum, *Emission Limit Calculations for Existing and New Sources for the Final Other Solid Waste Incinerator (OSWI) Rulemaking,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action.

*D. What are the final rule amendments addressing other definitions for the OSWI category?*

In addition to the proposed changes to applicability-related definitions described in section III.B of this preamble, the EPA included in its 2020 Proposed Rule definitions for "waste profile" and "small OSWI unit." As discussed in section III.C of this preamble, the EPA is finalizing the proposed subcategories and related MACT floor recalculations for new and existing VSMWC and IWI units with capacities less than or equal to 10 TPD. Accordingly, the EPA is finalizing separate flexibilities to the testing, monitoring, recordkeeping, and reporting requirements for OSWI units with capacities less than or equal to 10 TPD that require waste characterization and waste profile data (see section III.F.1 of this preamble). For these reasons, we are finalizing the proposed revision to add a definition for "waste profile" as related to compliance with the VSMWC and IWI with capacity of less than or equal to 10 TPD standards. The EPA proposed to define waste profile to mean the amount of each waste category burned as a percentage of

total waste burned on a mass basis. We are not finalizing the proposed definition for "small OSWI unit," but are retaining text for VSMWC and IWI units with capacities less than or equal to 10 TPD in keeping with the final subcategories and MACT floor redeterminations discussed in section III.C of this preamble.

Following consideration of the comments received and discussions with state and Tribal authority to gather additional data on the types of units referenced, the EPA proposed in the 2024 SNPRM to define a rudimentary combustion device separately from VSMWC or IWI because rudimentary combustion devices lack key features of commercially available incineration units and the emissions information, limits, and controls developed for the OSWI rule are not appropriate for them. The EPA proposed to define a rudimentary combustion device as a combustion device with a capacity less than or equal to 10 TPD that is designed and constructed without one or more of the following elements: (1) a stack, chimney, or pipe designed for the purpose of managing air flow and discharging flue gases from combustion; (2) mechanical draft to provide air flow; (3) burners designed to manage the combustion process; (4) an ancillary power supply to operate; or (5) supplemental fuel burners or nozzles. The EPA solicited additional comments and data to refine the definition of "rudimentary combustion device" and to better understand the number of devices and individuals using these devices in rural communities. Following review of the comments received on the 2024 SNPRM, we are finalizing revisions to the applicability requirements at 40 CFR 60.2885 and 40 CFR 60.2991 and adding a definition of

"rudimentary combustion device", with minor revisions from the 2024 SNPRM proposal. For the reasons described in section IV.A of this preamble, we are clarifying the proposed requirements and finalizing the definition of "rudimentary combustion device" as a combustion device with a capacity less than or equal to 10 TPD that is designed and constructed without one or more of the following elements: (1) a stack, chimney, or pipe designed for the purpose of discharging flue gases from combustion; (2) mechanical draft to provide air flow; (3) burners designed to initiate, and/or assist the combustion process, including burners designed to burn supplementary fuel; or (4) an ancillary power supply to operate. Additional information on this proposed revision can be found in section III of the preamble to the 2024 SNPRM.[6]

*E. What are the final rule amendments addressing emissions during periods of SSM?*

Currently, the OSWI standards do not apply during SSM periods (see 40 CFR 60.2918, 60.3025). The EPA proposed to eliminate this limitation or qualification on the applicability of the OSWI standards. The EPA proposed this change in light of the 2016 remand and certain legal developments, including a decision by the D.C. Circuit that invalidated certain regulations related to SSM in the 40 CFR part 63 General Provisions (*Sierra Club* v. *EPA,* 551 F.3d 1019 (2008)). We are finalizing the proposed amendments to the OSWI standards from the 2020 Proposed Rule to remove and revise provisions related to SSM.

<hr/>

[6] 89 FR 63045–47 (July 25, 2024).

For the reasons explained in the 2020 Proposed Rule (see section II.B.3 of the proposal preamble at 85 FR 54178), we determined that OSWI units can meet the applicable standards at all times, including during periods of startup and shutdown. In establishing the standards in this rule, the EPA has taken into account startup and shutdown periods and, for the reasons explained below, has not established alternate standards for those periods. As explained in the 2020 Proposed Rule, we have determined that during startup most OSWI units burn natural gas or clean distillate oil, and waste is not added until the unit has reached suitable combustion temperatures; and during shutdown periods, emissions are generally significantly lower than emissions during normal operations because the materials in the incinerator will be almost fully combusted before shutdown occurs.

Periods of startup, normal operations, and shutdown are all predictable and routine aspects of a source's operations. Malfunctions, in contrast, are neither predictable nor routine. Instead, they are, by definition, sudden, infrequent, and not reasonably preventable failures of emissions control, process, or monitoring equipment. (40 CFR 63.2) (definition of malfunction). The EPA interprets CAA section 112 as not requiring emissions that occur during periods of malfunction to be factored into development of CAA section 112 standards. This reading has been upheld by the court in *U.S. Sugar Corp.* v. *EPA*, 830 F.3d 579, 606–610 (D.C. Cir. 2016). The court's reasoning in *U.S. Sugar* applies equally to CAA section 129 standards given the similarities between the CAA section 112 and 129 standard setting criteria. Therefore, we are removing 40 CFR 60.2918 and 40 CFR 60.3025, which provided exemptions for SSM.

We are also finalizing, as proposed, other changes to the SSM standards in light of the EPA's experience with the CAA section 129 solid waste incinerator rules. These changes include harmonizing revisions to other rule provisions that reference SSM, such as: revising the definition of "Deviation" to remove language for periods of SSM; clarifying that the 12-hour rolling average values must include periods of continuous emissions monitoring systems (CEMS) data during startup and shutdown by adding a definition of "CEMS data during startup and shutdown" in 40 CFR 60.2977 and 40 CFR 60.3078; revising the equations used to calculate the 12-hour rolling average for CO; and updating requirements related to SSM for

recordkeeping and reporting in 40 CFR 60.2949, 60.2957, 60.2958, 60.3046, 60.3052, and 60.3053. These changes are further described in section III.F.2 of this preamble. We did not receive comments on the proposed removal and revisions of provisions related to SSM.

*F. What are the final rule amendments addressing testing, monitoring and reporting requirements?*

1. Initial and Continuous Compliance Demonstration

Consistent with the proposal, we are finalizing the substitute means of compliance demonstration (SMCD) for VSMWC and IWI units with capacities less than or equal to 10 TPD. We have considered the cost of testing, and we recognize that testing and monitoring requirements can impose substantial financial burdens and technical challenges on owners and operators of these sources. The SMCD provides an alternative to the general testing and monitoring requirements for VSMWC and IWI units with capacities less than or equal to 10 TPD. VSMWC and IWI units with capacities greater than 10 TPD must continue to demonstrate compliance by individual stack testing.

However, stack testing is unfeasible for some VSMWC and IWI units with capacities less than or equal to 10 TPD. As we stated in the proposal and confirmed by information we gathered between the proposal and this final action, we believe that many of these units are located in remote areas, such as SRIs located on oil and natural gas platforms on Alaska's North Slope in the Beaufort Sea and other areas that are similarly isolated which represent 29 of the 31 OSWI units that are not rudimentary combustion devices, surrounded by water or wetlands, or that have limited infrastructure or are difficult to access. Getting testing crews to those incinerators would be extremely challenging and costly. Other units could be considered readily accessible, but they are not equipped with stacks adequate to allow emissions sampling for performance tests. Such units would need to be modified to be able to conduct compliance testing. However, costs and logistics would prevent these types of incinerators from making the necessary changes. In still other cases, it simply may not be physically possible to modify an existing incinerator stack to allow compliance testing.

Therefore, we are finalizing, as proposed, an option for using a "representative" initial compliance demonstration. Owners and operators of VSMWC or IWI units with capacities

less than or equal to 10 TPD who have not previously submitted testing meeting the requirements of the final standards would have to submit detailed information about their units, including: the make, model, and manufacturer of the unit; the type and capacity of the unit; the unit's air pollution control devices (if any); the type and quantity of waste incinerated; and the charge rate. They would then identify a representative performance test in the EPA's WebFIRE database.

A representative performance test must be conducted on an OSWI unit that has similar throughput, methods of processing and burning waste, operating temperatures, types of wastes or supplemental fuels burned, and waste profile as the OSWI unit using the SMCD. A representative performance test must be conducted consistent with the requirements of the OSWI rule; demonstrate compliance with the OSWI standards; and include the following information in the report: unit design (including air pollution control devices), charge rate during the test, type of operation, combustion temperature during the test, types of waste burned during the test and the relative amount of each waste to the total waste burned (waste profile), type and amount of supplemental fuels used during the test, and, if the tested unit has an air pollution control device, the operating parameter data for the control device during the test. Not all tests in the WebFIRE database may qualify. If there is no representative performance test available in the WebFIRE database, the OSWI unit with capacity less than or equal to 10 TPD cannot use the SMCD and must instead conduct its own initial performance test.

To use this substitute option for demonstrating initial compliance, the owner/operator must submit the following information: a notice of intent to use the SMCD; waste profile information; and a representative performance test.[7] Each of these elements is discussed below.

a. Notice of Intent

We are finalizing provisions that offer VSMWC and IWI units with capacities less than or equal to 10 TPD two options for initial performance tests: conducting an individual initial performance test or using the SMCD described below. New VSMWC and IWI units with capacities less than or equal to 10 TPD that were constructed after August 31, 2020, or

---

[7] This information must be submitted through the EPA's Central Data Exchange (CDX) using the Compliance and Emissions Data Reporting Interface (CEDRI).

modified or reconstructed after December 29, 2025, must either complete initial performance tests within 60 days after reaching the charge rate at which they will operate, but no later than 180 days after initial startup,[8] or they must submit a notice of intent to use the SMCD by December 29, 2025, or within 60 days after initial startup, whichever of these dates is later. The notice of intent should include the manufacturer, make, model, and type of unit, and documentation showing that the capacity of the unit is less than or equal to 10 TPD. Owners and operators of existing VSMWC and IWI units with capacities less than or equal to 10 TPD (constructed on or before August 31, 2020, and not modified or reconstructed after December 29, 2025) are not required to submit a notice of intent to the EPA. However, they are required to either identify the results of an existing performance test in the EPA's WebFIRE database that is representative of their type of OSWI unit, if they intend to use the SMCD, or conduct an initial performance test; this must happen no later than 3 years after a state plan is approved or no later than July 1, 2030, whichever date is earlier.

b. Waste Profile Information

As we stated in the proposal, we recognize that the SMCD relies on the availability of the results of performance tests conducted on potentially representative sources in the EPA's WebFIRE database. Because we anticipate that owners and operators using the SMCD will need time to meet its conditions, we encourage them to submit their notices of intent to use the substitute means of compliance and collect data for waste characterization as soon as possible after this rule is promulgated. For this reason, beginning on December 29, 2025, and until the owner or operator identifies a representative performance test, but before March 30, 2027 or 60 days after the OSWI unit reaches the charge rate at which it will operate or 180 days after initial startup, whichever is later, each owner or operator of a new VSMWC and IWI unit with capacity less than or equal to 10 TPD planning to use the SMCD must collect data on a weekly basis to characterize the unit's operations and waste profiles, as further discussed in section III.F.1.c of this preamble. The waste profile information will record the unit's differing waste streams and

waste variability in order to develop a representative waste profile. The unit's profile can then be used to identify a representative performance test for the unit's SMCD.

c. Representative Testing

We are finalizing an SMCD alternative allowing owners and operators of VSMWC and IWI units with capacities less than or equal to 10 TPD to identify a representative performance test in the WebFIRE database and submit information about the representative performance test and documentation of how the performance test is representative for their unit (*e.g.,* based on the unit type and design, charge rate, operating temperatures, types of waste burned, and any air pollution control devices) to the Administrator through the EPA's Central Data Exchange (CDX) using the Compliance and Emissions Data Reporting Interface (CEDRI). Owners and operators must maintain a record of the representative performance test report (acquired from the EPA's WebFIRE database) and the submitted documentation of how the test is representative. The EPA encourages owners and operators to find similar sources by reviewing the notices of intent to use the SMCD and/or performance tests, available in the EPA's WebFIRE database. The EPA still anticipates that similar sources will coordinate to develop test protocols and find cost sharing opportunities by having representative sources conduct a performance test that can be used by all sources in that group.

If owners and operators of existing VSMWC and IWI units with capacities less than or equal to 10 TPD choose to use the SMCD, we are requiring them to submit SMCD information identifying the representative performance test through CDX using CEDRI beginning no later than March 30, 2027 or 60 days after the OSWI unit reaches the maximum charge rate at which it will operate, but no later than 180 days after initial startup, whichever date is later. This period will allow the owner or operator time for reviewing notices available on the EPA's WebFIRE database, finding and coordinating with similar sources, developing a testing protocol that will work for all sources within a group, conducting the performance tests, and electronically submitting the results of the test through CEDRI (see section III.E.3 of this preamble for a discussion of electronic reporting). The period will also allow time for the EPA to transfer these results to the EPA's WebFIRE database and for owners and operators to find a representative performance test and

submit information on how it is representative to the Administrator.

Given the time needed to identify and coordinate similar source groups or develop test protocols, and because the compliance date for new sources is earlier than the compliance date for existing sources and it is uncertain how many tests will be conducted, owners or operators of existing sources are encouraged to start collecting information that would be useful for identifying similar sources and submit this information as soon as possible. This will greatly increase the likelihood that a representative test will be available in the WebFIRE database prior the compliance deadline.[9] As noted in our proposal, owners and operators who do not provide their initial waste characterization data in a timely manner could miss the opportunity to avail themselves of this option due to the amount of planning, time, and resources required for similar sources to coordinate and perform performance tests. Owners and operators who cannot find a representative test conducted for a unit that is similar to their unit must conduct their own initial performance tests.

d. Continuous Compliance Demonstration

We are also finalizing, as proposed, an alternative waste characterization (AWC) option for demonstrating continuous compliance available to all VSMWC and IWI units with capacities less than or equal to 10 TPD that are subject to the OSWI rules. We are finalizing this AWC option in response to comments pointing out the difficulties of testing these units, which are generally located in areas that are remote and difficult to access.

In lieu of conducting annual performance tests, this alternative demonstration of continuous compliance will require recordkeeping. The recordkeeping requirements include recording the source-specific waste profiles and incinerator unit operating parameters, including the daily average charge rate and the 3-hour average combustion chamber temperature of the unit. As discussed in section IV.C of this preamble, in response to comments received, we have modified the final rule to require

---

[8] For units that startup between August 31, 2020, and December 29, 2025, the initial performance test must be conducted within 60 days after the OSWI unit reaches the charge rate at which it will operate, but no later than 180 days after its initial startup, or by February 25, 2026, whichever date is later.

[9] The distinction between a new and existing unit does not in itself preclude the use of a performance test. If a new unit is similar in design and operation to an existing unit, the new unit may use a performance test conducted by an existing unit and vice versa. However, if a performance test is conducted on an existing unit, it must, among other things, demonstrate initial compliance with the emissions limits for new units for a new unit to use it as a representative performance test.

that the facility use its records at the end of each calendar quarter to demonstrate that the waste combusted is consistent, within +/- 15 percent by weight, with the percentage established for the components of the waste stream according to the waste profiles established during the facility's initial performance test or established in the representative initial performance test for units using the SMCD.[10] The facility must report any deviations from the quarterly average waste profile requirements in its deviation report. Additionally, the records must demonstrate that the unit is operated within the charge rate and temperature ranges established during the initial performance test or the representative performance test.

As described in the proposal, we are finalizing a requirement that if the facility anticipates combusting a waste stream with a different profile, the owner/operator must conduct a performance test of the unit with a waste stream representative of the new waste profile, or alternatively, must identify a representative performance test report in the WebFIRE database and submit the information required by the SMCD, before combusting the modified waste stream.[11] Similarly, if the facility anticipates exceeding or operating outside of the established operating parameter ranges, the owner/operator must conduct a performance test of the unit while it is operating at the new parameter limits, or find a representative performance test with those operating parameter limits in the WebFIRE database and submit the information required by the SMCD, to confirm that the unit continues to meet the OSWI emission standards under the new operating parameter limits. Failure to comply with the retesting requirement is a deviation from the OSWI standards.

We are finalizing, as proposed in the 2020 Proposed Rule, revisions to monitoring to make the OSWI standards more consistent with the monitoring requirements in other CAA section 129 rules. For example, the only air

pollution control device for which the 2005 final OSWI standards provide operating requirements is wet scrubbers. We are finalizing revisions to 40 CFR 60.2916 and table 2 to subpart EEEE and 40 CFR 60.3023 and table 3 to subpart FFFF to include operating limits and operating parameter monitoring requirements for additional controls that may be employed for OSWI units, including dry scrubbers, electrostatic precipitators, and fabric filters. Additionally, we are finalizing a clarification to 40 CFR 60.2917 and 40 CFR 60.3024 that OSWI units that use an alternate method for air pollution control beyond a wet scrubber, dry scrubber, electrostatic precipitator, or fabric filter, including other methods such as material balance, may petition the EPA for specific operating parameter limits in these cases. The final requirements add flexibility for facilities by expanding the control options available. In addition, we are finalizing as proposed revisions to the requirements in 40 CFR 60.2916, 40 CFR 60.2928, 40 CFR 60.3023, and 40 CFR 60.3023 for owners and operators of OSWI units using control options to require that the minimum operating parameters (*e.g.,* combustion operating chamber temperature, pressure drop, liquid flow rate) established for initial compliance are calculated based on the lowest 1-hour average as measured during the most recent performance test (or representative performance test) demonstrating compliance. The current OSWI standards required that these parameters be calculated using the average as measured during the most recent performance test. Similarly, we are revising the continuous compliance requirements in 40 CFR 60.2932(c) and 40 CFR 60.3023(c) to specify the averaging times for continuous compliances for operating parameters for the extended control options (generally, 3-hour rolling averages).

Moreover, as we proposed, we are removing the requirement for CO and oxygen ($O_2$) CEMS for VSMWC and IWI units with capacities less than or equal to 10 TPD that use the AWC option in lieu of complying with the annual performance testing requirements. We are making this change for the same reasons that we are finalizing an alternative to the annual performance test. In addition to the cost of maintaining CEMS, calibrating a CEMS generally requires an annual stack test to verify the operation of the CEMS. Providing an alternative to conducting annual performance tests while continuing to require CEMS, which need annual stack tests, would not

achieve the stated goals and benefits of providing an alternative to annual performance tests for showing continuous compliance.

We are finalizing, as proposed, an option included in the 2020 Proposed Rule that allows OSWI units to use CO CEMS data in lieu of initial and annual testing for CO, provided the CEMS has been previously certified and is meeting the ongoing quality assurance/quality control requirements. Currently, facilities are required under 40 CFR 60.2927 and 40 CFR 60.3030 to conduct initial and annual performance testing to determine compliance with all emission limitations, including CO, and to also continuously monitor CO emissions using CEMS under 40 CFR 60.2939 and 40 CFR 60.3038. Facilities that opt to use CO CEMS data to demonstrate continuous compliance must use a 12-hour rolling average of the 1-hour arithmetic average CEMS data to determine compliance with the CO emission limitations. However, the initial performance evaluation (CEMS certification) must be completed prior to collecting CEMS data for the initial compliance demonstration. Under the final rule, such units could also use CO CEMS data in lieu of conducting an annual performance test for CO. This change provides flexibility for sources and reduces the cost burden associated with testing, while assuring compliance based on continuously measured emissions data.

As discussed in section IV.C of this preamble, for OSWI units that choose to conduct annual testing, we are revising the compliance timeline for the annual performance test in response to comments that weather and geographic constraints may prevent facilities from meeting the timeline on a 12-month basis. The final rule requires annual performance tests to be conducted within 14 months following the initial performance test and, subsequently, within 14 months from the prior years' tests.

For a more detailed discussion of these amendments addressing testing and monitoring requirements for VSMWC and IWI units see section II.B.4 of the proposal preamble (85 FR 54178). Section IV.C of this preamble provides a summary of the significant comments on the proposal and our responses to those comments. A full compilation of comments and responses can be found in the document, *Summary of Public Comments and Responses for the Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review,* which is available in the docket (see

---

[10] If, for example, the paper component of the waste stream during initial testing was 20 percent, then burning waste streams with a paper component between 5 and 35 percent of the total waste stream would be acceptable quarterly operation and, assuming all other requirements are met, additional testing would not be required for the source.

[11] To use a representative test, the owner or operator of a unit must show that the representative test is of a unit having a similar throughput, method of processing and burning waste, charge rate, operating temperatures, waste management plan, estimated waste variability, and waste profile as its unit.

Docket EPA–HQ–OAR–2003–0156) for this rulemaking.

2. Recordkeeping and Reporting

For units using the SMCD to demonstrate initial compliance, we are finalizing, as proposed, a requirement that owners and operators maintain the following records: the notice of intent to use the SMCD, along with documentation of the unit's design, operation, and capacity; initial waste characterization and operating data; and documentation of how the selected substitute test is representative of the unit.

We are also finalizing recordkeeping requirements to be used with the AWC option. Owners and operators must maintain records on: start and end times of the unit's operation; the amount or weight of each waste type (*e.g.,* pounds of solid waste, food waste, wood, or yard waste); the percentage of each type of waste burned; the 3-hour average temperature and charge rate; and operating records for units using air pollution controls such as a wet scrubber, dry scrubber, electrostatic precipitator, or fabric filters. Unit owners and operators must also keep records of periods when the waste profile does not meet the requirements as tested. As stated in the proposal, these recordkeeping requirements will help ensure that VSMWC and IWI units with capacities less than or equal to 10 TPD choosing the AWC option can demonstrate compliance with the emission and operating limits of the OSWI standards. The recordkeeping will also help to demonstrate that the percentage of waste components burned by VSMWC and IWI units with capacities less than or equal to 10 TPD is within +/− 15 percent of the percentages established for each waste category incinerated at a unit according to the profiles established during the initial performance test or representative performance test. We are also finalizing, as proposed, a reporting requirement that owners and operators include in annual reports a statement that there were no deviations from the waste characterization requirements and that the unit has been operated within the operating parameter limits. As we stated in the proposal, these recordkeeping and reporting requirements are intended to help ensure that there is adequate information available with which to determine compliance with the standards; to ascertain the severity of any failure to meet a standard; and to further assure compliance with the standards at all times.

Consistent with the proposal, we are also clarifying the timeline for owners and operators who choose the SMCD to submit their annual compliance reports. They must submit their annual compliance reports no later than 12 months after they submit the representative initial performance test and description of how the test is representative for the OSWI unit.

We are finalizing, as proposed, revisions to the recordkeeping and reporting requirements for deviations included in the 2020 Proposed Rule to clarify that a deviation includes any "failure to meet an applicable standard" and to clarify what information must be recorded and reported. These changes include the following:

• Revising the definition of "deviation" to remove language for periods of SSM, as discussed in section III.E of this preamble.

• Revising 40 CFR 60.2932(c) and 40 CFR 60.3033(c) to clarify the alarm time that constitutes a deviation from the operating limit for OSWI units with fabric filters and bag leak detection systems.

• Revising 40 CFR 60.2942(f) and 40 CFR 60.3041(f) to clarify that, for OSWI units using CEMS, failure to collect required data is a deviation from the monitoring requirements.

• Revising 40 CFR 60.2949 and 40 CFR 60.3046 to specify that facilities must retain a record identifying the calendar dates, times, and durations of malfunctions and a description of the failure and the corrective action taken.

• Revising 40 CFR 60.2956(e) and 40 CFR 60.3051(e) to clarify that for OSWI units with CEMS, the annual report must include a statement that there were no periods during which the CEMS were inoperative, inactive, malfunctioning, or out of control.

• Removing and reserving deviation reporting requirements (previously 40 CFR 60.2956(g); 40 CFR 60.3051(g)) previously included as part of the annual report to remove redundant reporting; these requirements are included in the deviation report submitted on a semiannual basis (40 CFR 60.2958; 40 CFR 60.3053).

• Modifying the annual reporting requirements in 40 CFR 60.2956 and 40 CFR 60.3051 to require facilities to provide a statement that there was no deviation identified from the waste characterization (*i.e.,* each quarter, the waste types burned are within 15 percent variation of the profiles established during the initial performance test) and the unit has been operated within the charge rate and temperature ranges established when no

deviations have occurred during the reporting period.

• For deviation reporting, revising the title of 40 CFR 60.2957 and 40 CFR 60.3052 to "What other reports must I submit if I have a deviation?" and reorganizing 40 CFR 60.2957(a) and 40 CFR 60.3052(a) to be consistent with the definition of "deviation" and to better reflect the types of deviations which must be reported.

• Modifying the requirements of 40 CFR 60.2958 and 40 CFR 60.3053 to clarify the contents of the deviation report, including identifying the calendar dates, times, and durations of any deviations and a description of any corrective actions taken, and adding new requirements to report deviations from the waste characterization and operating parameter limits established for VSMWC and IWI units with capacities less than or equal to 10 TPD.

As discussed in section IV.C.2 of this preamble, we are making one minor change to the proposed reporting requirements for qualified OSWI unit operators at 40 CFR 60.2956(j) and 40 CFR 60.3051(j) to clarify that facilities must report "the start date, start time, and duration in hours for each period of operation when all qualified OSWI unit operators were unavailable for more than 12 hours but less than 2 weeks". The proposed language referenced "each period when qualified OSWI unit operators were unavailable . . ." and unintentionally included periods of off-season, maintenance, or periods of shutdown. The final rule clarifies the text to "each period of operation" to exclude off-season, maintenance, and shutdown periods.

Lastly, we are finalizing, as proposed, additional changes to the recordkeeping and reporting requirements in 40 CFR 60.2949(b) and 40 CFR 60.2956(d) and (f) and 40 CFR 60.3046(b) and 40 CFR 60.3051(d) and (f) from the 2020 Proposed Rule that include consistency edits based on the revisions to allow for use of CO CEMS data in lieu of annual testing for CO (for OSWI units that have capacities greater than 10 TPD) (discussed in section III.F.1 of this preamble) and the revisions to the monitoring requirements to ensure consistency with other CAA section 129 rules such as CISWI (*e.g.,* adding operating parameters for controls other than a wet scrubber that may be employed for OSWI units and clarifying the frequency of the data recording or averaging for each required operating parameter, discussed in section III.F.1 of this preamble).

For a more detailed discussion of these amendments to recordkeeping and reporting requirements, see section

II.B.5 of the proposal preamble (85 FR 54178; August 31, 2020). Section IV.B.2 of this preamble provides a summary of key comments we received on these amendments and our responses.

3. Electronic Reporting

To increase the ease and efficiency of data submittal and data accessibility, we are finalizing, as proposed, a requirement that owners or operators of OSWI units submit required performance test reports, performance evaluation reports, deviation reports, and annual compliance reports through the EPA's Central Data Exchange (CDX) using the Compliance and Emissions Data Reporting Interface (CEDRI), as included in the 2020 Proposed Rule. The final rule requires that performance test results be submitted in the format generated through the use of the EPA's Electronic Reporting Tool (ERT) or an electronic file consistent with the extensible markup language (XML) schema on the ERT website.[12] Similarly, performance evaluation results of CEMS that include a relative accuracy test audit must be submitted in the format generated through the use of the ERT or an electronic file consistent with the XML schema on the ERT website.

For deviation reports and annual compliance reports, the final rule requires owners and operators to use the appropriate spreadsheet template to submit information to CEDRI, beginning June 30, 2026, or once the reporting forms have been made available in CEDRI for at least 1 year, whichever date is later. The final version of the template for these reports will be located on the CEDRI website.[13] If the reporting template specific to this subpart is not available in CEDRI at the time that the report is due, facilities must submit the report to the Administrator at the appropriate address listed in 40 CFR 60.4. Once the form has been available in CEDRI for at least 1 year, facilities must submit all subsequent reports via CEDRI. Furthermore, we are finalizing, as proposed, provisions that allow facility operators to seek extensions for submitting electronic reports for circumstances beyond the control of the facility, *i.e.,* for a possible outage in the CDX or CEDRI (see 40 CFR 60.2961(d) and 40 CFR 60.3056(d)) or, for a force majeure event, see 40 CFR 60.2961(e) and 40 CFR 60.3056(e) in the time just prior to a report's due date, as well as

provisions outlining the process to assert such a claim.

For a more detailed discussion of these final amendments, see section II.B.6 of the preamble to the 2020 Proposed Rule (85 FR 54178), as well as section III.B of this preamble on compliance with the Paperwork Reduction Act (PRA). For a more thorough discussion of electronic reporting, see the memorandum, *Electronic Reporting Requirements for New Source Performance Standards (NSPS) and National Emission Standards for Hazardous Air Pollutants (NESHAP) Rules,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this rulemaking.

4. Technical Edits, Clarifications, and Additional Revisions

We are finalizing several of the revisions that we proposed for technical corrections, harmonizing changes, clarifications, and improvements to the OSWI standards in the 2020 Proposed Rule, with the exception of certain proposed changes related to testing or compliance requirements for VSMWC and IWI units with capacities less than or equal to 10 TPD that we are finalizing with revisions (see sections III.F.1 and III.G of this preamble). These revisions include:

• Including operating limits and operating parameter monitoring requirements for additional controls that may be employed for OSWI units, including dry scrubbers, electrostatic precipitators, and fabric filters, and revisions to clarify that OSWI units that use an alternate method for air pollution control may petition the EPA for specific operating parameter limits.

• Revising the requirements for owners and operators of OSWI units using control options to require that the minimum operating parameters (*e.g.,* combustion operating chamber temperature, pressure drop, liquid flow rate, etc.) established for initial compliance are calculated based on the lowest 1-hr average as measured during the most recent performance test (or representative performance test) demonstrating compliance, and revising the continuous compliance requirements to specify the averaging times for continuous compliances for operating parameters for the extended control options (which is generally based on 3-hour rolling averages).

• Clarifying that for continuous monitoring, the 12-hour rolling average values must include CEMS data during startup and shutdown.

• Adding a requirement that the incinerator operator training course under 40 CFR 60.2905(c) and 40 CFR

60.3014(c) must include coverage of good combustion practices as well as waste characterization procedures, and related actions for prevention and correction of malfunctions.

• Adding a provision to 40 CFR 60.2911 and 40 CFR 60.3020 to clarify that batch units must always have a qualified operator accessible times during the operation of the unit.

• Updating 40 CFR 60.2890 and 40 CFR 60.2998 to clarify the principal components of the subparts include definitions and table.

• For existing units, adding new section 40 CFR 60.3003 to clarify that certain substitute means of compliance demonstration requirements must be completed prior to the compliance date.

• Modifying 40 CFR 60.2910 to 40 CFR 60.3019 to clarify that site-specific documentation must include procedures for establishing initial and continuous compliance.

• Updating requirements for initial and annual performance tests such that they must be conducted according to the methods and meet the revised emissions limitations specified in tables 1 through 1b to subpart EEEE and tables 2 and 2a to subpart FFFF, as applicable.

• Updating 40 CFR 60.2922(e), 40 CFR 60.2940(c), 40 CFR 60.3027(e), and 40 CFR 60.3039(c) to add references to ASME/ANSI PTC 19.10–198 Part 10 (2010), "Flue and Exhaust Gas Analyses" (previously approved as an alternative method to EPA Method 3B in the 2005 OSWI rule).

• Adding an additional test method, ASTM D7520–16, "Standard Test Method for Determining the Opacity of a Plume in the Outdoor Ambient Atmosphere," as an acceptable alternative to EPA Method 9 for opacity. This test method was identified as an acceptable alternative to EPA Method 9 when specific provisions are followed.

• Revising 40 CFR 60.2932(d) and 40 CFR 60.3033(d) to specify that VSMWC and IWI units with capacities less than or equal to 10 TPD using control devices must continuously monitor operating parameters and specifying the averaging values to demonstrate continuous compliance.

• Revising 40 CFR 60.2939 and 40 CFR 60.3038 (requirements for installation and calibration of CEMS) such that they apply only to OSWI units with a capacity greater than 10 TPD.

• Clarifying the installation and calibration requirements for operating parameter equipment in 40 CFR 60.2944 and 40 CFR 60.3043, including adding new requirements for bag leak detection systems.

• Revising 40 CFR 60.2949(b) and 40 CFR 60.3046(b) to incorporate

---

[12] *https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert.*

[13] *https://www.epa.gov/electronic-reporting-air-emissions/cedri.*

recordkeeping for data from OSWI units that use an alternate method for air pollution control beyond a wet scrubber, dry scrubber, electrostatic precipitator, fabric filter, or other method such as material balance.

• Clarifying that for CO CEMS, records of annual performance evaluations must be maintained (40 CFR 60.2949(g) and 40 CFR 60.3046(g)).

• Adding a recordkeeping requirement for notifications submitted for excluded units, such as temporary-use incinerators.

• Revising 40 CFR 60.2954 to clarify that a copy of the waste management plan must be submitted following the initial performance test, for consistency with 40 CFR 60.3049(c).

• Clarifying that for facilities with a title V permit, the permit may address the submittal timeline of the annual report (40 CFR 60.2955, 40 CFR 60.3050).

• Minor clarifications to the content of the annual reports and deviation reports, including what information must be submitted if a performance test is conducted during the annual period and what information may be excluded if the reports are submitted via CEDRI (40 CFR 60.2956, 40 CFR 60.3051).

• Other minor grammatical or technical edits (*e.g.*, corrections to typographical errors or cross-references within existing provisions, or to clarify existing provisions).

We are also including several additional minor clarifying edits in the final rule based on comments received during the public comment period, such as adjusting the testing requirements for seasonal weather issues. The comments and our responses can be found in section IV.B.1 of this preamble and in the *Summary of Public Comments and Responses for the Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review,* available in the docket for this rulemaking.

*G. What are the effective and compliance dates of the standards?*

In the 2020 Proposed Rule, we established that OSWI units with capacities less than or equal to 10 TPD that commenced construction after August 31, 2020 are new units and those that commenced construction prior to August 31, 2020 are considered existing incineration units. We are finalizing the effective and compliance dates for OSWI units to distinguish between new and existing OSWI units and to require any incinerator already subject to a current OSWI standard to continue to comply with that standard until the effective date of the revised OSWI standards. Table 4 of this preamble provides the applicable compliance dates for new and existing OSWI units.

The effective date of this final action is August 29, 2025. We are finalizing the compliance dates for the amended rule as proposed. The compliance dates depend on whether the OSWI unit is a VSMWC or IWI unit with capacity less than or equal to 10 TPD, or a VSMWC or IWI unit with a capacity greater than 10 TPD, and whether the OSWI unit is a new or existing unit.

However, we are revising the dates by which a source is considered a new source to be consistent with the construct of CAA sections 111 and 129. A new VSMWC or IWI unit is a unit that commenced construction after August 31, 2020, or commenced modification or reconstruction on or after December 29, 2025. Sources that commenced construction after December 9, 2004, or commenced reconstruction or modification on or after June 16, 2006, which are currently new sources under the 2005 OSWI rule, will become existing sources. However, these sources must continue to comply with the requirements of 40 CFR part 60, subpart EEEE, including the emission limits in table 1 to the subpart, until the unit is subject to 40 CFR part 60, subpart FFFF through an approved state plan or Federal plan. The 2005 OSWI rule emission limits for new and existing sources were identical, so the stringency of the limits and ability of the unit to comply with the limits is not changing for sources which were new sources under the 2005 OSWI rule and will becoming existing sources under the this final rule.

Similarly, as discussed in sections III.C and IV.A of this preamble, SRIs which are currently regulated under the CISWI rules will become subject to regulation under the OSWI rule in this final action. We believe that all or most of these units will be VSMWCs with capacities less than or equal to 10 TPD. If any SRIs meet the definition of a new unit, then these new units must demonstrate compliance with the final rule by no later than December 29, 2025, or by the date the unit first begins operation, whichever is later. If any SRIs do not meet the definition of a new unit, then these units must demonstrate compliance by July 1, 2030 or 3 years after the effective date of the state plan approval, whichever is earlier. However, SRIs that do not meet the definition of a new unit, and which are currently regulated under the CISWI rules must continue to demonstrate compliance with subpart CCCC or DDDD of this part, or subpart IIIa of part 62, until the unit becomes subject to the requirements of an approved state plan or federal plan that implements subpart FFFF of this part (Emission Guidelines and Compliance Times for Other Solid Waste Incineration Units).

TABLE 4—COMPLIANCE SCHEDULE FOR NEW AND EXISTING UNITS

| For. . . | Complete this action | By this date |
|---|---|---|
| New units as defined in 40 CFR 60.2886 | Initial Performance Test. | 60 days after unit reaches the charge rate at which it will operate, but no later than 180 days after its initial startup. |
| Existing units as defined in 40 CFR 60.2992. | Initial Performance Test. | No later than 180 days after final compliance date. |
| New units as defined in 40 CFR 60.2015. | Initial Performance Test. | 60 days after unit reaches the charge rate at which it will operate, but no later than 180 days after its initial startup. |
| Existing units as defined in 40 CFR 60.2550. | Initial Performance Test. | No later than 180 days after final compliance date. |
| New units subject to requirements in 40 CFR 60.2932(a). | Annual performance test. | No later than 14 calendar months following the initial performance test. |
| Existing units subject to requirements in 40 CFR 60.3033(a). | Annual performance test. | No later than 14 calendar months following the initial performance test. |

This action eliminates the SSM provisions at 40 CFR 60.2918 and 40 CFR 60.3025 and adds electronic reporting. Eliminating the SSM provisions will provide more data on emission limits and operating limits. As noted at proposal, the finalized electronic reporting provisions will reduce burden on regulated facilities, delegated air agencies, and the EPA. Accordingly, we are finalizing the removal of SSM provisions and the addition of electronic reporting for all OSWI units. As stated in section III.F.3 of this preamble, for deviation reports and annual compliance reports, the final rule requires owners and operators to use the appropriate spreadsheet template to submit information to CEDRI beginning June 30, 2026, or once the reporting forms have been made available in CEDRI for at least 1 year, whichever date is later. The final rule requires owners and operators to submit performance test reports and CEMS performance evaluation reports to CEDRI beginning on December 29, 2025.

1. OSWI Units With Capacities Less Than or Equal to 10 TPD

For VSMWC and IWI units with capacities less than or equal to 10 TPD, we are finalizing revised MACT standards and revised compliance, monitoring, and testing requirements. For new sources, CAA section 129(f)(1) requires that performance standards and other requirements shall be effective 6 months after the promulgation of the final rule. For these purposes, a new VSMWC or IWI unit with capacity less than or equal to 10 TPD is a unit that commenced construction after August 31, 2020, or commenced modification or reconstruction on or after December 29, 2025. We are finalizing, as proposed, that these new units must demonstrate compliance with the final rule by no later than December 29, 2025, or by the date the unit first begins operation, whichever is later.

For existing sources, CAA section 129(f)(2) provides that the performance standards and other requirements shall be effective not later than 3 years after the state plan is approved or July 1, 2030, whichever is earlier. For these purposes, an existing VSMWC or IWI unit with capacity less than or equal to 10 TPD is one for which construction commenced on or before August 31, 2020.

For existing VSMWC and IWI units with capacities less than or equal to 10 TPD, we are finalizing a compliance date of July 1, 2030, or 3 years after the effective date of the state plan approval, whichever is earlier.

OSWI units with a capacity less than 10 TPD that commenced construction after December 9, 2004, or commenced reconstruction or modification on or after June 16, 2006, and that are subject to the 2005 OSWI standard must continue to comply with the 2005 OSWI standard until the unit is subject to 40 CFR part 60, subpart FFFF through an approved state plan or Federal plan.

2. OSWI Units With Capacities Greater Than 10 TPD

Under the final rule, OSWI units with a capacity greater than 10 TPD continue, with limited changes, to be subject to the requirements of the OSWI standards that were promulgated in 2005—either the NSPS or a plan promulgated pursuant to the EG. With certain exceptions (discussed below), these sources will continue to follow the emission and operating limits, including compliance, monitoring, and testing provisions, associated with the 2005 OSWI standards. However, because the definition of a new source is being revised, the compliance dates are changing in the final rule. Emissions and operating limits apply to new OSWI units with a capacity greater than 10 TPD when they begin to operate, although there are some pre-construction requirements (see 40 CFR 60.2881). For existing OSWI units with a capacity greater than 10 TPD (that is, OSWI units that commenced construction on or before August 31, 2020, or commenced reconstruction or modification before December 29, 2025), CAA section 129(f)(2) provides that performance standards and other requirements shall be effective as expeditiously as practicable after approval of a state plan or promulgation of a Federal plan, but no later than 5 years after they are promulgated. Therefore, compliance for existing sources must be demonstrated by July 1, 2030, or 3 years after the effective date of the state plan approval, whichever is earlier. However, incineration units with a capacity greater than 10 TPD that commenced construction after December 9, 2004, or commenced reconstruction or modification on or after June 16, 2006, and that are subject to the 2005 OSWI standard must continue to comply with the 2005 standard until the unit is subject to 40 CFR part 60, subpart FFFF through an approved state plan or Federal plan.

IV. Public Comments and Responses

Additional comments and our specific responses can be found in the comment summary and response document titled *Summary of Public Comments and Responses for the Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review*, which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this rulemaking. Key comments and responses are discussed below.

*A. What key comments did we receive on the applicability of OSWI requirements, and what are our responses?*

*Comment:* The EPA received several comments on the proposed revisions to add a definition of "rudimentary combustion unit". One commenter did not support the proposed addition of a definition, expressing concerns that prematurely changing the definition puts the EPA on track to develop regulations without appropriate data. The commenter requested that EPA conduct an advanced notice of proposed rulemaking to ask for additional data and work with and provide resources to Tribes to collect this data.

Other commenters supported the proposed changes, but at least one commenter recommended that the definition be simplified to provide ease of compliance. One commenter stated that the definition should include a "non-exhaustive" list of what units meet the definition of a rudimentary combustion device, such as cyclonic burn barrels, 55-gallon burn barrels, and locally obtained or manufactured burn receptables such as dumpsters.

The commenter also provided input on the individual criteria that EPA proposed as part of the definition. Specifically, commenters noted that the wording "managing air flow and discharging flue gases from combustion" is confusing. The commenters stated that in any combustion device, a stack, chimney or pipe is used to remove the post-combustion flue gases or to direct the exhaust gas to the atmosphere, and that the air flow (combustion air) is handled, controlled, and metered at the burden. Commenters therefore recommended that the text "managing air flow" be removed.

Commenters also questioned the meaning of the criterion "burners designed to manage the combustion process". Commenters stated that EPA's intent is unclear and that if criterion is meant to include any devices that have burners or a specific type of burner (*e.g.,* burner with modulating or staging controls) then the language should be updated to "designed to initiate and/or maintain or assist the combustion process" or to more clearly explain the type of burner. Commenters also

questioned the meaning of "supplemental fuel burners or nozzles" as included in the proposed definition. Commenters stated that if the intent is to not include devices with a specific type of burner and "supplemental fuel burners or nozzles" or to exclude devices equipped with secondary combustion, this should be more plainly stated.

One commenter added that the proposed definition's inclusion of a capacity limit of "less than or equal to 10 TPD that is designed and constructed without one or more of the following elements" may inadvertently discourage businesses or villages from acquiring small modern packaged incinerators that are cleaner burning but that are equipped with all five elements. The commenter noted that rudimentary combustion devices will almost exclusively be hand-fed in portable (hand-carried) batches, and that 10 TPD of hand-held or delivered batches would be equivalent to 500 individual batches, daily.[14] The commenter stated that this amount exceeds the realistic expectations of the population statistics of the average village communities using such devices. The commenter suggested that the rationale of a specific number for capacity or throughput deserves additional consideration, especially in consideration of the recordkeeping requirements that would be required for compliance with weight throughput limitations (which would be excessive for remote areas and ineffective for most batch units). The commenter questioned what recordkeeping or reporting would be required to verify compliance, especially provided that these activities generally fall below permitting thresholds. The commenter suggested that the EPA may want to consider setting a volume limit threshold for these devices (*e.g.,* "smaller than a dump truck"), or consider adding the qualifier "uncompacted, loose" to the type of trash that may be burned in such devices. Another commenter requested that EPA consider the potential unintended consequences of any future regulation of such devices. Specifically, the commenter stated that the EPA must not force communities with few resources to purchase commercially available combustion devices.

Other commenters criticized the proposed definition as overly broad and

lacking in protective provisions, by not adequately narrowing the circumstances, locations, or devices that would be eligible. Commenters supported including restrictions to ensure that the use of such units is limited to those areas that truly have no better options, including very clear descriptions and specifics about the types of devices that are included in the definition of "rudimentary combustion device" and the criteria that must be met for a geographic area to qualify, so that only those with the logistical challenges described in the proposal will be eligible for the exemption. Other commenters expressed that the proposed rule did not define the circumstances or restrictions under which rudimentary combustion devices may be used and recommended that the EPA add a clarification to the definition to avoid use of the devices where access to municipal solid waste disposal is readily available or where installation of such devices could result in the circumvention of the OSWI standards. Commenters also objected to the proposed definition as it would apply in their jurisdiction, which prohibits open burning; the commenters warned the definition is confusing and could lead to an increase in air pollution.

Several commenters requested that the EPA provide more clarity on what geographic areas would be qualified to be exempt from the OSWI regulations. A commenter noted that Alaska is geographically diverse, with areas of limited or no road access, and that the EPA should clarify whether units in the following circumstances are exempt: (1) devices located in rural areas not accessible by the Federal Aid Highway System, including what distance from the road area is necessary for exemption; (2) devices transported and utilized by oil spill prevention and response teams in remote areas for response cleanup; (3) devices located in municipal areas at businesses or other commercial institutions that may have refuse service provided they are only used for on-site generated waste; and (4) devices located at industrial facilities along the Federal Aid Highway system that are days away from waste disposal facilities, including what distance from an organized landfill or from an improved road system qualifies for exemption. One commenter added the rule should ensure that use of a rudimentary combustion device would not be allowed when it conflicts with more stringent state or local rules and regulations. Other commenters generally opposed the broad applicability of the definition of rudimentary combustion

unit throughout the U.S., recommending that the EPA adjust the definition to pertain specifically to Alaska, and take time to develop standards for the rest of the country.

One commenter also requested that the EPA consider providing clear rules related to the use of rudimentary combustion devices during emergency remote spill responses. The commenter explained that the waste from such spills is effectively managed through incineration in small batch cyclonic burn barrels or other devices. The commenter requested that any rules on such usage be easy to interpret such that they do not require EPA agency interpretation or concurrence prior to use (including any limitations on the type of device that is a "rudimentary combustion device" or any limitations on geographic siting requirements). The commenter stated that if EPA concurrence remains necessary during an emergency spill, the authority should be granted to EPA Federal On-Scene Coordinators regardless of the disaster classification of the response.

*Response:* In the final rule, we are adopting a definition of "rudimentary combustion device" to be a combustion device with a capacity less than or equal to 10 TPD that is designed and constructed without one or more of the following elements: (1) a stack, chimney, or pipe designed for the purpose of discharging flue gases from combustion; (2) mechanical draft to provide air flow; (3) burners designed to initiate and/or assist the combustion process, including burners designed to burn supplementary fuel; or (4) an ancillary power supply to operate.

For the final rule, we have revised the applicability of the final OSWI standards as proposed in the 2024 SNPRM to address issues and concerns raised for small units that are rudimentary combustion devices. The EPA is finalizing its decision to add a definition for "rudimentary combustion device" to distinguish these types of primitive devices from those addressed in today's rule. The EPA agrees with commenters regarding certain clarifications to the criteria included in the proposed definition, specifically, removal of text related to the use of a stack for "managing air flow" and the clarification of text describing the type of burners included in the criterion. The EPA is removing the phrase "managing air flow" to reduce confusion regarding the stack function. We are also clarifying the criterion regarding burners to manage the combustion process. We are adopting language similar to what commenters suggested to indicate that we mean burners that

---

[14] Per 40 CFR 60.2977 (Subpart EEEE) and 40 CFR 60.3078 (Subpart FFFF), a batch OSWI unit means an OSWI unit that is designed such that neither waste charging nor ash removal can occur during combustion, and a continuous OSWI unit means an OSWI unit that is designed to allow waste charging and ash removal during combustion.

initiate and/or assist with combustion. In light of this clarification, we have also lumped supplementary fuel burners in with other burners that manage the combustion process, as the purpose of supplementary fuel is to initate combustion or to aid in better combustion.

We disagree with commenters who requested a specific list of unit types that are considered rudimentary combustion devices, but rather, acknowledge that a number of combustion unit types may be considered "rudimentary" if they have a capacity of less than 10 TPD and were designed or constructed without one of more of the defined criterion. As described in the 2024 SNPRM, the EPA identified rudimentary combustion devices as primarily located within the state of Alaska, and consulted with state and Tribal agencies in the state of Alaska in assessing the types of combustion devices referenced. We determined that these rudimentary devices are often primitive in nature, most often not commercially constructed or engineered, and have capacities less than 10 TPD. Although we solicited comment on the matter, we did not receive any comments on the 2024 SNPRM that provided additional information or data on the typical capacity or volume thresholds for these units, and as such, are maintaining the proposed capacity threshold of 10 TPD; this threshold remains appropriate as we anticipate that all rudimentary combustion devices that fail to include the design elements included in the definition, by their nature and construction, would have capacities less than 10 TPD. We emphasize that the final rule does not set standards for these rudimentary combustion devices because they lack key features of commercially available incineration units and the emissions information, limits, and controls developed for the OSWI rule are not appropriate for them. The EPA is therefore not setting emission standards for these units in this rule.

Although we solicited comment on the location of units, number of units in rural communities, and emissions information from these units in the 2024 SNPRM, we did not receive any additional information in response to the 2024 SNPRM. The Agency intends to consider requirements for these units in a future effort and would seek additional information regarding these units and the impacts of any regulations at that time. Because we received no information in response to our 2024 SNPRM solicition, the EPA is also not setting requirements or restrictions

regarding the geographic location or circumstantial restrictions on the use of rudimentary combustion devices under the OSWI standards; the definition of rudimentary combustion device in the final OSWI rules applies to the entire United States. The final rules do not usurp existing local or state regulations that may apply to these units, which will continue to apply.

*Comment:* We received one comment contending that the proposal fails to set CAA section 129 standards for previously excluded units and therefore contravenes the CAA and violates the EPA's obligations under a consent decree and pursuant to the voluntary remand. The commenter stated that the proposed regulations expressly exempt or exclude a wide variety of other waste combustion units, including: (1) solid waste-burning cement kilns; (2) various waste-burning boilers and process heaters; (3) residential incinerators; (4) agricultural waste incinerators; (5) wood waste incinerators; (6) construction and demolition waste incinerators; (7) crematories; (8) contaminated soil treatment facilities; (9) rural IWIs; (10) incinerators and ACIs in isolated areas of Alaska; (11) incinerators located on remote islands; (12) temporary use incinerators used in disaster or emergency recovery efforts; (13) units that combust contraband or prohibited goods; (14) units burning national security documents; (15) co-fired combustors; (16) institutional boilers and process heaters; and (17) pathological waste incineration units. The commenter added that all of the categories identified combust solid waste and none of them fall within the narrow exemption of CAA section 129(g).

The commenter generally contends that, under CAA section 129, the EPA must set standards for all solid waste incineration units, without exception. The commenter further contends that, under CAA section 129, the OSWI rule must set standards for all "other" incinerators, that is, all incinerators not already subject to regulation under the EPA's MWC rules, medical waste incinerator rules, or CISWI rules.

The commenter refers to a "Partial Consent Decree" entered in *Sierra Club* v. *Jackson,* No. 01–1537 (PLF) (D.D.C.), under which the EPA was to propose, by November 30, 2004, a rule establishing standards for OSWI units and to promulgate, by November 30, 2005, a final rule establishing such standards. The commenter contends that the EPA's failure to set standards for various excluded types of combustion units violates its obligations under that Partial Consent Decree.

The commenter also asserts that the EPA sought and obtained, in 2016, a "voluntary remand" of the OSWI standards from the court (*Sierra Club* v. *EPA,* No. 06–1066 (D.C. Cir.)). The commenter states that the EPA sought the voluntary remand to bring the OSWI standards into compliance with certain decisions issued by the D.C. Circuit. The commenter contends that the EPA's failure to set standards for the excluded types of combustion units identified by the commenter (*i.e.,* solid waste-burning cement kilns; various waste-burning boilers and process heaters; residential incinerators; agricultural waste incinerators; pathological waste incineration units, etc.) violates its obligations pursuant to the voluntary remand.

The commenter further claims that the EPA's failure to set standards for currently unregulated incinerators fails to satisfy CAA section 129(a)(5). The commenter cited *Louisiana Environmental Action Network* v. *EPA,* 955 F.3d 1088 (D.C. Cir. 2020) (*LEAN*), and maintained that the EPA is required, in the course of a CAA section 129(a)(5) rulemaking, to bring its OSWI standards into compliance with the CAA and that the EPA's failure to set standards for all OSWI units, including the excluded incinerators, in the course of its CAA section 129(a)(5) rulemaking, violates that section.

The commenter further cited *NRDC* v. *EPA,* 489 F.3d 1250 (D.C. Cir. 2007), in which, the commenter said, the D.C. Circuit made clear that institutional waste incinerators that recover energy are combusting solid waste and must be regulated as incinerators under CAA section 129. The commenter added that the *NRDC* ruling holds that any unit that combusts waste is an incinerator, whether it recovers energy or not. The commenter stated that EPA sought and obtained a voluntary remand allegedly to address the aspects of its rule that are inconsistent with *NRDC.* The commenter added that EPA's failure to change its definition of institutional waste incinerator to include units that recover energy is flatly unlawful and displays contempt for the Clean Air Act and the courts and bad faith in implementation of the unopposed remand.

*Response:* As the commenter recognizes, we proposed the definition of "other solid waste incineration unit" on the 2004 proposal for the OSWI standards to cover very small municipal waste combustion units and institutional waste incineration units but proposed to exclude certain types of other units (see 69 FR 71472, December 9, 2004). In response to the 2004 proposal for the

OSWI standards, the EPA received comments concerning the proposal to exclude various units from the OSWI standards, and the EPA addressed comments on both covered and excluded units at that time (70 FR 74870, 74874–74881; December 16, 2005). The EPA was challenged on the 2005 OSWI rule (*Sierra Club* v. *EPA,* No. 06–1066, (D.C. Cir.)), which eventually led to the 2016 voluntary remand of the 2005 OSWI rule.

The EPA disagrees with the assertion that the EPA failed to satsify its obligations under the Partial Consent Decree entered in *Sierra Club* v. *Jackson,* No. 01–1537 (PLF) (D.D.C.). Under the Partial Consent Decree, the EPA was required to issue a final rulemaking establishing standards for OSWI units under CAA section 129(a)(1)(E) on or before November 30, 2005. The Partial Consent Decree contained no requirments regarding the content of the regulation. The EPA satisfied this obligation by signing the final rulemaking titled, "Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units" on November 30, 2005. 79 FR 74870.

The EPA disagrees that *NRDC* v. *EPA,* 489 F.3d 1250 (D.C. Cir. 2007), requires the EPA to set emissions standards for all OSWI units, "without exception." Rather, *NRDC* focused on whether the EPA could determine that certain facilities that were combusting solid waste could be regulated under CAA section 112, rather than CAA section 129. The *NRDC* decision held that the statutory definition of "solid waste incineration unit" is clear and unambiguous and does not permit the EPA to exclude commercial and industrial units combusting solid waste from regulation under CAA section 129. However, the *NRDC* decision does not address whether the EPA is required to establish emissions standards for *all* "other categories" of solid waste incineration units, as opposed to commercial or industrial incinerators, which are categories Congress clearly required to be regulated. EPA is continuing to assess the *NRDC* decision, which vacated the EPA's definition of "commercial or industrial solid waste incineration unit" because it excluded some units combusting solid waste for the purpose of energy recovery, but has not yet proposed to take action following remand on whether the language in section 129(a)(1)(E) requires requires regulation of "every [ ] possible type of incineration unit burning any type of solid waste." *See* 70 FR at 74875.

We further disagree with the commenter's contention that the EPA is required, in the course of a periodic review of the OSWI standards under CAA section 129(a)(5), to set standards for all solid waste incinerators that are not already regulated under the rules for municipal waste incinerators; hospital, medical or infectious waste incinerators; or commercial or industrial waste incinerators. The *LEAN* (955 F.3d 1088 (D.C. Cir. 2020)) decision considered standards set under CAA section 112(d)(6). CAA section 112(d)(6) applies to "emission standards promulgated under [section 112]." CAA section 129 applies to a specific category of sources: non-hazardous solid waste incinerators. In CAA section 129, Congress itself designated the source categories to be regulated. CAA section 112, on the other hand, delegates to the Administrator the authority to identify source categories to regulate and to set emission standards for them, CAA sections 112(c) through (d). By contrast, in CAA section 129, Congress specifies sources that the EPA must regulate:

- "[S]olid waste incineration units with capacity greater than 250 [TPD] combusting *municipal waste.*" (Italics added.)
- "[S]olid waste incineration units with capacity equal to or less than 250 [TPD] combusting *municipal waste* and units combusting *hospital waste, medical waste and infectious waste.*" (Italics added.)
- "[S]olid waste incineration units combusting *commercial or industrial waste.*" (Italics added.)

However, Congress left "the promulgation of standards under section 7411 of this title and this section applicable to other categories of solid waste incineration units" (CAA section 112(a)(1)(e)) up to the Administrator's discretion.

CAA section 112(d)(6), the section of the CAA considered in *LEAN,* requires a periodic review (every 8 years) of standards promulgated under CAA section 112. *LEAN* did not discuss nor make any decisions concerning the scope or nature of the EPA's periodic review under CAA section 129(a)(5). The discussion in *LEAN* focused on the precise language in CAA section 112(d)(6), which differs from the language of CAA section 129(a)(5). Specifically, CAA section 112(d)(6) requires that the EPA periodically "review, and revise as necessary" CAA section 112 emission standards. CAA section 129(a)(5) requires that the EPA "review, and in accordance with this section and section [111] of this title, revise" the CAA section 129 standards and requirements. The language within

CAA section 129(a)(5) does not otherwise cross-reference CAA section 112. Further, the "as necessary" language in CAA section 112(d)(6) (which is not found in CAA section 129(a)(5)) was key to the decision in *LEAN.* The decision notes, for example, that the "only question" was "whether the EPA lawfully may complete a section 112(d)(6) review and 'revise' an existing underinclusive emission standard 'as necessary' without supplying the missing controls." 955 F.3d at 1096.

The commenter claims that the language of CAA section 129(a)(5) is "closely analogous" to CAA section 112(d)(6), and therefore imposes the same obligation the *LEAN* court found. The EPA disagrees. The two key features of the statutory language the *LEAN* court pointed to in CAA section 112(d) are not at issue here. The court first noted that the "standards" referred to in CAA section 112(d)(6) must include limits for each HAP the category emits, and an "emission standard" under that provision "includes as many limits as needed to control all the emitted air toxics of a particular source category." *LEAN* at 1097. In contrast, CAA section 129 requires the EPA to establish emissions standards only for certain, specified pollutants. Even if "emission standard" as used in CAA section 129(a)(5) refers to all limits, the EPA has established those limits for the specified CAA section 129 pollutants.

The commenter also claims that the EPA's failure to propose, here, to eliminate the various excluded units in 40 CFR 60.2887 and 40 CFR 60.2993 and as identified by the commenter (*i.e.,* solid waste-burning cement kilns; various waste-burning boilers and process heaters; residential incinerators; agricultural waste incinerators; pathological waste incineration units, etc.) from the OSWI standards and expand the applicability or coverage of the standards fails to satisfy the terms of the voluntary remand granted by the D.C. Circuit in 2016. The EPA sought and obtained a voluntary remand of the 2005 OSWI rule "to allow the EPA to consider what potential revisions, if any to the final rule may be appropriate in light of relevant decisions including *Sierra Club* v. *EPA,* 479 F.3d 875 (D.C. Cir. 2007), *NRDC* v. *EPA,* 489 F.3d 1250 (D.C. Cir. 2007), and *Sierra Club* v. *EPA,* 551 F.3d 1019 (D.C. Cir. 2008)." [15] As explained in the 2020 proposal and above, this final action addresses certain issues involved in the 2016 voluntary remand of the OSWI standards

[15] Motion for Voluntary Remand, *Sierra Club* v. *EPA,* no. 06–1066 (D.C. Cir. filed Jan. 29, 2016).

including changes to the SSM provisions and revised subcategories and MACT standards that better reflect actual emissions test data from OSWI units and the population of OSWI. The EPA is continuing to evaluate other aspects of the remand not addressed in this final action.

For the final rule, we have revised the applicability of the final OSWI standards to address issues and concerns raised for units that are rudimentary combustion devices. As discussed in section III.B and above in this section IV.A of this preamble, the EPA is finalizing adding a definition for "rudimentary combustion device" to address certain combustion devices that lack key elements typical of incineration units. Because the EPA believes that rudimentary combustion units lack key elements of other OSWI incineration units, the emissions information, limits, and controls developed for the OSWI rule are not appropriate for them. Any limits that the EPA may set for rudimentary combustion units in the future would be based on information and data that are appropriate for those units.

*Comment:* One commenter requested that the EPA clarify the applicability of the CISWI standards and the OSWI standards, asserting that as proposed, the same units that meet the definition of a "small OSWI unit" in the OSWI standards also meet the definition of a "commercial and industrial solid waste incineration unit" under the CISWI standard. The commenters stated that this potential confusion is not entirely eliminated by 40 CFR 60.2020(j) and 60.2555(j) of the CISWI rules that state that units subject to 40 CFR part 60, subparts EEEE or FFFF are exempt from the CISWI standards or by 40 CFR 60.2887(d) and 60.2993(d) in the OSWI rules that state units subject to 40 CFR part 60, subparts CCCC and DDDD are exempt from the OSWI standards. The commenter specifically urged the inclusion of a new paragraph in 40 CFR 60.2887 and 40 CFR 60.2993 of the OSWI rules that states: "Incinerators in Alaska that meet the definition of small OSWI unit under subparts EEEE and FFFF of this part are not subject to subparts CCCC or DDDD."

*Response:* We agree with commenters that clarification regarding the applicability of CISWI to certain units located in the State of Alaska that are now subject to OSWI is warranted. However, the commenter's proposed language to add an exclusion for units subject to 40 CFR part 60, subparts EEEE and FFFF from CISWI is inappropriate for OSWI. Instead, we are finalizing revisions to the CISWI NSPS and EG

that clarify the applicability of the standards to small remote incinerators that may now be subject to the OSWI standards, specifically the standards for VSMWC. In 2024, the EPA finalized development of a Federal plan implementing the CISWI standards in states that do not have an approved state plan (89 FR 100092, December 11, 2024). The final rule included revisions to exclude small remote incinerators in the state of Alaska from the Federal plan, which reflected prohibitions on the implementation of CISWI standards to units in the State of Alaska that were implemented by Congress.[16] To address the concerns raised by commenters and to align the CISWI NSPS and EG with the CISWI Federal plan, we are finalizing a similar amendment to the CISWI NSPS and EG requirements at 40 CFR 60.2020 and 40 CFR 60.2555 to clarify that small remote incineration units located in the State of Alaska are not subject to the CISWI standards as specified in the Consolidated Appropriations Act of 2024, H.R. 4366, section 432. However, because existing units would not be subject to the control requirements in the OSWI standards until they become subject to a state plan or Federal plan that implements 40 CFR part 60, subpart FFFF, we have included language within the exclusion to clarify that such units remain subject to 40 CFR part 60, subparts CCCC or DDDD until the unit becomes subject to a state plan or Federal plan that implements 40 CFR part 60, subpart FFFF. The changes are consistent with final revisions to 40 CFR 60.2886(a)(5) and 40 CFR 60.2992(a)(3) to clarify the applicability dates for OSWI units, as discussed in section IV.D of this preamble.

## B. What key comments did we receive on the OSWI subcategories and related MACT floor redeterminations?

*Comment:* One commenter contended that EPA has no authority to create subcategories for Section 129 standards, and therefore, cannot create subcategories in OSWI for units with capacities greater than 10 TPD and units with capacities less than 10 TPD. The commenter asserted that while Section 112 allows EPA to "distinguish among classes, types, and sizes of sources

within a category or subcategory in establishing such standards," Section 129 does not have similar language. The commenter added that Section 129 shows that Congress considered which subcategories of incinerator it wanted, and that Congress created them itself. The commenter stated that by creating additional subcategories, EPA not only exceeds its statutory authority but defies Congress's plainly expressed intent that the only subcategories of incinerator would be those Congress expressly enumerated in Section 129(a)(1). The commenter added that EPA's failure to identify any statutory authority for its subcategories or to explain why it believes it has such authority is unreasonable and arbitrary.

*Response:* CAA section 129(a)(2) states that "The Administrator may distinguish among classes, types (including mass-burn, refuse-derived fuel, modular and other types of units), and sizes of units within a category in establishing such standards." We interpret this language as allowing us to develop subcategories for source categories being regulated. Further, the EPA has cited this statutory authority for other CAA section 129 subparts. The 1999 proposed CISWI rules clearly state "Categories may be divided into subcategories when differences (such as design, fuel, or waste type, etc.) between given types of units lead to corresponding differences in the technical feasibility of applying emission control techniques" (64 FR 67097, November 30, 1999) and the 1995 HMIWI standards state, "Section 129 states that the Administrator may distinguish among classes, types, and sizes of units within a category in establishing the standards and guidelines. In other words, EPA may subcategorize the MWI source category in establishing standards and guidelines" (65 FR 10669–70, February 27, 1995). Therefore, we are establishing subcategories for OSWI (IWI and VSMWC) as proposed based on size—including units that have capacities greater than 10 TPD and units that have capacities less than or equal to 10 TPD. Our decision to finalize subcategories for IWI and VSMWC OSWI is further discussed in section III.C and this section of this preamble.

*Comment:* One commenter contended that the EPA does not have sufficient data on smaller units of less than or equal to 10 TPD to establish emission limits and other requirements. Consequently, the commenters stated that it is likely that requirements for larger units will be unnecessarily placed on smaller units. Another commenter explained that comparisons of emission

---

[16] As specified in the Consolidated Appropriations Act of 2024, H.R. 4366, section 432, the EPA is precluded from "expending funds to implement or enforce certain EPA regulations for commercial and industrial solid waste incineration units with respect to units in the state of Alaska that are defined as small remote incinerator until a subsequent regulation is issued." Consolidated Appropriations Act, 2024. Public Law 118–42 (2024, March 8). *https://www.congress.gov/bill/118th-congress/house-bill/4366/text.* See also 89 FR 100097, December 11, 2024.

limits shown in the proposed rule to the emissions from the smaller units under than 3 TPD are well below the emissions for larger incinerators for a number of pollutants. The commenter specifically compared the particulate matter and cadmium emissions limits for new small OSWI units to the emission limits for SRIs under table 8 of the CISWI rule, noting that the emissions limits for new small OSWI units for these pollutants are below the corresponding CISWI limits, and other limits for these units, including hydrogen chloride and NO$_X$, are very close to the SRI limits in the CISWI rule. Commenters added that the proposed rule subjects incinerators with capacity less than 3 ton per day to the same requirements even if the emission profiles do not seem to justify the requirements to perform enhanced control measures (such as wet scrubbers and baghouses). These commenters included additional concerns related to the requirements to install pollution controls such as wet scrubbers for SRIs in Alaska, which they countered would only burden small operations and small businesses. The commenters requested that EPA exempt small Alaska incinerators with an operational capacity of less than or equal to 3 TPD from the final rules. One commenter suggested that EPA create a third subcategory of units that have capacities less than or equal to 3 TPD and these units should be excluded if they incinerate greater than 30 percent MSW and are not regulated under the CISWI rule. Another commenter stated that if EPA is going to regulate units with capacities less than or equal to 3 TPD, it must collect additional information from the small incinerator manufacturers and establish MACT floor emission limits that are achievable.

Other commenters supported the regulation of small remote incineration units under the OSWI standard, acknowledging that the emission limits for small OSWI units developed in the 2020 Proposed Rule were developed specifically based on test data from the Alaskan SRI units, and in many cases, these units are unable to comply with the emission limits for existing units under CISWI. These commenters generally supported the creation of a subcategory for smaller OSWI units but requested additional modifications and clarifications to the subcategory. One commenter requested that EPA reconsider defining the subcategory for small OSWI units based on the "capacity" of units less than 10 tons of solid waste per day. The commenter pointed to the prior subcategory for SRI

units promulgated under CISWI, which is for incineration units "that combust 3 tons or less of solid waste per day". The commenter stated that it is unlikely that any SRI (as included in the proposed emission limits) has the physical capacity to burn 10 TPD, or that even any facility operating an SRI has the capacity to generate 10 TPD of waste for incineration. The commenter pointed to at least one SRI unit located at the ConocoPhillips Kuparuk facility that has a manufacturer-listed capacity of over 10 TPD, however, the commenter asserted that it does not reflect the actual or practical capacity to combust solid waste because the manufacturer-listed capacity includes the weight of the incinerated material, the weight of the fuel used for combustion, the weight of air combusted, and the weight of any moisture in the unit. The commenter added that, in that case, the manufacturer-listed "capacity" is not strictly limited to the capacity to incinerate solid waste and is greater than its capacity for waste. The commenter added that it is "pragmatically impossible" for the Kuparak unit to combust 10 tons of solid waste per day, and that this capacity could not be reached even if the incinerator usage was maximized to two consecutive 12-hour shifts; the commenter provided that on average, the unit burns about 1.25 TPD and has never exceeded 3 TPD despite the manufacturer's listed capacity. The commenter requested that EPA clarify that the 10 ton per day capacity language used to differentiate the small OSWI subcategory reflects a practical or operational "capacity" to incinerate waste and not a manufacturer listed capacity that may reflect non-waste fuel, air, and moisture. The commenter asked EPA to change the size threshold to reflect the amount of solid waste the unit combusts. The commenter added that defining the subcategory on the amount of solid waste combusted, as was done in the CISWI rule, is a better approach.

*Response:* Regarding the comments that EPA should set the capacity for small OSWI units considering the capacity of SRI units currently regulated under CISWI, we disagree. As we described in the proposal, the EPA has sufficient data from several small remote incinerators from testing conducted in both 2010 and 2014 to calculate emission limits using the same statistical intervals used to calculate the CISWI SRI emission limits (see 85 FR

54185).[17] We collected test data from 29 units of this size and proposed calculated emissions limits at the level of the MACT floor which we have determined are representative for VSMWC and IWI units with capacities less than or equal to 10 TPD in the OSWI source category.[18] The emission limits applicable to these units already consider their size, since they are based on test data and design information gathered from units of similar size. For these reasons, we disagree with the request that the EPA categorically exempt or create a separate subcategory for small Alaska incinerators with an operational capacity of less than or equal to 3 TPD under the OSWI rules.

Regarding the comment asking that the EPA clarify that the 10 ton per day "capacity" language reflects a practical or operational "capacity" to incinerate solid waste, not a manufacturer listed capacity, we generally disagree with the comment and believe the rules are clear as written. When determining a unit's capacity in the context of the OSWI rules, the owner or operator must use the "design capacity" of the unit calculated using the equations in the regulations. (See 40 CFR 60.2975) The "capacity" of continuous and batch [19] VSMWC units is defined in the rules— this contrasts with emissions-based thresholds *e.g.,* for prevention of significant deterioration (PSD) applicability which considers enforceable physical or operational constraints. While the OSWI rules sometimes refer to the "maximum design waste burning capacity" (see, *e.g.,* 40 CFR 60.2953 and table 4), this phrase is also intended to describe the design "capacity" of OSWI units, with respect to the maximum design amount of municipal solid waste or refused-derived fuel that may be charged (not including air or moisture content or non-waste fuels). We believe the design capacity is the most appropriate basis for subcategorization under OSWI. Any other basis, such as operational load,

[17] See Docket Item No. EPA–HQ–OAR–2003–0156–0138 and the memorandum entitled *Small Remote Incinerator (SRI) Emissions Data From CISWI* in the docket for this action for more discussion on data collected from small remote incinerators.

[18] For more information about emission limit calculations, see *Emission Limit Calculations for Existing and New Sources for the Final Other Solid Waste Incinerator (OSWI) Rulemaking,* available in the docket for this action (Docket ID No. EPA–HQ–OAR–2003–0156).

[19] Per 40 CFR 60.2977 (Subpart EEEE) and 40 CFR 60.3078 (Subpart FFFF), a batch OSWI unit means an OSWI unit that is designed such that neither waste charging nor ash removal can occur during combustion, and a continuous OSWI unit means an OSWI unit that is designed to allow waste charging and ash removal during combustion.

**27930** Federal Register / Vol. 90, No. 123 / Monday, June 30, 2025 / Rules and Regulations

would likely be variable depending on operating conditions and could therefore result in confusion about which standards are applicable to the unit at which time. For this reason, the commenter's suggestion that the subcategories be based on practical capacity to incinerate waste is not feasible. Using design capacity, *e.g.,* is consistent with the requirements in 40 CFR, part 60, subpart AAAA, 40 CFR 60.1460(d) and (e), which cover small municipal waste combustion units. We recognize that in two situations, for exempting small municipal waste combustion units that combust less than 11 TPD and for certain co-fired combustors with a fuel limitation, 40 CFR part 60, subpart AAAA allows federally enforceable permitting limits. We created the OSWI subcategories for VSMWC and IWI units with capacities less than or equal to 10 TPD due to differences in operation (*e.g.,* batch versus continuous/semi-continuous feed), equipment complexity and whether emissions that are routed to a stack or flue could be routed to air pollution control devices for these units. Additional discussion on the final subcategories are in section III.C. of this preamble and in the preamble to the proposed rule (85 FR 54183). An OSWI unit with a capacity greater than 10 TPD may not comply with emission limits and compliance requirements for units with capacities less than or equal to 10 TPD, and consequently, the final rule does not provide for consideration of operational restrictions on the "capacity" of OSWI units to avoid compliance requirements designed for such units. As such, commenters are also incorrect that the rule subjects OSWI units with capacities less than or equal to 10 TPD to the same requirements for enhanced control measures (*i.e.,* wet scrubbers and baghouses) to meet emissions limits as those required for large units. In our analysis of the MACT floor for VSMWC and IWI units with capacities less than or equal to 10 TPD, we used data obtained from operating units with capacities less than or equal to 10 TPD and have assumed that additional units in these subcategories, should they exist, would be similar in design, uncontrolled, and burn similar MSW-type waste as those units reflected in the SRI dataset. Based on the data, we believe that any VSMWC and IWI units with capacities less than or equal to 10 TPD would not require additional controls to meet the proposed standards that are being finalized. We add that for the final rule we have also revised the applicability of the final OSWI

standards to address issues and concerns raised for certain units with capacities less than or equal to 10 TPD that may be considered rudimentary combustion devices, as explained in sections III.B and IV.A of this preamble.

*Comment:* A commenter stated that EPA's decision to subcategorize OSWI units greatly weakens the standards for the newly created small OSWI subcategory, contravenes CAA section 129's floor provisions, and is arbitrary. The commenter stated that some of or all these units—certainly the best performing ones, those with the lowest emissions—have already been meeting the EPA's existing standards consistently for years. The commenter added that the average emission level achieved by these units therefore cannot possibly be worse than the existing CISWI standards. The commenter concluded that the floors cannot be worse than the existing standards.

*Response:* We explained in the preamble to the proposed rule that the prior floors were not based on OSWI units but on HMIWI units (85 FR 54183) and the SRI emissions test data used to calculate the emission limits for the VSMWC and IWI units with capacities less than or equal to 10 TPD subcategories are more representative of and better reflect the emissions achievable for new and existing units in each category required under CAA sections 129(a)(2) and (4). The standards are based on the level of the MACT floor calculated using the SRI emission data but are not identical to the CISWI standards because updated data and procedures were used in the OSWI calculation.[20] While the EPA does not update MACT floors to be less stringent than existing limits for the same subcategory based on the 5-year review process, the emission limits for the VSMWC and IWI with capacities less than or equal to 10 TPD represent newly established subcategories. It is not appropriate to compare the stringency of standards between rules or subcategories. This means that neither the current CISWI standards nor the OSWI standards for units with capacities greater than 10 TPD are appropriate points of comparison for the new MACT floors.

---

[20] For more information on the SRI data, see Document ID No. EPA–HQ–OAR–2003–0156–0138. For more information about the MACT floor calculation, see the memorandum *Emission Limit Calculations for Existing and New Sources for the Final Other Solid Waste Incinerator (OSWI) Rulemaking* available in the docket for this action (Docket ID No. EPA–HQ–OAR–2003–0156).

*C. What key comments did we receive on other amendments, and what are our responses?*

1. Testing and Compliance

*Comment:* We received one comment related to the proposed 12-month deadline for annual compliance tests. The commenters stated the proposed 12-month deadline at 40 CFR 60.2933 and 40 CFR 60.3034 creates potential compliance problems over time for SRI operators in Alaska. The commenters explained that testing on SRI units is more difficult than on typical units, and the window for testing SRI units is constrained by weather and may be impracticable during the long North Slope winter season. The commenters stated the proposed 12-month window creates issues of compliance date "creep" when operators seeking to submit data reasonably in advance of the EPA deadlines (*e.g.,* one week early to ensure timely delivery), inadvertently and progressively push the testing deadline earlier and earlier into the calendar year, potentially into problematic testing periods for SRI units. The commenters requested that the EPA set the annual compliance testing deadline at 14 months, to allow operators flexibility to keep testing in optimal weather windows over time. The commenters added that this is consistent with the EPA practice for other rules and referenced 40 CFR 60.4415(a).

*Response:* We agree with the commenters' assertions that, for some OSWI units, seasonal weather issues may not allow testing within exact 12-month intervals. To address this concern, the final rule requires that annual performance tests be conducted no later than 14 months following the initial performance test and subsequent annual performance tests must be conducted within 14 months following the previous performance test.

*Comment:* We received two comments supporting the proposed alternative means to demonstrate compliance for VSMWC and IWI units with capacities less than or equal to 10 TPD, but the commenters contested that the proposed parameters (plus or minus 15 percent and on a weekly basis) are too narrowly constrained. The commenters explained that MSW mass generated by camp operations has the potential to being highly variable by the nature of its span of contents including paper, wood, yard wastes, food wastes, plastics, leather, rubber, and other combustible materials. The commenters stated that managing mass may be technically difficult for batch incinerators, as finite chamber volume limits mass manipulation. The

commenters further stated that managing mass also could be affected by short-duration projects that could cause food waste and other combustible materials to flux at sites using continuous, intermittent, or batch incinerators or where the incinerator is operated infrequently (*e.g.*, an incinerator operated only bi-weekly). The commenters provided two examples of occasions when the weight ratio of incinerated waste can be temporarily skewed. One example the commenters provided is during facility ''turnaround'' periods when all meals are eaten on disposable trays that have a very low weight-to-volume ratio, which can temporarily skew the weight ratio of incineration units. The commenters explained that some operators typically burn wooden pallets at the bottom of their incinerators to facilitate the most efficient operation of the unit, and that during turnaround where there is a high volume of disposal trays, the weight of the pallets overshadows the light-weight disposable trays, likely skewing the solid waste composition outside the plus or minus 15 percent composition by weight requirement on a weekly basis. Commenters also provided a second example: an occasion when the weight ratio can be temporarily skewed during carcass incineration, which is required on occasion by state permits to dispose of an animal carcass to prevent health and safety concerns. The commenters explained that disposal of a caribou carcass that can average 350 to 400 pounds can also skew the weight ratio in the short term. The commenters suggested setting the plus or minus 15 percent weight requirement on a calendar-quarterly, rather than weekly, basis. The commenters pointed to CISWI as an example where tracking and averaging waste streams is accounted for on a calendar-quarter basis and requested that the EPA continue this approach. Although the commenters generally preferred this suggested approach, the commenters also suggested an alternative of setting the weekly obligation at plus or minus 30 percent rather than plus or minus 15 percent. The commenters also suggested the rule should include language that prevents units that are operated only seasonally from triggering the deviation and testing upon restarting after a period of being down.

One commenter requested that the previously submitted data for SRI units in Alaska can and should be used to demonstrate initial compliance or used as representative testing results for inclusion in the WebFIRE database.

*Response:* We are finalizing, as proposed, an option for using a ''representative'' initial compliance demonstration. We disagree with the commenters that 15 percent variability is insufficient or too narrowly constrained. The waste profile variability for a VSMWC or IWI unit with capacity less than or equal to 10 TPD will be based on the waste profile used in the unit's initial compliance test, or, for owners and operators who use the SMCD demonstrating initial compliance, the waste profile used in the chosen representative test. VSMWC and IWI units with capacities less than or equal to 10 TPD that have highly variable waste streams will account for that variability in their initial compliance tests or, if the owner or operator is using the SMCD demonstrating initial compliance, by choosing a representative test with a similarly variable waste stream. Based on information currently available, the EPA anticipates that allowing greater than 15 percent variability in a waste stream after a unit's initial compliance demonstration would not provide a sufficient means of demonstrating compliance on a continuous basis because it would not be representative of the conditions established during the compliance test. As such, it would not be possible to provide assurance that the unit continuously complies with the emission standards. Provided the facility has conducted or selected a representative performance test, the facility should be able to demonstrate compliance by assuring that the wastes combusted do not exceed 15 percent variability.

However, we also acknowledge that some OSWI units may be needed to dispose of unexpected and unplanned animal carcasses in remote areas. In such cases, the carcasses would skew the waste profile. To address this concern, we have revised the final rule to allow the percentage of waste burned for each waste category to be calculated on a quarterly average instead of weekly average.

We encourage owners and operators who elect to use the SMCD to identify their waste variability and waste characterization data as soon as possible so that representative waste profiles are tested in a timely manner. Owners and operators of VSMWC or IWI units with capacities less than or equal to 10 TPD who have not previously submitted testing data meeting the requirements of the rule in the development of the final standards will have to submit detailed information about their units and identify a representative performance test in the EPA's WebFIRE database. As

noted in the preamble to the proposed rule (85 FR 54190), the representative performance tests must have been conducted according to the requirements in the OSWI rule, demonstrate compliance with the OSWI standards, and include the following information in the report: unit design (including air pollution control devices), charge rate during the test, type of operation, combustion temperature during the test, types of waste burned during the test and the relative amount of each waste to the total waste burned, type and amount of supplemental fuels used during the test, and, if the tested unit has an air pollution control device, the operating parameter data for the control device during the test. We understand that the units the commenters are referring to have conducted prior tests. However, if a test in question does not include all of the information needed to meet the requirements for the representative performance test in the rule, that test cannot be used as a representative performance tests for other OSWI units and will not be made available in WebFIRE. However, the owners or operators of these units can contact the Administrator under the General Provisions (see 40 CFR 60.8), to determine whether the prior tests conducted on the unit are acceptable to demonstrate compliance with requirements of the OSWI rule.

### 2. Recordkeeping and Reporting

*Comment:* Commenters stated that the requirements at 40 CFR 60.2956(j) and 40 CFR 60.3051(j) to report the start date, start time, and duration in hours for each period when all qualified OSWI unit operators were unavailable for more than 12 hours, but less than 2 weeks, appear to contemplate that an OSWI unit is under continuous operation. The commenters further stated that is not the case for many SRI units and stated that some SRI units are operated only seasonally, while other units may be shut down for days or weeks at a time for maintenance or other reasons. The commenters added that during those non-operational times, there may not be a qualified OSWI unit operator available onsite. To avoid unnecessary reporting, the commenters request that the reporting requirement be modified to require reporting for each period ''of operation'' when all qualified OSWI unit operators were unavailable.

*Response:* We agree with commenters that the reporting requirements for qualified OSWI unit operators were intended to apply for periods of active operation, and it was not our intent to require additional reporting for non-

operational periods. We are revising the proposed requirements at 40 CFR 60.2956(j) and 40 CFR 60.3051(j) to clarify that facilities must report the start date, start time, and duration in hours for each period of downtime when all qualified OSWI unit operators were unavailable for more than 12 hours but less than 2 weeks.

*D. What key comments did we receive on effective and compliance dates?*

*Comment:* Commenters requested EPA clarify the applicability timeline for existing SRI units at 40 CFR 60.2886(a)(5). The commenters stated that the language as written appears to treat all existing SRI units (those constructed prior to August 31, 2020) as new units, subject to the OSWI NSPS, until a state or Federal plan is implemented for existing units, in which case these SRI units become existing sources again. Specifically, commenters stated that the effective and compliance dates of the proposed NSPS and EG are unclear and present a conflict related to the definition of new units. The commenters stated that the proposed OSWI rule at 40 CFR 60.2886(a)(3) establishes that small OSWI units that commenced construction after August 31, 2020 are new units, but at section 60.2886(a)(5), says that small OSWI units that "commenced construction . . . prior to August 31, 2020 . . . are considered new incineration units." The commenters stated that this conflicting language could be interpreted as treating certain VSMWC and IWI units with capacities less than or equal to 10 TPD that are currently in operation as new units because they were constructed prior to August 31, 2020. The commenters noted that the proposed language is inconsistent with the proposed transition provision in 40 CFR part 60, subpart EEEE, which recognizes that under the existing rules, OSWIs that commenced construction on or before December 9, 2004 are considered existing OSWIs (see proposed 40 CFR 60.2992(b)). The commenters indicated that the intent, based on the preamble for the proposed rule, is that a unit that is currently subject to the new source OSWI standard or other incinerator standard, continue to comply with that standard until it becomes subject to an approved state or Federal plan under 40 CFR part 60, subpart FFFF. However, the commenter stated that as drafted, this provision would force a unit that is currently classified as an existing OSWI to comply with the new source standard during this transition period. The commenter stated that clarification is required if this is not the intended

meaning. Further, commenters are uncertain what the purpose of this provision is, or how treating existing units (temporarily or otherwise) as new units is consistent with section 129 of the CAA. The commenters noted that this provision seems to put unnecessary risk on existing units of having to meet the NSPS for small OSWI units including the proposed emission limitations at table 1 of 40 CFR part 60, subpart EEEE, in the event a state or Federal implementation plan is not forthcoming. The commenters urged that only units constructed or modified after August 31, 2020, can be expected to comply with the limits in 40 CFR part 60, subpart EEEE, which were developed using the best controlled unit, whereas the 40 CFR part 60, subpart FFFF standards were developed using the top 12 percent criterion. The commenter urged that existing SRI units should instead be subject only to the requirements of subpart FFFF. The commenter recommended that the EPA use language in 40 CFR 60.2886 and 40 CFR 60.2992 that does not refer to small OSWI units constructed prior to 2020 as "new units" and adopt a new section 60.2886(c) to read as follows: "(c) Any incineration unit that is a small OSWI unit under 40 CFR 60.2977 and was constructed prior to August 31, 2020, but was required to comply with standards in subpart EEEE of this part prior to [the effective date of these rules] must continue to comply with the applicable standards in subpart EEEE of this part until the unit becomes subject to the requirements of an approved state plan or Federal plan that implements subpart FFFF of this part (Emission Guidelines and Compliance Times for Other Solid Waste Incineration Units)."

Another commenter stated that the reconstruction date of June 16, 2006, in 40 CFR 60.2977 and 40 CFR 60.3078 is not appropriate for SRI units which have not previously been subject to the OSWI rule. Commenters further stated that the definition of reconstruction should be modified for small OSWI units to the date of the proposed rule, August 31, 2020.

*Response:* In response to comment, the EPA is clarifying the regulatory text with regards to the dates used to define new and existing sources. A new VSMWC or IWI unit is a unit that commenced construction after August 31, 2020, or commenced modification or reconstruction on or after December 29, 2025. Sources that commenced construction after December 9, 2004, or commenced reconstruction or modification on or after June 16, 2006, which are currently new sources under the 2005 OSWI rule, will become

existing sources. However, these sources must continue to comply with the requirements of 40 CFR part 60, subpart EEEE, including the emission limits in table 1 to the subpart, until the unit is subject to 40 CFR part 60, subpart FFFF through an approved state plan or Federal plan.

Similarly, SRIs which are currently regulated under the CISWI rules will become subject to regulation under the OSWI rule in this final action. If any SRIs meet the definition of a new OSWI unit, then these new units must demonstrate compliance with the final rule by no later than December 29, 2025, or by the date the unit first begins operation, whichever is later. SRIs that do not meet the definition of a new OSWI unit and are currently regulated under the CISWI rules must continue to demonstrate compliance with subpart CCCC or DDDD of this part, or subpart IIIa of part 62, until the unit becomes subject to the requirements of an approved state plan or federal plan that implements subpart FFFF of this part (Emission Guidelines and Compliance Times for Other Solid Waste Incineration Units).

We are also revising the definitions of "Modification or modified unit" and "reconstruction" in 40 CFR 60.2977 and 40 CFR 60.3078 to clarify, in conjunction with the amended 40 CFR 60.2886(a)(4), that OSWI units that modify or reconstruct 180 days after publication of the final rule would become subject to 40 CFR part 60, subpart EEEE (New Source Performance Standards for Other Solid Waste Incineration Units).

**V. Summary of Cost, Environmental, and Economic Impacts**

*A. What are the affected facilities?*

The EPA estimates there are approximately 60 OSWI units at 56 facilities that will be affected by the final amendments. These OSWI units include 2 VSMWC units with capacity greater than 10 TPD at 2 facilities, 29 small VSMWC units with capacities less than or equal to 10 TPD at 25 facilities, and 29 ACI units at 29 facilities. The number of affected units has decreased from the 2020 Proposed Rule. Notably, we are finalizing a definition of "rudimentary combustion device" that applies to a number of combustion units that were previously included in the OSWI inventory. We estimate that the OSWI database developed for the 2020 Proposed Rule includes 9 VSMWC units and 105 IWI units with capacities less than or equal to 10 TPD that meet one of the four criteria for rudimentary combustion devices as described in

section III.D of this preamble. Based on our understanding that these units lack key features of other OSWI units, we have determined that the final OSWI standards are not appropriate for rudimentary combustion devices, and so they are not subject to the final OSWI standards. The basis of our estimate is provided in the memorandum, *Inventory of Other Solid Waste Incineration (OSWI) Units for Final OSWI Rulemaking,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) to this rulemaking. We have not received any input on, and for various reasons do not anticipate, the construction of any new sources over the next 3 years. For example, facilities that might use an OSWI unit would be smaller in nature or institutional (*e.g.,* schools). Use of incinerators has been consistently decreasing and the cost of compliance with the NSPS (testing, monitoring, and potentially some control) are likely considered too high to construct new OSWI units. As a result, such facilities would likely use other disposal methods, such as shipping to a CISWI unit or landfilling. While this is generally the case, one exception is remote units in Alaska at oil and gas companies (*e.g.,* the SRIs). However, because most of those units were installed relatively recently and the estimated equipment life of an OSWI unit is 20 years, the EPA considers it unlikely that they will be replaced in the near future.

### B. What are the air quality impacts?

EPA expects emissions to decrease relative to the primary baseline in which the 2005 standards have been remanded and no Federal or state plans exist. There are no estimated emissions reductions based on the final OSWI standards relative to an alternative baseline that assumes the 2005 standards are in effect. However, we note that 29 VSMWC units with capacities less than or equal to 10 TPD, which were previously regulated as SRIs by CISWI, will now be regulated under OSWI. Because these units combust municipal-type solid waste, even though they are located at commercial or industrial facilities, we determined they are more appropriately regulated under the OSWI rule (see sections III.C and IV.B of this preamble). Based on the OSWI emissions limits established for these units (which reflects more recent and accurate test data for these units), we estimate that removing these units from CISWI will result in forgone emissions reductions of 11.3 tons per year (tpy) of total CAA section 129 pollutants, with the majority being PM (8.56 tpy) and CO (2.6 tpy), as a result

of the units now being regulated under OSWI instead of CISWI. However, we note that many of these units, including SRIs located in the State of Alaska, were not currently meeting the CISWI standards and the implementation of the CISWI standards was prohibited for units in the State of Alaska by Congress (see section IV.A of this preamble). We anticipate that these units will be able to meet the standards in this final OSWI rule, which includes initial and continuous compliance requirements that reduce compliance costs, and could result in improved compliance relative to a baseline where these units are subject to CISWI. These emissions impacts are documented in the memorandum, *Costs and Impacts for Other Solid Waste Incinerators,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action.

### C. What are the cost and economic impacts?

We anticipate that the final rule will ultimately result in a *de minimis* increase in burden for the affected sources. As EPA discusses in the EIA, we assume the remaining OSWI facilities have not complied with the 2005 rule and likely would not comply in the future with the 2005 requirements in the absence of this final action. To determine whether the final requirements would add to or reduce costs from what OSWI facilities already incur under the existing rule, we compared the costs for the final rule requirements with the costs incurred in a no-standards baseline, which reflects remand of the 2005 standards and the current lack of Federal and state plans. EPA also assessed costs relative to a baseline that includes costs incurred by affected units under the current OSWI and CISWI standards.

EPA notes that there is uncertainty regarding the appropriate baseline for this action given litigation history surrounding the 2005 standards and absence of state and Federal implementation plans. As discussed in the proposed rule (85 FR 54196), the EPA has limited information on the number of OSWI units that are currently complying with the existing OSWI standards, in part because the OSWI Federal plan has not been finalized, and states have neither developed state plans nor incorporated Federal plan requirements into state rules. Additionally, we have limited information from existing facilities that would definitively demonstrate their compliance. In the absence of a Federal plan and EPA-approved state plans in most states, EPA's primary baseline

measures the effects of this rule relative to no standards.

For the alternative baseline, EPA assumed (consistent with the proposed rule) that 10 percent of the population of facilities operating OSWI units are in compliance with the existing rule. Therefore, to develop baseline costs for facilities with units currently subject to the 2005 OSWI rules, we assumed that 10 percent have complied and continue to comply with testing, monitoring, and recordkeeping and reporting requirements. We included the initial cost of testing, parametric monitoring systems, and CO and $O_2$ CEMS because the current OSWI rule requires these systems, and estimated annual compliance costs comprised of annual testing, parametric monitoring, CO and $O_2$ CEMS monitoring, and associated recordkeeping and reporting. We have retained these assumptions for the alternative baseline in the final rule.

We estimated the alternative baseline total capital investment for the 10 percent of facilities assumed to be in compliance with the current OSWI rule to be $6.30 million (2024\$). We estimated the alternative baseline annual costs for the 10 percent of facilities assumed to be in compliance with the current OSWI rules to be $2.78 million (2024\$).[21]

The alternative baseline total capital investment for units currently subject to the CISWI standards to comply is estimated to be $29.2 million (2024\$), and the annual compliance costs (for monitoring, recordkeeping, and reporting) are estimated to be $11.0 million (2024\$).[22]

The total alternative baseline costs for compliance for affected units in the current OSWI and CISWI rules taken together includes $35.5 million (2024\$) in total capital investment and total annual costs of $13.8 million (2024\$). Combined, this represents a present value of $150 million (2024\$) and an equivalent annualized value of $13 million (2024\$) at a 3 percent discount rate and a present value of $130 million (2024\$) and an equivalent annualized

---

[21] See Table 4 of the *Economic Impact Analysis for the Final Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action, for more information on this cost calculation.

[22] See Table 5 of the *Economic Impact Analysis for the Final Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action, for more information on this cost calculation.

value of $13 million (2024$) at a 7 percent discount rate.[23]

The facilities affected by the final rule include two VSMWC units with capacity greater than 10 TPD and 29 VSMWC units with capacities less than or equal to 10 TPD at 25 facilities. The final rule does not substantively change the compliance requirements for the VSMWC with capacity greater than 10 TPD and ACI facilities. Although costs are incurred by the 29 VSMWC units with capacities less than or equal to 10 TPD at 25 facilities, under a baseline that assumes the Congressional rider barring CISWI impementation does not continue, these costs are offset because these units would no longer be regulated under CISWI. However, under a baseline that assumes the Congressional rider will continue in perpetuity, these are new costs to the VSMWCs. The costs that would be incurred under the final rule for all units are for initial compliance, continuous compliance, and recordkeeping and reporting. The final rule revises the applicability of the 2005 rule to exclude units that meet the definition of a rudimentary combustion device, as discussed in section III.B of this preamble. The final rule also allows for owners and operators of VSMWC and IWI units with capacities less than or equal to 10 TPD (including units that were previously regulated under CISWI as SRIs) to reduce their initial and compliance costs using alternatives to initial and annual testing; the final rule costs for these units reflect the recordkeeping and reporting required to comply with waste characterization requirements (as discussed in section III.F.1 of this preamble). Further, the rule allows for electronic reporting. Benefits to industry of electronic reporting include reduced costs for creation and transmittal of reports.

Under the alternative baseline, the total initial cost of compliance (for recordkeeping and reporting) for the final OSWI standards is estimated to be $158,000 (2024$) and the annual compliance costs are estimated to be $798,000 ($393,000 for testing and $405,000 recordkeeping and reporting) (2024$).[24] Combined, this represents a

present value of $8.9 million (2024$) and an equivalent annualized value of $720,000 (2024$) at a 3 percent discount rate and a present value of $7.2 million (2024$) and an equivalent annualized value of $730,000 (2024$) at a 7 percent discount rate.[25]

The total resulting cost impacts of the final rule in comparison to the alternative baseline is a one-time benefit of $35.3 million (2024$) in total capital investment and a reduction in total annual costs of $13.0 million (2024$).[26] Combined, this represents a present value of $140 million (2024$) and an equivalent annualized value of $12 million (2024$) at a 3 percent discount rate and a present value of $120 million (2024$) and an equivalent annualized value of $13 million (2024$) at a 7 percent discount rate.[27] The cost savings reflects a reduction in the number of facilities with applicable requirements under the OSWI standards, based on the changes to the applicability in this final rule (see section III.B of this preamble for additional information), and the regulation of 29 units under the OSWI rule instead of regulation under the CISWI rule as SRI units.

The cost calculations are detailed in the memorandum, *Costs and Impacts of the Final Other Solid Waste Incineration (OSWI) Units Rulemaking,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action.

The EPA provides an analysis of the compliance costs in present value and equivalent annual value form in the memorandum, *Economic Impact Analysis for the Final Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action.

Relative to the alternative baseline, the final rule is burden reducing relative to the 2005 rule because it revises the applicability of the requirements of the

2005 rule to limit the OSWI standards that apply to units that meet the definition of a rudimentary combustion device, and allows for certain owners and operators of VSMWC and IWI units with capacities less than or equal to 10 TPD to reduce their initial and compliance costs using alternatives to initial and annual testing (*i.e.,* the substitute means of compliance demonstration and alternative waste characterization options that are described in section III.F.1 of this preamble).

However, as noted previously, there is uncertainty regarding the appropriate baseline for this action because the 2005 rule has yet to be fully implemented. As measured against EPA's primary baseline, some affected OSWI owner/operators may need to perform initial compliance actions and incur compliance costs on an ongoing basis. The EPA expects minimal economic impacts under the final rule because of the relatively small number of affected existing units and because the EPA does not anticipate affected new sources in the next 3 years. As a result, this action will incur *de minimis* regulatory costs. As discussed in the economic impact analysis associated with the 2005 rule, OSWI owner/operators may also substitute landfilling services for incineration rather than perform compliance actions associated with this rule (see Docket Item No. EPA–HQ–OAR–2003–0156–0101). However, the rate at which owner/operators of OSWI units substitute the use of landfilling services rather than incur the costs of OSWI compliance is highly uncertain. More information and details of this analysis is provided in the memorandum, *Economic Impact Analysis for the Proposed Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action.

### D. What are the benefits?

The final emission limits are unchanged relative to the 2005 standards for units with capacities greater than 10 TPD. The limits for the subcategories of VSMWC and IWI with capacities less than or equal to 10 TPD are less stringent than the corresponding limits for VSMWC and IWI with capacities greater than 10 TPD. However, the VSMWC and IWI with capacities less than or equal to 10 TPD operate intermittently with a relatively low stack gas flow rate, and so the actual emissions of pollutants are relatively low for these units. For

---

[23] See Table 8 of the *Economic Impact Analysis for the Final Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action.

[24] See Table 6 of the *Economic Impact Analysis for the Final Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action, for more information on this cost calculation.

[25] See Table 8 of the *Economic Impact Analysis for the Final Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action.

[26] See Table 7 of the *Economic Impact Analysis for the Final Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action, for more information on this cost calculation.

[27] See Table 8 of the *Economic Impact Analysis for the Final Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action.

example, the EPA estimates that a representative VSMWC with capacity greater than 10 TPD may emit between 0.006 and 0.01 tons of Cd per year while meeting its limit of 18 μg/dscm, while the highest-emitting VSMWC with capacity less than or equal to 10 TPD emitting at the level of the standard (2,000 μg/dscm) would only emit 0.007 tons of Cd per year.

There are no changes relative to the 2005 standards to the requirements for the 29 ACI units and the 2 VSMWC with capacities greater than 10 TPD. Therefore, there are no emission reductions for them. The 29 units brought over from CISWI and now classified as VSMWC with capacities less than or equal to 10 TPD are assumed to be able to meet the emission limits in the final rulemaking for units less than or equal to 10 TPD capacity based on the test information provided and input provided by AOGA in their comments. Therefore, there are no emission reductions for these units.

Because the emission limits for the IWI and VSMWC with capacities less than or equal to 10 TPD are less stringent than the CISWI limits, movement of the units will result in forgone emissions reductions, *i.e.,* emissions reductions that would have occurred had the units stayed in CISWI and the CISWI emissions limits were implemented for them. Table 5 shows the forgone emissions reductions. The detailed emissions reductions calculations are documented in the memorandum *Final Reconsideration Baseline Emissions and Emissions Reductions Estimates for Existing CISWI Units* which is in the CISWI docket.

TABLE 5—ESTIMATED FORGONE EMISSIONS REDUCTIONS FROM MOVING 29 UNITS FROM CISWI TO OSWI *

| Pollutant | Total forgone emissions reductions (tons/year) |
|---|---|
| Cadmium (Cd) | 0.018 |
| Carbon monoxide (CO) | 2.6 |
| Hydrogen chloride (HCl) | 0 |
| Lead (Pb) | 0.116 |
| Mercury (Hg) | 0.00028 |
| Nitrogen oxides (NOₓ) | 0 |
| Particulate matter (PM) | 8.56 |
| Sulfur dioxide (SO₂) | 0 |
| Dioxins/furans (PCDD/PCDF) | 0 |
| Total | 11.3 |

*These forgone emissions reductions are relative to a baseline in which the Congressional rider pertaining to CISWI does not continue.

Although the EPA does not anticipate quantifiable reductions in emissions as a result of the final rule, this action includes improvements to the 2005 OSWI rule. Specifically, the final

amendments revise the OSWI standards such that they apply at all times, which we expect will minimize emissions during periods of SSM and protect public health and the environment. Additionally, the final amendments require electronic submittal of performance tests, deviation reports, and annual compliance reports, which will streamline reporting for affected sources and increase the usefulness of the data and improve data accessibility for the public. The EPA has developed CEDRI, which is located on EPA's Central Data Exchange (CDX), an application used by EPA programs and various stakeholders to manage environmental data transmitted to EPA. Reports are stored in the CDX and made available to report certifiers, preparers, and authorized EPA, regional, state, local, and Tribal reviewers immediately upon submission. Following a processing period, copies of the reports are also subsequently sent to EPA's WebFIRE where the reports are available for public access. Increasing the availability of facility emissions and reporting data allows for accountability of emitters to the public, and the information collected through improved electronic reporting will aid local, state, and national policymakers as they evaluate and consider future policy decisions. Benefits to industry of electronic reporting include the the value of having more standardized data to present to the public to demonstrate appropriate environmental stewardship, and to better evaluate emission levels and identify opportunities to reduce emissions. Additionally, as discussed in section V.B of this preamble, we expect that certain units that previously were not meeting standards under CISWI will be able to meet the standards in this final OSWI rule; which could result in improved compliance and subsequent emissions reductions. In addition, relative to EPA's primary baseline, the standards in this final rule represent emissions reductions that the agency has not quantified or monetized.

## VI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Orders 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is a significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review. Any changes made during

Executive Order 12866 review have been documented in the docket. The EPA prepared an analysis of the potential costs and benefits associated with this action. This analysis, *Economic Impact Analysis for the Final Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units* is available in the docket. The economic impacts of this rulemaking are also discussed in section V.D of this preamble.

### B. Executive Order 14192: Unleashing Prosperity Through Deregulation

This action is considered an Executive Order 14192 deregulatory *de minimis* action. Details on the estimated cost impacts are presented in the memorandum titled, *Economic Impact Analysis for the Final Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action.

### C. Paperwork Reduction Act (PRA)

The information collection activities in this action have been submitted for approval to OMB under the PRA as discussed for each subpart covered by this action in sections VI.B.1 and VI.B.2.

1. 40 CFR Part 60, Subpart EEEE

The information collection request (ICR) document that the EPA prepared has been assigned EPA ICR number 2163.09 and OMB control number 2060–0563. You can find a copy of the ICR in the docket for this rule, and it is briefly summarized here. The information collection requirements are not enforceable until OMB approves them.

We are finalizing amendments that revise 40 CFR part 60, subpart EEEE to revise applicability-related and definitional changes, remove the reporting requirements related to periods of SSM, and add electronic reporting requirements for submittal of certain reports and performance test results.

This information will be collected to assure compliance with 40 CFR part 60, subpart EEEE. The total estimated burden and cost for reporting and recordkeeping due to these amendments are presented here and are not intended to be cumulative estimates that include the burden associated with the requirements of the existing 40 CFR part 60, subpart EEEE. The ICR reflects both the total burden for subject units to comply with EEEE and the incremental

burden associated with the requirements of these final amendments.

*Respondents/affected entities:* Owners and operators of other solid waste incineration units.

*Respondent's obligation to respond:* Mandatory (40 CFR 60, subpart EEEE).

*Estimated number of respondents:* 2.

*Frequency of response:* Initially and annually.

*Total estimated burden:* 817 hours (per year), which includes 0 hours of incremental burden from the final revisions. Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost:* $421,000 (per year), of which there are no incremental costs from the final revisions to 40 CFR part 60, subpart EEEE. These costs include annualized capital or operation and maintenance costs of $306,000, of which there are no incremental annualized capital or operation and maintenance costs from the final revisions to 40 CFR part 60, subpart EEEE.

### 2. 40 CFR Part 60, Subpart FFFF

The ICR document that the EPA prepared has been assigned EPA ICR number 2164.09 and OMB control number 2060–0562. You can find a copy of the ICR in the docket for this rule, and it is briefly summarized here. The information collection requirements are not enforceable until OMB approves them.

We are finalizing amendments that revise 40 CFR part 60, subpart FFFF, to revise applicability-related and definitional changes, remove the reporting requirements related to periods of SSM, and add electronic reporting requirements for submittal of certain reports and performance test results.

This information will be collected to assure compliance with 40 CFR part 60, subpart FFFF. The total estimated burden and cost for reporting and recordkeeping due to these amendments are presented here and are not intended to be cumulative estimates that include the burden associated with the requirements of the existing 40 CFR part 60, subpart FFFF. The ICR reflects both the total burden anticipated for FFFF and the incremental burden associated with the requirements of these final amendments.

*Respondents/affected entities:* Owners and operators of other solid waste incineration units.

*Respondent's obligation to respond:* Mandatory (40 CFR 60, subpart FFFF).

*Estimated number of respondents:* 54.

*Frequency of response:* Initially and annually.

*Total estimated burden:* 2,390 hours (per year), which includes 1,824 hours of incremental burden from the final revisions. Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost:* $424,000 (per year), of which includes $257,000 in incremental costs from these final revisions to 40 CFR part 60, subpart FFFF. These costs include annualized capital or operation and maintenance costs of $87,000, of which there are no incremental annualized capital or operation and maintenance costs from the final revisions to 40 CFR part 60, subpart FFFF.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9. When OMB approves this ICR, the Agency will announce that approval in the **Federal Register** and publish a technical amendment to 40 CFR part 9 to display the OMB control number for the approved information collection activities in this final rule.

### D. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (RFA). In making this determination, the EPA concludes that the impact of concern for this rule is any significant adverse economic impact on small entities and that the agency is certifying that this rule will not have a significant economic impact on a substantial number of small entities because the rule relieves regulatory burden on the small entities subject to the rule.

The small entities that may be subject to the requirements of this action are small businesses, small government jurisdictions, and small nonprofits. Because we do not have an accurate inventory of potential OSWI units, there may be additional units at small entities that could be impacted by this final rule.

However, those impacts are likely to be minimal because this final rule will not impose any requirements on combustion units that meet the definition of a rudimentary combustion device (units with capacities less than or equal to 10 TPD without one or more of the elements listed in section III.B of this preamble). Many of these units are located at small entities and therefore would not be subject to the final rules. Additionally, this rule allows for owners and operators of VSMWC and IWI units with capacities less than or equal to 10 TPD to reduce their initial and annual compliance costs using alternatives to initial and annual testing (as discussed in section III.F.1 of this preamble), which further reduces the compliance costs for small entities.

Of the 174 OSWI units in our dataset, 69 units (about 40 percent) are owned by small entities. Of the $13 million in annualized regulatory cost savings, about $3 million (or 23 percent) of the savings are estimated to accrue to small entities. The difference between these percentages is primarily due to the fact that small entities own a disproportionate number of ACI units (23 out of 29 units) which are not expected to experience a regulatory cost change under this rule. As described in section II.B, the 2024 ACI Rule removed title V permitting requirements for ACIs that only burn wood waste, clean lumber, yard waste, or a mixture of those, and are not located at title V major sources or subject to title V for other reasons. Small entities owning OSWI-affected ACI units will receive a reduction in compliance expenditures under that rule. Overall, this final rule will reduce regulatory requirements for affected units relative to requirements faced before this final rulemaking. We have therefore concluded that this action will relieve regulatory burden for all directly regulated small entities.

Details of this analysis are presented in the memorandum titled, *Economic Impact Analysis for the Final Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this action.

### E. Unfunded Mandates Reform Act (UMRA)

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. While this action creates an enforceable duty on the private sector, the cost does not exceed $100 million or more.

### F. Executive Order 13132: Federalism

This action does not have Federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government. However, the EPA recognizes that states will have an interest in this action and any future revisions to associated requirements relating to state implementation plans.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have Tribal implications as specified in Executive Order 13175. It will neither impose direct compliance costs on federally recognized Tribal governments nor preempt Tribal law. Thus, Executive Order 13175 does not apply to this action.

The EPA is not aware of any OSWI owned or operated by Indian Tribal governments at the time of the publication of this document. Because we do not have an accurate inventory of potential OSWI units, there may be additional units owned or operated by Indian Tribal governments that could be impacted.

Consistent with the EPA Policy on Consultation and Coordination with Indian Tribes, the EPA consulted with Tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this regulation to allow for meaningful and timely input into its development. The EPA conducted multiple outreach activities such as Tribal partnership calls, webinars, and offers for government-to-government consultation with potentially impacted Tribes and other Tribes as requested. A summary of this consultation is provided in section II.C of this preamble.

*H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

Executive Order 13045 directs federal agencies to include an evaluation of the health and safety effects of the planned regulation on children in federal health and safety standards and explain why the regulation is preferable to potentially effective and reasonably feasible alternatives. This action is not subject to Executive Order 13045 because it is not a significant regulatory action under section 3(f)(1) of Executive Order 12866, and because the EPA does not believe the environmental health or safety risks addressed by this action present a disproportionate risk to children. The emission limits for most OSWI units remain unaffected by this rulemaking. However, the emission limits for VSMWC and IWI with capacity less than or equal to 10 TPD have been added to reflect actual emissions from units of those size, and the applicability of the OSWI rule has been updated such that SRIs which were previously regulated under CISWI will now be regulated under OSWI. SRIs are not currently meeting the emission

limits under CISWI, as explained in Section IV.A of this preamble. SRIs will be required to meet OSWI limits under an applicable state or Federal plan. All units are expected to be able to meet the OSWI limits. Because the SRIs are not currently required to meet the CISWI emission limits and are expected to be able to meet the OSWI limits, the EPA does not anticipate any changes in emissions from these units (see Section V.B. for more discussion). Since the EPA estimates no changes in actual emissions based on this rulemaking, the EPA does not believe there are disproportionate risks to children caused by this action.

However, the EPA's *Policy on Children's Health* applies to this action. This action is consistent with the EPA's *Policy on Children's Health* because the new technology-based standards provide a maximum level of emission that is implementable for all OSWI units. As described by the 2020 proposal, the EPA also considered more stringent standards in the context of beyond-the-floor regulatory options, but determined that requiring additional controls on VSMWC or IWI with capacity less than or equal to 10 TPD is infeasible or cost prohibitive.[28] As explained in Section III.C of this preamble, the emissions from the VSMWC or IWI with capacity less than or equal to 10 TPD are relatively small on an annual basis, and these units are primarily located in remote areas with low populations, including populations of children.

*I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not a ''significant energy action'' because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. This action includes defining and setting emission limits for new subcategories; applicability-related and definitional changes; changes to the startup, shutdown, and malfunction (SSM) provisions; and the testing, monitoring, recordkeeping, and reporting requirements. This does not impact energy supply, distribution, or use.

*J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51*

This action involves technical standards. As discussed in the proposal preamble (85 FR 54178; August 31, 2020), the EPA conducted searches for

the OSWI standards through the Enhanced National Standards Systems Network Database managed by the American National Standards Institute (ANSI). We also contacted voluntary consensus standards (VCS) organizations and accessed and searched their databases. During the EPA's VCS search, if the title or abstract (if provided) of the VCS described technical sampling and analytical procedures that are similar to the EPA's reference method, the EPA reviewed the VCS as a potential equivalent method.

The EPA incorporates by reference VCS, ASTM D7520–16, ''Standard Test Method for Determining the Opacity of a Plume in the Outdoor Ambient Atmosphere'' as an acceptable alternative to EPA Method 9. This test method describes the procedures to determine the opacity of a plume, using digital imagery and associated hardware and software. The plume is caused by particulate matter emitted from a stationary point source in the outdoor ambient environment. The opacity of emissions is determined by the application of a Digital Camera Opacity Technique (DCOT) that consists of a digital still camera, analysis software, and the output function's content to obtain and interpret digital images to determine and report plume opacity. This method is suitable to determine the opacity of plumes from zero percent to one hundred percent. Conditions that shall be considered when using this method to obtain the digital image of the plume include the plume's background, the existence of condensed water in the plume, orientation of the digital still camera to the plume and the sun. This standard describes the procedures to certify the DCOT, hardware, software, and method to determine the opacity of the plumes.

This method is available for purchase from ASTM International, 100 Barr Harbor Drive, P.O. Box CB700, West Conshohocken, Pennsylvania 19428–2959, (800) 262–1373, *http://www.astm.org/*. The EPA's approval of this method as an alternative method does not provide or imply a certification or validation of any vendor's hardware or software. The onus to maintain and verify the certification and/or training of the DCOT camera, software, and operator in accordance with ASTM D7520–16 is on the facility, DCOT operator, and DCOT vendor. The standard is available to everyone at a cost determined by ASTM ($119). ASTM also offers memberships or subscriptions for reduced costs. The cost of obtaining this method is not a significant financial burden, making the method reasonably available.

[28] 85 FR 54186 (August 31, 2020).

The EPA incorporates by reference VCS, American National Standards Institute/American Society of Mechanical Engineers (ASME/ANSI) PTC 19.10–1981 Part 10, "Flue and Exhaust Gas Analyses" as an acceptable alternative to EPA Methods 3B, 6, and 7 (manual portion only, not the instrumental procedures). This standard was previously incorporated into the 2005 OSWI final rule. This standard determines quantitatively the gaseous constituents of exhausts resulting from stationary combustion sources. The gases covered in ASME/ANSI PTC 19.10–1981 are $O_2$, carbon dioxide ($CO_2$), CO, $SO_2$, sulfur trioxide ($SO_3$), nitric oxide (NO), nitrogen dioxide ($NO_2$), hydrogen sulfide ($H_2S$), and hydrocarbons. However, the use in this rule is only applicable to $O_2$, $CO_2$, $SO_2$, NO, and $NO_2$. This standard may be obtained from the American National Standards Institute (ANSI), 1899 L Street NW, 11th Floor, Washington, DC 20036 and the American Society of Mechanical Engineers (ASME), Two Park Avenue, New York, New York 10016–5990. See *https://www.ansi.org* and *https://www.asme.org*. The standard is available to everyone at a cost determined by ASME/ANSI ($80). ASME/ANSI also offer memberships or subscriptions for reduced costs. The cost of obtaining this method is not a significant financial burden, making the method reasonably available.

The EPA incorporates by reference an EPA guidance document, Office of Air Quality Planning and Standards (OAQPS) Fabric Filter Bag Leak Detection Guidance, EPA–454/R–98–015, September 1997, for its guidance on the use of fabric filter air pollution control devices and monitoring system descriptions, selection, installation, set up, adjustment, operation, and quality assurance procedures. In conjunction with the bag leak detection system manufacturer's written specifications, this guidance helps to ensure proper installation, operation, and maintenance of these systems. This guidance may be obtained from the U.S. Environmental Protection Agency, 1200 Pennsylvania Avenue NW, Washington, DC 20460, (202) 272–0167, *https://www.epa.gov* or *https://www.epa.gov/sites/default/files/2021-01/documents/bagleakddetectionguidance.pdf*. The EPA determined that this standard is reasonably available because it is freely available from the EPA.

While the EPA also identified 26 other VCS as being potentially applicable, the Agency decided not to use them because those methods are impractical as alternatives due to lack of equivalency, documentation, or validation data, or because of other important technical and policy considerations. The search and review results have been documented and are in the memorandum, *Voluntary Consensus Standard Results for Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units; Proposed Rule,* which is available in the docket (see Docket EPA–HQ–OAR–2003–0156) for this rulemaking.

### K. Congressional Review Act (CRA)

This action is subject to the Congressional Review Act (CRA), and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

### List of Subjects in 40 CFR Part 60

Environmental protection, Administrative practice and procedures, Air pollution control, Incorporation by reference, Intergovernmental relations, Reporting and recordkeeping requirements.

**Lee Zeldin,**
*Administrator.*

For the reasons set forth in the preamble, the Environmental Protection Agency amends part 60 of title 40, chapter I, of the Code of Federal Regulations as follows:

## PART 60—STANDARDS OF PERFORMANCE FOR NEW STATIONARY SOURCES

■ 1. The authority citation for part 60 continues to read as follows:

**Authority:** 42 U.S.C. 7401, *et seq.*

### Subpart A—General Provisions

■ 2. Amend § 60.17 by revising paragraphs (g)(14), (h)(215), and (k)(3) to read as follows:

### § 60.17 Incorporations by reference.

\*    \*    \*    \*    \*

(g) \*    \*    \*

(14) ASME/ANSI PTC 19.10–1981, Flue and Exhaust Gas Analyses [Part 10, Instruments and Apparatus], Issued August 31, 1981 IBR approved for §§ 60.56c(b); 60.63(f); 60.106(e); 60.104a(d), (h), (i), and (j); 60.105a(b), (d), (f), and (g); 60.106a(a); 60.107a(a), (c), (d), and e; 60.275(e); 60.275a(e); 60.275b(e); 60.285a(f); 60.396a(a); 60.614a(b); 60.664a(b); 60.704(b); 60.704a(b); 60.2145(s) and (t); 60.2710(s) and (t); 60.2922(e); 60.2940(c); tables 1, 1a, 1b, and 3 to subpart EEEE; §§ 60.3027(e); 60.3039(c); tables 2, 2a, and 4 to subpart FFFF; table 2 to subpart JJJJ; §§ 60.4415(a); 60.4900(b); tables 1 and 2 to subpart LLLL; § 60.5220(b); tables 2 and 3 to subpart MMMM; §§ 60.5406(c); 60.5413(b); 60.5406a(c); 60.5407a(g); 60.5413a(b) and (d); 60.5406b(c); 60.5407b(g); 60.5413b(b) and (d); 60.5413c(b) and (d).

\*    \*    \*    \*    \*

(h) \*    \*    \*

(215) ASTM D7520–16, Standard Test Method for Determining the Opacity of a Plume in the Outdoor Ambient Atmosphere, approved April 1, 2016; IBR approved for §§ 60.123(c); 60.123a(c); 60.271(k); 60.272(a) and (b); 60.273(c) and (d); 60.274(i); 60.275(e); 60.276(c); 60.271a; 60.272a(a) and (b); 60.273a(c) and (d); 60.274a(h); 60.275a(e); 60.276a(f); 60.271b; 60.272b(a) and (b); 60.273b(c) and (d); 60.274b(h); 60.275b(e); 60.276b(f); 60.374a(d); 60.2972(a); tables 1, 1a, and 1b to subpart EEEE; § 60.3067(a); tables 2 and 2a to subpart FFFF.

\*    \*    \*    \*    \*

(k) \*    \*    \*

(3) EPA–454/R–98–015, Office of Air Quality Planning and Standards (OAQPS), Fabric Filter Bag Leak Detection Guidance, September 1997; IBR approved for §§ 60.124(f); 60.124a(f); 60.273(e); 60.273a(e); 60.273b(e); 60.373a(b); 60.2145(r); 60.2710(r); 60.2944(c); 60.3043(c), 60.4880(b); 60.5200(b). (Available from: *https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=2000D5T6.pdf*).

\*    \*    \*    \*    \*

### Subpart CCCC—Standards of Performance for Commercial and Industrial Solid Waste Incineration Units

■ 3. Amend § 60.2020 by adding paragraph (k) to read as follows:

### § 60.2020    What combustion units are exempt from this subpart?

\*    \*    \*    \*    \*

(k) *Small remote incinerators.* Incineration units located in the State of Alaska are not subject to this subpart as specified in the Consolidated Appropriations Act of 2024, H.R. 4366, section 432. For small, remote incinerators that met the requirements of 40 CFR 60.2015(a)(3) as of December 29, 2025, the unit remains subject to this subpart until the unit becomes subject to the requirements of an approved state plan or Federal plan that implements subpart FFFF of this part (Emission Guidelines and Compliance Times for Other Solid Waste Incineration Units).

## Subpart DDDD—Emissions Guidelines and Compliance Times for Commercial and Industrial Solid Waste Incineration Units

■ 4. Amend § 60.2555 by adding paragraph (k) to read as follows:

### § 60.2555   What combustion units are exempt from my state plan?

\*   \*   \*   \*   \*

(k) *Small, remote incinerators.* Incineration units located in the State of Alaska are not subject to this subpart as specified in the Consolidated Appropriations Act of 2024, H.R. 4366, section 432. For small, remote incinerators that met the requirements of 40 CFR 60.2550(a) as of December 29, 2025, the unit remains subject to this subpart until the unit becomes subject to the requirements of an approved state plan or Federal plan that implements subpart FFFF of this part (Emission Guidelines and Compliance Times for Other Solid Waste Incineration Units).

## Subpart EEEE—Standards of Performance for Other Solid Waste Incineration Units

■ 5. Revise the heading of subpart EEEE of part 60 to read as set out above.

■ 6. Revise and republish § 60.2881 to read as follows:

### § 60.2881   When does this subpart become effective?

This subpart takes effect December 29, 2025. Some of the requirements in this subpart apply to planning the incineration unit and must be completed even before construction is initiated on the unit (*i.e.,* the preconstruction requirements in §§ 60.2894 and 60.2895). Other requirements such as the emission limitations and operating limits apply when the unit begins operation.

■ 7. Amend § 60.2885 by revising paragraphs (a) and (b), and adding paragraph (d) to read as follows:

### § 60.2885   Does this subpart apply to my incineration unit?

\*   \*   \*   \*   \*

(a) Your incineration unit is a new incineration unit as defined in § 60.2886, except as specified in paragraph (d) of this section.

(b) Your incineration unit is an OSWI unit as defined in § 60.2977 or an air curtain incinerator subject to this subpart as described in § 60.2888. Other solid waste incineration units are very small municipal waste combustion units and institutional waste incineration units as defined in § 60.2977.

\*   \*   \*   \*   \*

(d) This subpart does not apply to your incineration unit if it is a rudimentary combustion device as defined in § 60.2977.

■ 8. In § 60.2886 revise and republish paragraph (a) to read as follows:

### § 60.2886   What is a new incineration unit?

(a) A new incineration unit is an incineration unit subject to this subpart that meets any of the criteria specified in paragraphs (a)(1) or (2) of this section, except as specified in paragraph (a)(3) of this section.

(1) Commenced construction after August 31, 2020.

(2) Commenced reconstruction or modification on or after December 29, 2025.

(3) If your incineration unit is a very small municipal waste combustion unit or institutional waste incineration unit and commenced construction, reconstruction, or modification on or before August 31, 2020, or reconstruction or modification on or before December 29, 2025, and you must meet one of the following:

(i) If your incineration unit commenced construction after December 9, 2004, or commenced reconstruction or modification after June 16, 2006, and met the applicability of paragraph (a)(1) or (a)(2) of this section before December 29, 2025, your unit is considered a new incineration unit and remains subject to the emission limitations of table 1 and applicable requirements of this subpart until the unit becomes subject to the requirements of an approved state plan or federal plan that implements subpart FFFF of this part (Emission Guidelines and Compliance Times for Other Solid Waste Incineration Units), except as provided in paragraph (a)(3)(iii) of this section.

(ii) If your incineration unit commenced construction on or before December 9, 2004, or commenced reconstruction or modification on or before June 16, 2006, and did not meet the applicability of paragraph (a)(1) or (a)(2) of this section as of December 29, 2025, then your unit is considered an existing incineration unit and is subject to the requirements of an approved state plan or federal plan that implements subpart FFFF of this part (Emission Guidelines and Compliance Times for Other Solid Waste Incineration Units), except as provided in paragraph (a)(3)(iii) of this section.

(iii) If you met the applicability of § 60.2015(a)(3) or § 40 CFR 60.2550(a) as of December 29, 2025, then your unit is considered a commercial and industrial solid waste incineration unit and remains subject to the applicable

requirements, until the unit becomes subject to the requirements of an approved state plan or federal plan that implements subpart FFFF of this part (Emission Guidelines and Compliance Times for Other Solid Waste Incineration Units).

\*   \*   \*   \*   \*

■ 9. Amend § 60.2887 by revising paragraphs (b)(1), (b)(3), and paragraph (q) introductory text to read as follows:

### § 60.2887   What combustion units are excluded from this subpart?

\*   \*   \*   \*   \*

(b) \* \* \*

(1) The unit has a federally enforceable permit limiting the combustion of municipal solid waste to 30 percent of the total fuel input by weight.

\*   \*   \*   \*   \*

(3) You provide the Administrator with a copy of the federally enforceable permit.

\*   \*   \*   \*   \*

(q) *Incinerators used for national security.* Your incineration unit is excluded if it meets the requirements specified in either paragraph (q)(1) or (2) of this section.

\*   \*   \*   \*   \*

■ 10. Amend § 60.2888 by revising paragraph (a) and paragraph (b) introductory text to read as follows:

### § 60.2888   Are air curtain incinerators regulated under this subpart?

(a) Air curtain incinerators that burn less than 35 tons per day of municipal solid waste or air curtain incinerators located at institutional facilities burning any amount of institutional waste generated at that facility are incineration units subject to all requirements of this subpart, including the emission limitations specified in tables 1, 1a, and 1b to this subpart.

(b) Air curtain incinerators that burn less than 35 tons per day and burn only the materials listed in paragraphs (b)(1) through (4) of this section collected from the general public and from residential, commercial, institutional, and industrial sources; or, air curtain incinerators located at institutional facilities that burn only the materials listed in paragraphs (b)(1) through (4) of this section generated at that facility, are required to meet only the requirements in §§ 60.2970 through 60.2973 and are exempt from all other requirements of this subpart.

\*   \*   \*   \*   \*

■ 11. Revise § 60.2889 to read as follows:

## §60.2889   Who implements and enforces this subpart?

(a) This subpart can be implemented and enforced by the U.S. Environmental Protection Agency (EPA), or a delegated authority such as your state, local, or Tribal authority. If the EPA has delegated authority to your state, local, or Tribal authority, then that agency (as well as the EPA) has the authority to implement and enforce this subpart. You should contact your EPA Regional office to find out if this subpart is delegated to your state, local, or Tribal authority.

(b) In delegating implementation and enforcement authority of this subpart to a state, local, or Tribal authority, the authorities listed in paragraphs (b)(1) through (9) of this section are retained by EPA and are not transferred to the state, local, or Tribal authority.

(1) The authority to approve alternatives to the emission limitations in tables 1, 1a, and 1b to this subpart and operating limits established under §60.2916 and table 2 to this subpart.

(2) The authority to approve petitions for specific operating limits in accordance with the requirements in §60.2917.

(3) The authority of the Administrator to receive and grant petitions under §60.8(b)(3) to approve major alternatives to test methods in §60.2922.

(4) The authority to approve major alternatives to monitoring in §§60.2939 through 60.2945.

(5) The authority to approve major alternatives to recordkeeping and reporting in §§60.2949 through 60.2962.

(6) The authority to receive the required notices and to approve continued operation in connection with the status report requirements in §60.2911(c)(2).

(7) The authority of the Administrator to receive and grant petitions under §60.11(e)(6) through (8) to adjust opacity standards and establish opacity standards in accordance with alternative opacity emission limits in §60.2915 and §§60.2971 through 60.2973.

(8) The authority of the Administrator under §60.8(b)(4) to waive performance test requirements and §60.8(b)(5) to approve shorter sampling times or smaller sample volumes.

(9) The authority to approve an alternative to any electronic reporting to the EPA required by this subpart.

■ 12. Amend §60.2890 by revising the introductory text and adding paragraphs (j) and (k) to read as follows:

## §60.2890   How are these new source performance standards structured?

These new source performance standards contain 11 major components, as follows:

*    *    *    *    *

(j) Definitions.
(k) Tables.
■ 13. Revise §60.2894 to read as follows:

## §60.2894   Who must prepare a siting analysis?

You must prepare a siting analysis if you commence construction after August 31, 2020, or if you commence reconstruction or modification on or after December 29, 2025.

■ 14. Amend §60.2895 by revising paragraphs (a) and (b) to read as follows:

## §60.2895   What is a siting analysis?

(a) The siting analysis must consider air pollution control alternatives that minimize, on a site-specific basis, to the maximum extent practicable, potential risks to public health or the environment. In considering such alternatives, you may consider costs, energy impacts, non-air environmental impacts, or any other factors related to the practicability of the alternatives.

(b) Analyses of your OSWI unit's impacts that are prepared to comply with state, local, or other Federal regulatory requirements may be used to satisfy the requirements of this section, provided they include the consideration of air pollution control alternatives specified in paragraph (a) of this section.

*    *    *    *    *

■ 15. Amend §60.2905 by revising paragraph (b), paragraph (c) introductory text, and paragraphs (c)(1)(iv), (viii), and (x) to read as follows:

## §60.2905   What are the operator training and qualification requirements?

*    *    *    *    *

(b) Operator training and qualification must be obtained through a state-approved program or by completing the requirements included in paragraph (c) of this section.

(c) Training must be obtained by completing an incinerator operator training course that includes, at a minimum, the three elements described in paragraphs (c)(1) through (3) of this section:

(1) *    *    *

(iv) Combustion controls and monitoring, including good combustion practices and waste characterization procedures.

*    *    *    *    *

(viii) Actions to prevent and correct malfunctions or to prevent and correct conditions that may lead to malfunction.

*    *    *    *    *

(x) Applicable Federal, state, and local regulations, including Occupational Safety and Health Administration workplace standards.

*    *    *    *    *

■ 16. Revise §60.2906 to read as follows:

## §60.2906   When must the operator training course be completed?

The operator training course must be completed by the latest of the dates specified in paragraphs (a) through (d) of this section.

(a) Six months after your OSWI unit startup date.

(b) December 29, 2025.

(c) The date before an employee assumes responsibility for operating the OSWI unit or assumes responsibility for supervising the operation of the OSWI unit.

■ 17. Revise §60.2908(d) to read as follows:

## §60.2908   How do I maintain my operator qualification?

*    *    *    *    *

(d) Prevention and correction of malfunctions or conditions that lead to malfunction.

*    *    *    *    *

■ 18. Amend §60.2910 by:
■ a. Revising paragraph (a) introductory text and paragraph (a)(4);
■ b. Adding paragraph (a)(10); and
■ c. Revising paragraph (c)(2).
The revisions and addition read as follows:

## §60.2910   What site-specific documentation is required?

(a) Documentation must be available at the facility and readily accessible for all OSWI unit operators that addresses the ten topics described in paragraphs (a)(1) through (10) of this section. You must maintain this information and the training records required by paragraph (c) of this section in a manner that they can be readily accessed and are suitable for inspection upon request.

*    *    *    *    *

(4) Procedures for maintaining good combustion practices, including proper combustion air supply levels.

*    *    *    *    *

(10) Procedures for establishing initial and continuous compliance, including but not limited to, procedures to determine waste characterization.

*    *    *    *    *

(c) *    *    *

(2) Records showing the names of the OSWI unit operators who have completed the operator training requirements under § 60.2905, met the criteria for qualification under § 60.2907, and maintained or renewed their qualification under § 60.2908 or § 60.2909. Records must include documentation of training, the dates of the initial and refresher training, and the dates of their qualification and all subsequent renewals of such qualifications.

\*    \*    \*    \*    \*

■ 19. Amend § 60.2911 by revising the introductory paragraph to read as follows:

### § 60.2911  What if all the qualified operators are temporarily not accessible?

For each batch OSWI unit, a qualified operator must always be accessible when the unit is operating. For each continuous OSWI unit or intermittent OSWI unit, if all qualified operators are temporarily not accessible (*i.e.*, not at the facility and not able to be at the facility within 1 hour), you must meet one of the three criteria specified in paragraphs (a) through (c) of this section, depending on the length of time that a qualified operator is not accessible.

\*    \*    \*    \*    \*

■ 20. Revise § 60.2915 to read as follows:

### § 60.2915  What emission limitations must I meet and by when?

For OSWI units with initial startup before June 30, 2025, you must meet the emission limitations specified in table 1 to this subpart 60 days after your OSWI unit reaches the charge rate at which it will operate, but no later than 180 days after its initial startup. For OSWI units with capacities greater than 10 tons per day and with initial startup on or after June 30, 2025, you must meet the emissions limitations specified in table 1a to this subpart 60 days after your OSWI unit reaches the charge rate at which it will operate, but no later than 180 days after its initial startup. For very small municipal waste combustion units and institutional waste incineration units with capacities less than or equal to 10 tons per day with initial startup on or after June 30, 2025, you must meet the emission limitations specified in table 1b to this subpart 60 days after your OSWI unit reaches the charge rate at which it will operate, but no later than 180 days after its initial startup.

■ 21. Revise § 60.2916 to read as follows:

### § 60.2916  What operating limits must I meet and by when?

You must comply with the requirements in paragraphs (a) through (h) of this section, as applicable. If you own or operate a very small municipal waste combustion unit or institutional waste incineration unit using the substitute means of compliance demonstration under § 60.2929, the references in this section to the most recent performance test demonstrating compliance are not applicable and instead, refer to the limits established during the representative performance test identified in the information submitted as specified in § 60.2929(b).

(a) You must establish a maximum charge rate, calculated using the procedures in paragraph (a)(1) or (2) of this section, as appropriate.

(1) For continuous and intermittent units, maximum charge rate is the average charge rate measured during the most recent performance test demonstrating compliance with all applicable emission limitations.

(2) For batch units, maximum charge rate is the charge rate measured during the most recent performance test demonstrating compliance with all applicable emission limitations.

(b) You must establish a minimum combustion chamber operating temperature equal to the lowest 1-hour average combustion chamber operating temperature measured during the most recent performance test demonstrating compliance with all applicable emission limitations.

(c) If you use a wet scrubber to comply with the emission limitations, you must establish operating limits for the operating parameters as described in paragraphs (c)(1) through (3) of this section.

(1) Minimum pressure drop across the wet scrubber, which is calculated as the lowest 1-hour average pressure drop across the wet scrubber measured during the most recent performance test demonstrating compliance with the particulate matter emission limitations; or minimum amperage to the wet scrubber, which is calculated as the average amperage to the wet scrubber measured during the most recent performance test demonstrating compliance with the particulate matter emission limitations.

(2) Minimum scrubber liquor flow rate, which is calculated as the lowest 1-hour average liquor flow rate at the inlet to the wet scrubber measured during the most recent performance test demonstrating compliance with all applicable emission limitations.

(3) Minimum scrubber liquor pH, which is calculated as the lowest 1-hour average liquor pH at the outlet to the wet scrubber measured during the most recent performance test demonstrating compliance with the hydrogen chloride and sulfur dioxide emission limitations.

(d) If you use a dry scrubber to comply with the emission limitations, you must measure the injection rate of each sorbent during the performance test. The minimum operating limit for the injection rate of each sorbent is calculated as the lowest 1-hour average injection rate for each sorbent measured during the most recent performance test demonstrating compliance with the hydrogen chloride emission limitations.

(e) If you use an electrostatic precipitator to comply with the emission limitations, you must measure the (secondary) voltage and amperage of the electrostatic precipitator collection plates during the particulate matter performance test. Calculate the average electric power value (secondary voltage × secondary current = secondary electric power) for each test run. The minimum operating limit for the electrostatic precipitator is calculated as the lowest 1-hour average secondary electric power measured during the most recent performance test demonstrating compliance with the particulate matter emission limitations.

(f) If you use a fabric filter to comply with the emission limitations, you must operate each fabric filter system such that the bag leak detection system alarm does not sound more than 5 percent of the operating time during a 6-month period. Calculate the alarm time (*i.e.*, time that the alarm sounds) as specified in paragraphs (f)(1) and (2) of this section.

(1) If inspection of the fabric filter demonstrates that no corrective action is required, the alarm duration is not counted in the alarm time calculation.

(2) If corrective action is required and you take less than an hour to initiate corrective action, the alarm time is counted as 1 hour. If you take longer than 1 hour to initiate corrective action, the alarm time is counted as the actual amount of time taken to initiate corrective action.

(g) If you own or operate a very small municipal waste combustion unit or institutional waste incineration unit with capacity less than or equal to 10 tons per day and you demonstrate continuous compliance according to § 60.2932(d), you must establish the amount of waste burned in each waste category as a percentage of total waste burned on a mass basis. These percentages are your waste profile and must be based on the categories of waste fed to the incinerator (*e.g.,* food waste,

**27942**    Federal Register / Vol. 90, No. 123 / Monday, June 30, 2025 / Rules and Regulations

paper waste, wood waste) during the most recent performance test.

(h) You must meet the operating limits established during the initial or representative performance test no later than the date specified in paragraph (h)(1) or (2) of this section, as applicable.

(1) For each OSWI unit with a capacity greater than 10 tons per day or for each very small municipal waste combustion unit or institutional waste incineration unit with a capacity less than or equal to 10 tons per day for which you conduct an initial performance test under § 60.2927(a), within 60 days after your OSWI unit reaches the charge rate at which it will operate, but no later than 180 days after its initial startup.

(2) For each very small municipal waste combustion unit or institutional waste incineration unit for which you use the substitute means of compliance demonstration under § 60.2929, by the date you submit to the Administrator the information required in § 60.2929(b).

■ 22. Amend § 60.2917 by revising the section heading and the introductory text to read as follows:

### § 60.2917    What if I do not use a wet scrubber, dry scrubber, electrostatic precipitator, or fabric filter to comply with the emission limitations?

If you use an air pollution control device other than a wet scrubber, dry scrubber, electrostatic precipitator, or fabric filter to comply with the emission limitations under § 60.2915, you must petition the EPA Administrator for specific operating limits to be established during the performance test and then continuously monitored thereafter. Additionally, unless you demonstrate continuous compliance according to § 60.2932(d), if you limit emissions in some manner other than an add-on control device to comply with the emission limitations under § 60.2915, such as by material balance, then you must submit a petition for approval of your means of limiting your emissions. You must submit the petition at least 60 days before the performance test is scheduled to begin and not conduct the initial performance test until after the petition has been approved by the EPA. Your petition must include the five items listed in paragraphs (a) through (e) of this section.

\*    \*    \*    \*    \*

### § 60.2918    [Removed and reserved].

■ 23. Remove and reserve § 60.2918.
■ 24. Revise and republish § 60.2922 to read as follows:

### § 60.2922    How do I conduct the initial and annual performance tests?

(a) All performance tests must consist of a minimum of three test runs conducted under conditions representative of normal operations.

(b) All performance tests must be conducted using the methods in tables 1, 1a, and 1b to this subpart.

(c) All performance tests must be conducted using the minimum run duration specified in tables 1, 1a, and 1b to this subpart.

(d) EPA Method 1 of Appendix A to this part must be used to select the sampling location and number of traverse points.

(e) EPA Method 3A or 3B of Appendix A to this part or ASME/ANSI PTC 19.10–1981(incorporated by reference, see § 60.17), in lieu of EPA Method 3B, must be used for gas composition analysis, including measurement of oxygen concentration. EPA Method 3A or 3B of Appendix A to this part or ASME/ANSI PTC 19.10–1981 must be used simultaneously with each method.

(f) All pollutant concentrations, except for opacity, must be adjusted to 7 percent oxygen using Equation 1 to § 60.2975.

(g) EPA Method 26A of Appendix A to this part must be used for hydrogen chloride concentration analysis, with the additional requirements specified in paragraphs (g)(1) through (3) of this section.

(1) The probe and filter must be conditioned prior to sampling using the procedure described in paragraphs (g)(1)(i) through (iii) of this section.

(i) Assemble the sampling train(s) and conduct a conditioning run by collecting between 14 liters per minute (0.5 cubic feet per minute) and 30 liters per minute (1.0 cubic feet per minute) of gas over a one-hour period. Follow the sampling procedures outlined in section 8.1.5 of EPA Method 26A of Appendix A to this part. For the conditioning run, water can be used as the impinger solution.

(ii) Remove the impingers from the sampling train and replace with a fresh impinger train for the sampling run, leaving the probe and filter (and cyclone, if used) in position. Do not recover the filter or rinse the probe before the first run. Thoroughly rinse the impingers used in the preconditioning run with deionized water and discard these rinses.

(iii) The probe and filter assembly are conditioned by the stack gas and are not recovered or cleaned until the end of testing.

(2) For the duration of sampling, a temperature around the probe and filter (and cyclone, if used) between 120 °C

(248 °F) and 134 °C (273 °F) must be maintained.

(3) If water droplets are present in the sample gas stream, the requirements specified in paragraphs (g)(3)(i) and (ii) of this section must be met.

(i) The cyclone described in section 6.1.4 of EPA Method 26A of Appendix A to this part must be used.

(ii) The post-test moisture removal procedure described in section 8.1.6 of EPA Method 26A of Appendix A to this part must be used.

■ 25. Revise § 60.2923 to read as follows:

### § 60.2923    How are the performance test data used?

You use results of performance tests to demonstrate compliance with the emission limitations in tables 1, 1a, and 1b to this subpart.

■ 26. Revise § 60.2927 to read as follows:

### § 60.2927    How do I demonstrate initial compliance with the emission limitations and establish the operating limits?

(a) Except as provided in paragraph (b) of this section, you must conduct an initial performance test, as required under § 60.8, to determine compliance with the emission limitations in table 1, 1a, or 1b to this subpart and to establish operating limits using the procedures in § 60.2916 or § 60.2917. The initial performance test must be conducted using the test methods listed in table 1, 1a, or 1b to this subpart and the procedures in § 60.2922. In the event of any conflict between § 60.8 and the provisions of this subpart, the provisions of this subpart shall apply.

(b) For very small municipal waste combustion units and institutional waste incineration units with a capacity less than or equal to 10 tons per day, you must demonstrate initial compliance according to paragraph (a) of this section, unless you comply with the requirements for the substitute means of compliance demonstration in § 60.2929.

(c) For each OSWI unit with a capacity greater than 10 tons per day, as an alternative to conducting a performance test under paragraph (a) of this section for carbon monoxide, you may use a 12-hour rolling average of the 1-hour arithmetic average CEMS data to determine compliance with the emission limitations in tables 1, 1a, and 1b to this subpart. The initial performance evaluation required by § 60.2940(b) must be conducted prior to collecting CEMS data that will be used for the initial compliance demonstration.

■ 27. Revise § 60.2928 to read as follows:

**§ 60.2928   By what date must I conduct the initial performance test?**

The initial performance test must be conducted within 60 days after your OSWI unit reaches the charge rate at which it will operate, but no later than 180 days after its initial startup. For units which start-up between August 31, 2020, and December 29, 2025, the initial performance test must be conducted within 60 days after your OSWI unit reaches the charge rate at which it will operate, but no later than 180 days after its initial startup, or by February 25, 2026, whichever date is later.

■ 28. Under the center heading ''Initial Compliance Requirements'', add § 60.2929 o read as follows:

**§ 60.2929   What are the substitute means of compliance demonstration requirements for very small municipal waste combustion units and institutional waste incineration units with capacities less than or equal to 10 tons per day?**

Instead of conducting the initial performance test in § 60.2927(a), very small municipal waste combustion units and institutional waste incineration units with capacities less than or equal to 10 tons per day may demonstrate initial compliance according to the requirements in paragraphs (a) through (d) of this section.

(a) You must submit the information specified in paragraph (a)(1) of this section and comply with the requirements of paragraph (a)(2) of this section for each very small municipal waste combustion unit or institutional waste incineration unit for which you are using a substitute means of compliance demonstration.

(1) On or before December 29, 2025 or within 60 days of startup, whichever is later, you must submit a written notification to the Administrator via CEDRI, which can be accessed through the EPA's Central Data Exchange (CDX) (*https://cdx.epa.gov),* that you intend to use the substitute means of compliance demonstration. Your submittal must include information on the design and operation of the OSWI unit, including the information in paragraphs (a)(1)(i) through (iv) of this section. Do not use CEDRI to submit information you claim as confidential business information (CBI). If you wish to assert a CBI claim, submit the information listed below following the procedures in paragraph (b)(3) of this section.

(i) Manufacturer, make, and model of the unit.

(ii) Type of unit (*e.g.,* burn barrel, incinerator with secondary chamber, etc.).

(iii) Capacity of the unit.

(iv) The anticipated waste profile, as defined in § 60.2977.

(2) Beginning on December 29, 2025 or upon initial startup, whichever is later, you must collect the data in paragraphs (a)(2)(i) through (vii) of this section. You must continue to collect the data in paragraphs (a)(2)(i) through (vii) of this section until you meet the requirements of paragraph (b) of this section.

(i) Identity and weight of each waste type (*e.g.,* lbs of paper waste, food waste, wood or yard waste) on a weekly total basis for the date range the information is collected.

(ii) Identity and quantities (*e.g.,* flow rate or percentage of operating time) of supplemental fuels burned on a weekly total basis for the date range the information is collected.

(iii) Percentage of total waste burned for each waste type on a weekly average basis for the date range the information is collected.

(iv) Temperature indicative of the combustion chamber and description of where temperature is measured. Record this information on a 3-hour rolling average basis for the date range the information is collected.

(v) Hours operated per day for the date range the information is collected.

(vi) Charge rate each day in tons per day for the date range the information is collected.

(vii) Operating parameter data for any air pollution control devices. For wet scrubbers, include pressure drop across the scrubber or amperage to the scrubber, scrubber liquor inlet flow rate, and scrubber liquor pH at the outlet of the scrubber. For dry scrubbers, include injection rate of each sorbent used. For electrostatic precipitators, include the secondary voltage, secondary amperage, and secondary power. Record this information on a 3-hour rolling average basis for the date range the information is collected.

(b) On or before the latest of March 30, 3027; 60 days after the very small municipal waste combustion unit or institutional waste incineration unit reaches the charge rate at which it will operate; or 180 days after initial startup, you must identify the results of a performance test in the EPA's WebFIRE database that is representative for your very small municipal waste combustion unit or institutional waste incineration unit using the criteria in paragraphs (b)(2)(i) through (viii) of this section and submit the information in paragraphs (b)(1) and (2) of this section. You must submit the information following the procedure in paragraph (b)(3) of this section. The performance test may be

any test that meets the requirements in paragraph (c) of this section, regardless of location, that is representative of your OSWI unit.

(1) Identify the representative performance test used to demonstrate initial compliance with each very small municipal waste combustion unit or institutional waste incineration unit by submitting the information in paragraphs (b)(1)(i) through (vi) of this section as provided in the EPA's WebFIRE database for the performance test:

(i) Organization.

(ii) Facility.

(iii) City.

(iv) State.

(v) County.

(vi) Submission date.

(2) Describe how the test is representative for your OSWI unit, based on the following criteria, using the data submitted as specified in paragraph (a)(1) of this section and collected as specified in paragraph (a)(2) of this section:

(i) Unit design, including type of unit and any associated air pollution control devices.

(ii) Charge rate.

(iii) Type of operation (batch, continuous, intermittent).

(iv) Combustion temperature and location of temperature measurement.

(v) Type(s) of waste burned.

(vi) Waste profile, as defined in § 60.2977.

(vii) Type and amount of supplemental fuels.

(viii) Similarity of air pollution control devices and operation of the air pollution control devices, if the performance test was conducted on a unit with an air pollution control device.

(3) You must submit the information required in paragraphs (b)(1) and (2) of this section via CEDRI, which can be accessed through the EPA's Central Data Exchange (CDX) (*https://cdx.epa.gov/).* The EPA will make all the information submitted through CEDRI available to the public without further notice to you. Do not use CEDRI to submit information you claim as CBI. If you wish to assert a CBI claim, submit the information, including information claimed to be CBI, to the EPA following the procedures in paragraphs (b)(3)(i) and (ii) of this section. Clearly mark the part or all of the information that you claim as CBI. Information not marked as CBI may be authorized for public release without prior notice. Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 CFR part 2. All CBI claims must be asserted at the time of

submission. Anything submitted using CEDRI cannot later be claimed CBI. Furthermore, under CAA section 114(c), emissions data is not entitled to confidential treatment, and the EPA is required to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available. You must submit the same file submitted to the CBI office with the CBI omitted to the EPA via the EPA's CDX as described earlier in this paragraph.

(i) The preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol, or other online file sharing services. Electronic submissions must be transmitted directly to the OAQPS CBI Office at the email address *oaqps_cbi@epa.gov*, and as described above, should include clear CBI markings and be flagged to the attention of the Other Solid Waste Incinerator Units Sector Lead. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email *oaqps_cbi@epa.gov* to request a file transfer link.

(ii) If you cannot transmit the file electronically, you may send CBI information through the postal service to the following address: U.S. EPA, Attn: OAQPS Document Control Officer and Other Solid Waste Incinerator Units Sector Lead, Mail Drop: C404–02, 109 T.W. Alexander Drive, P.O. Box 12055, RTP, NC 27711. The mailed CBI material should be double wrapped and clearly marked. Any CBI markings should not show through the outer envelope.

(c) Any performance test used as a representative test in a substitute means of compliance demonstration under paragraph (b) of this section must be conducted following the initial testing requirements of § 60.2922 and demonstrate compliance with the emission limits in table 1b to this subpart. In addition to the results of the performance test and the information required by § 60.8(f)(2), the performance test report must contain the information in paragraphs (c)(1) through (8) of this section.

(1) Unit design, including type of unit and any associated air pollution control devices.

(2) Charge rate during the test.

(3) Type of operation (batch, continuous, intermittent).

(4) Combustion temperature and location of temperature measurement. The temperature must be recorded continuously for each run of the performance test. The performance test

report must also identify the lowest 1-hour average combustion chamber operating temperature.

(5) Types of waste burned during the test.

(6) Waste profile, as defined in § 60.2977, established during the test.

(7) Type and amount of supplemental fuels burned during the test and the timeframe that each supplemental fuel was burned during the test.

(8) If the performance test was conducted on a unit with an air pollution control device, the operating parameter data for the control device must be recorded continuously for each run of the performance test. The performance test report must also identify the lowest or highest, as applicable, 1-hour average for the operating parameter.

(i) For wet scrubbers, the performance test report must include data for pressure drop across the scrubber or amperage to the scrubber, scrubber liquor inlet flow rate, and scrubber liquor pH at the outlet of the scrubber.

(ii) For dry scrubbers, the performance test report must include data for the injection rate of each sorbent used.

(iii) For electrostatic precipitators, the performance test report must include data for the secondary voltage, secondary amperage, and secondary power.

(d) If there are no results from a performance test that meet the requirements of paragraph (c) of this section that are representative of your OSWI unit, you must demonstrate initial compliance according to the requirements of § 60.2927(a).

■ 29. Revise § 60.2932 to read as follows:

### § 60.2932 How do I demonstrate continuous compliance with the emission limitations and the operating limits?

You must demonstrate continuous compliance according to the requirements in paragraphs (a) through (c) of this section, unless you own or operate a very small municipal waste combustion unit or institutional waste incineration unit with a capacity less than or equal to 10 tons per day. If you own or operate a very small municipal waste combustion unit or institutional waste incineration unit with a capacity less than or equal to 10 tons per day, you must either comply with the requirements in paragraphs (a) and (c) of this section or the requirements in paragraph (d) of this section.

(a) You must conduct an annual performance test for all pollutants in table 1, 1a, or 1b to this subpart for each OSWI unit to determine compliance

with the emission limitations, except if you own or operate an OSWI unit with a capacity greater than 10 tons per day you are not required to conduct an annual performance test for carbon monoxide. The annual performance test must be conducted using the test methods listed in table 1, 1a, or 1b to this subpart and the procedures in § 60.2922.

(b) You must continuously monitor carbon monoxide emissions to determine compliance with the carbon monoxide emissions limitation. Twelve-hour rolling average values, including CEMS data during startup and shutdown as defined in this subpart, are used to determine compliance. A 12-hour rolling average value above the carbon monoxide emission limit in table 1, 1a, or 1b to this subpart constitutes a deviation from the emission limitation.

(c) You must continuously monitor the operating parameters specified in § 60.2916(a) through (f) or established under § 60.2917. Three-hour rolling average values are used to determine compliance with the operating limits, except for bag leak detection system alarm time, unless a different averaging period is established under § 60.2917. A 3-hour rolling average value (unless a different averaging period is established under § 60.2917) above the established maximum or below the established minimum operating limits constitutes a deviation from the established operating limits. For bag leak detection systems, an alarm time of more than 5 percent of the operating time during a 6-month period constitutes a deviation from the operating limit. Operating limits do not apply during performance tests.

(d) For each very small municipal waste combustion unit or institutional waste incineration unit with capacity less than or equal to 10 tons per day, unless you comply with the requirements in paragraphs (a) and (c) of this section, you must comply with the requirements in paragraphs (d)(1) through (3) of this section.

(1) You must maintain the percentage of waste burned in each waste category within +/− 15 percent of the percentage of total waste burned on a mass basis as established for that waste category according to the waste profile established under § 60.2916(g). You must demonstrate that the percentage of waste burned in each waste category is maintained within +/− 15 percent of the percentage of total waste burned on a mass basis as established for that waste category according to the waste profile established under § 60.2916(g) according to paragraphs (d)(1)(i) through (iii) of this section.

(i) At the end of each calendar quarter, you must determine the mass of waste burned in each waste category for that quarter. You must determine the total waste burned during the quarter by summing the quarterly totals for all the waste categories. You must then determine the amount of waste burned in each waste category as a percentage of the total waste burned on a mass basis by dividing the quarterly total in each waste category by the quarterly total waste burned.

(ii) You must also maintain records as required in § 60.2949(q).

(iii) The values calculated in (d)(1)(i) must be +/− 15 percent of the percentage of total waste burned on a mass basis as established for that waste category according to the waste profile established under § 60.2916(g). Failure to maintain the percentage of waste burned in each waste category within +/− 15 percent of the percentage established for that waste category in any calendar quarter constitutes a deviation.

(2) If you want to establish new operating parameter limits or establish a different waste profile, you must comply with § 60.2935(b).

(3) You must continuously monitor the operating parameters specified in § 60.2916(b) through (f), as applicable. The total daily charge rate is used to determine compliance with the charge rate limit in § 60.2916(a). For the operating parameters in § 60.2916(b) through (f), determine compliance as described in paragraph (d)(3)(i) or (ii) of this section. Failure to meet the operating parameters specified in § 60.2916(a) through (f) is a deviation.

(i) Three-hour rolling average values are used to determine compliance with the operating parameter limits, unless your OSWI unit operates on a batch basis and it is operated for less than three hours.

(ii) If your OSWI unit operates on a batch basis, and you operate for less than three hours, compliance with the operating parameter limits is determined by averaging the operating parameter over the length of the batch operation.

■ 30. Revise § 60.2933 to read as follows:

### § 60.2933  By what date must I conduct the annual performance test?

For each OSWI unit that is subject to the annual performance test requirement in § 60.2932(a), you must conduct an annual performance test no later than 14 calendar months following the initial performance test. Conduct subsequent annual performance tests no later than 14 calendar months following the previous annual performance test.

■ 31. Amend § 60.2934 by adding paragraph (d) to read as follows:

### § 60.2934  May I conduct performance testing less often?

\*    \*    \*    \*    \*

(d) For very small municipal waste combustion units and institutional waste incineration units with capacities less than or equal to 10 tons per day demonstrating initial compliance following the substitute means of compliance demonstration requirements in § 60.2929, the requirements in paragraphs (a) through (c) of this section do not apply.

■ 32. Revise § 60.2935 to read as follows:

### § 60.2935  May I conduct a repeat performance test to establish new operating limits?

(a) Yes, you may conduct a repeat performance test at any time to establish new values for the operating limits. The Administrator may request a repeat performance test at any time.

(b) For each very small municipal waste combustion unit or institutional waste incineration unit for which you opt to demonstrate continuous compliance following the requirements in § 60.2932(d), if you want to establish new operating parameter limits or establish a different waste profile, you must comply with either paragraph (b)(1) or (2) of this section.

(1) You must conduct a new performance test of the unit using the test methods listed in table 1b to this subpart and the procedures in § 60.2922 with a waste stream representative of the new waste profile or under the new operating parameter limits.

(2) You must identify a representative performance test that meets the requirements in § 60.2929(c). You must submit the information in § 60.2929(b)(1) and (2) to the Administrator.

■ 33. Revise § 60.2939(a) to read as follows:

### § 60.2939  What continuous emission monitoring systems must I install?

(a) For each OSWI unit with a capacity greater than 10 tons per day, you must install, calibrate, maintain, and operate continuous emission monitoring systems for carbon monoxide and for oxygen. You must monitor the oxygen concentration at each location where you monitor carbon monoxide.

\*    \*    \*    \*    \*

■ 34. Amend § 60.2940 by revising paragraphs (b) and (c) to read as follows:

### § 60.2940  How do I make sure my continuous emission monitoring systems are operating correctly?

\*    \*    \*    \*    \*

(b) Complete your initial performance evaluation of the continuous emission monitoring systems within 60 days after your OSWI unit reaches the maximum load level at which it will operate, but no later than 180 days after its initial startup.

(c) For initial and annual performance evaluations, collect data concurrently (or within 30 to 60 minutes) using your carbon monoxide and oxygen continuous emission monitoring systems. To validate carbon monoxide concentration levels, use EPA Method 10, 10A, or 10B of Appendix A to this part. Use EPA Method 3A or 3B of Appendix A to this part or ASME/ANSI PTC 19.10–1981 (incorporated by reference, see § 60.17), in lieu of Method 3B, to measure oxygen. Collect the data during each initial and annual evaluation of your continuous emission monitoring systems following the applicable performance specifications in Appendix B to this part. Table 3 to this subpart shows the required span values and performance specifications that apply to each continuous emission monitoring system.

\*    \*    \*    \*    \*

■ 35. Amend § 60.2942 by revising the section heading and paragraphs (a) and (f) to read as follows:

### § 60.2942  What is the minimum amount of monitoring data I must collect with my continuous emission monitoring systems?

(a) Where continuous emission monitoring systems are required, obtain 1-hour arithmetic averages. Except for CEMS data during startup and shutdown, as defined in this subpart, the 1-hour arithmetic averages for carbon monoxide must be expressed in parts per million by dry volume corrected to 7 percent oxygen. The CEMS data during startup and shutdown are not corrected to 7 percent oxygen and are measured at stack oxygen content. Use the 1-hour averages of oxygen data from your CEMS to determine the actual oxygen level and to calculate emissions at 7 percent oxygen. Use Equation 2 in § 60.2975 to calculate the 12-hour rolling averages from the 1-hour arithmetic averages.

\*    \*    \*    \*    \*

(f) If continuous emission monitoring systems are temporarily unavailable to meet the data collection requirements, refer to table 3 to this subpart. It shows alternate methods for collecting data when systems malfunction or when repairs, calibration checks, or zero and span checks keep you from collecting

the minimum amount of data. Failure to collect required data is a deviation of the monitoring requirements.

■ 36. Revise § 60.2944 to read as follows:

### § 60.2944 What operating parameter monitoring equipment must I install, or what operating parameters must I monitor?

(a) You must install, calibrate (to manufacturers' specifications at the frequency recommended by the manufacturer), maintain, and operate devices (or establish methods) for monitoring the value of the operating parameters used to determine compliance with the operating limits listed in table 2 to this subpart, as applicable. These devices (or methods) must measure and record the values for these operating parameters at the frequencies indicated in table 2 to this subpart at all times. The devices must be positioned to provide a representative measurement of the parameter monitored.

(b) You must install, calibrate (to manufacturers' specifications), maintain, and operate a device or method for measuring the use of any stack that could be used to bypass the control device. The measurement must include the date, time, and duration of the use of the bypass stack.

(c) If you are using a fabric filter to comply with the requirements of this subpart, you must install, calibrate, maintain, and continuously operate a bag leak detection system as specified in paragraphs (c)(1) through (8) of this section:

(1) You must install and operate a bag leak detection system for each exhaust stack of the fabric filter. The bag leak sensor(s) must be installed in a position(s) that will be representative of the relative or absolute particulate matter loadings for each exhaust stack, roof vent, or compartment of the fabric filter;

(2) Each bag leak detection system must be installed, operated, calibrated, and maintained in a manner consistent with the manufacturer's written specifications and recommendations; and in accordance with the guidance provided in EPA–454/R–98–015 (incorporated by reference, see § 60.17);

(3) The bag leak detection system must be certified by the manufacturer to be capable of detecting particulate matter emissions at concentrations of 1 milligrams per actual cubic meter or less;

(4) The bag leak detection system sensor must provide output of relative or absolute particulate matter loadings;

(5) The bag leak detection system must be equipped with a device to

continuously record the output signal from the sensor;

(6) The bag leak detection system must be equipped with an alarm system that will automatically alert an operator when an increase in relative particulate matter emissions over a preset level is detected. The alarm must be located where it is observed easily by operating personnel;

(7) For positive pressure fabric filter systems, a bag leak detection system must be installed in each baghouse compartment or cell. For negative pressure or induced air fabric filters, the bag leak detector must be installed downstream of the fabric filter; and

(8) Where multiple detectors are required, the system's instrumentation and alarm may be shared among detectors.

(d) If you are required to petition the EPA for operating limits under § 60.2917, you must install, calibrate (to the manufacturers' specifications), maintain, and operate the equipment necessary to monitor compliance with the site-specific operating limits established using the procedures in § 60.2917.

■ 37. Amend § 60.2949 by revising the introductory paragraph, paragraphs (b) through (e), and (g), and adding paragraphs (p), (q) and (r) to read as follows:

### § 60.2949 What records must I keep?

You must maintain the information specified in paragraphs (a) through (r) of this section, as applicable, for a period of at least 5 years.

\* \* \* \* \*

(b) Records of the data described in paragraphs (b)(1) through (10) of this section.

(1) The OSWI unit charge dates, times, weights, and total daily charge rates.

(2) The combustion chamber operating temperature every 15 minutes of operation.

(3) For each OSWI unit with a wet scrubber, the liquor flow rate to the wet scrubber inlet, pressure drop across the wet scrubber system or amperage to the wet scrubber, and liquor pH at the outlet of the wet scrubber, every 15 minutes of operation.

(4) For each OSWI unit with a dry scrubber, the injection rate of each sorbent, every 15 minutes of operation.

(5) For each OSWI unit with an electrostatic precipitator, the secondary voltage, secondary current, and secondary electric power, every 15 minutes of operation.

(6) For each OSWI unit with a fabric filter, the date, time, and duration of

each alarm; the times corrective action was initiated and completed; and a brief description of the cause of the alarm and the corrective action taken. You must also record the percent of the operating time during each 6-month period that the alarm sounds, calculated as specified in § 60.2916(f).

(7) For OSWI units that establish operating limits for controls under § 60.2917, you must maintain data collected for all operating parameters used to determine compliance with the operating limits.

(8) For OSWI units that use a carbon monoxide CEMS, all 1-hour average concentrations of carbon monoxide and oxygen.

(9) All 12-hour rolling average values of carbon monoxide emissions, corrected to 7 percent oxygen (except during periods of startup and shutdown), all 3-hour rolling average values of continuously monitored operating parameters, and total daily charge rates, as applicable.

(10) Records of the dates, times, and durations of any bypass of the control device.

(c) Records of the start date and time and duration in hours of each malfunction of operation (*i.e.*, process equipment) or the air pollution control and monitoring equipment, and description of the malfunction.

(d) Records of actions taken during periods of malfunction to minimize emissions in accordance with § 60.11(d), including corrective actions to restore malfunctioning process and air pollution control and monitoring equipment to its normal or usual manner of operation.

(e) Start date, start time, and duration in hours for each period for which monitoring data show a deviation from the carbon monoxide emissions limit in table 1, 1a, or 1b to this subpart, a deviation from the operating limits in table 2 to this subpart, or a deviation from other operating limits established under § 60.2917. Include a description of the deviation, reasons for the deviation, and a description of corrective actions taken. You must record the start date, start time, and duration in hours for each period when all qualified operators were not accessible in accordance with § 60.2911.

\* \* \* \* \*

(g) For carbon monoxide continuous emissions monitoring systems, document the results of your annual performance evaluations, daily drift tests and quarterly accuracy determinations according to Procedure 1 of Appendix F to this part.

\* \* \* \* \*

(p) If you comply with the substitute means of compliance demonstration requirements in § 60.2929, you must keep the records specified in paragraphs (p)(1) through (4) of this section.

(1) Copy of the notification submitted to the Administrator that you intend to use the substitute means of compliance demonstration as required in § 60.2929(a)(1).

(2) Records of the data collected as required in § 60.2929(a)(2).

(3) Copy of the representative performance test used to demonstrate initial compliance; and

(4) Documentation of how the test in paragraph (p)(3) of this section is representative of the unit as required in § 60.2929(b)(2).

(q) If you comply with the continuous compliance requirements of § 60.2932(d), you must keep records of the following elements:

(1) Start and end times the unit is operated when waste is being combusted.

(2) Total mass of waste burned for each waste category (*i.e.*, identity and weight of each waste category such as solid waste, food waste, wood or yard waste), summed for each calendar quarter.

(3) Total mass of waste burned each calendar quarter.

(4) The amount of waste burned in each waste category as a percentage of total waste burned each calendar quarter.

(5) Waste profile established under § 60.2916(g).

(6) Temperature of unit combustion chamber and description of where temperature is measured, as a 3-hour average for each batch operation.

(7) Charge rate (in tons per day) of each operation.

(8) For each very small municipal waste combustion unit or institutional waste incineration unit with a capacity less than or equal to 10 tons per day using a wet scrubber, dry scrubber, electrostatic precipitator, or fabric filter, the records specified in paragraphs (b)(3) through (10) of this section, as applicable.

(9) For each calendar quarter, you must record whether your waste profile meets the requirement in paragraph § 60.2932(d)(1)(iii).

(r) Copies of any notifications submitted pursuant to §§ 60.2887 and 60.2969.

■ 38. Amend § 60.2954 by revising the introductory paragraph and adding paragraph (c) to read as follows:

### § 60.2954 What information must I submit following my initial performance test?

Unless you choose to comply with the substitute means of compliance demonstration requirements in § 60.2929, you must submit the information specified in paragraphs (a) and (b) of this section no later than 60 days following the initial performance test. All reports must be signed by the facilities manager.

\* \* \* \* \*

(c) The waste management plan, as specified in §§ 60.2899 through 60.2901.

■ 39. Revise § 60.2955 to read as follows:

### § 60.2955 When must I submit my annual report?

You must submit an annual report no later than 12 months following the submission of the information in § 60.2954, unless you choose to comply with the substitute means of compliance demonstration requirements in § 60.2929. If you choose to comply with the substitute means of compliance demonstration requirements in § 60.2929, you must submit an annual report no later than 12 months following the submission of the information in § 60.2929(b). You must submit subsequent reports no more than 12 months following the previous report. The permit will address the submittal of annual reports for a unit with an operating permit required under title V of the Clean Air Act.

■ 40. Revise and republish § 60.2956 to read as follows:

### § 60.2956 What information must I include in my annual report?

The annual report required under § 60.2955 must include the items listed in paragraphs (a) through (k) of this section. If you have a deviation from the operating limits or the emission limitations, you must also submit deviation reports as specified in §§ 60.2957 through 60.2959.

(a) Company name and address.

(b) Statement by the owner or operator, with their name, title, and signature, certifying the truth, accuracy, and completeness of the report. Such certifications must also comply with the requirements of 40 CFR 70.5(d) or 40 CFR 71.5(d). If your report is submitted via CEDRI, the certifier's electronic signature during the submission process replaces this requirement.

(c) Date of report and beginning and ending dates of the reporting period. You are no longer required to provide the date of report when the report is submitted via CEDRI.

(d) Identification of each OSWI unit, and for each OSWI unit, the parameters monitored and values for the operating limits established pursuant to § 60.2916 or § 60.2917.

(e) If no deviations from any emission limitation or operating limit that applies to you have occurred during the annual reporting period, a statement that there were no deviations from the emission limitations or operating limits during the reporting period. If you use a CMS to monitor emissions or operating parameters and there were no periods during which any CMS was inoperative, inactive, malfunctioning or out of control, a statement that no monitoring system used to determine compliance with the emission limitations or operating limits was inoperative, inactive, malfunctioning or out of control.

(f) The highest recorded 12-hour average and the lowest recorded 12-hour average, as applicable, for carbon monoxide emissions if you are using a CEMS to demonstrate continuous compliance and the highest recorded 3-hour average and the lowest recorded 3-hour average, as applicable, for each operating parameter recorded for the calendar year being reported.

(g) [Reserved].

(h) If a performance test was conducted during the reporting period, identification of the OSWI unit tested, the pollutant(s) tested, and the date of the performance test. Submit, following the procedure specified in § 60.2961(b), the performance test report no later than the date that you submit the annual report.

(i) If you met the requirements of § 60.2934(a) or (b) and did not conduct a performance test during the reporting period, you must state that you met the requirements of § 60.2934(a) or (b), and, therefore, you were not required to conduct a performance test during the reporting period.

(j) The start date, start time, and duration in hours for each period of operation when all qualified OSWI unit operators were unavailable for more than 12 hours, but less than 2 weeks.

(k) If you are complying with the continuous compliance requirements in § 60.2932(d) and have had no deviations from maintaining the percentage of waste burned in each waste category within +/− 15 percent of the percentage established for that waste category for each calendar quarter for the reporting period, and the OSWI unit has been operated within the operating parameter limits established during the representative performance test identified in the information submitted as required in § 60.2929(b) or the performance test conducted by the source using the test methods listed in table 1b to this subpart and the procedures in § 60.2922, a statement that there were no deviations from the

percentage of waste burned in each category and the OSWI unit has been operated within the established operating parameter limits.

■ 41. Amend § 60.2957 by revising the section heading and paragraph (a) to read as follows:

### § 60.2957 What other reports must I submit if I have a deviation?

(a) You must submit a deviation report as specified in paragraphs (a)(1) through (3) of this section:

(1) If your OSWI unit fails to meet any requirement or obligation established by this subpart, including but not limited to any emission limitation, operating limit, or operator qualification and accessibility requirements.

(2) If your OSWI unit fails to meet any term or condition that is adopted to implement an applicable requirement in this subpart and that is included in the operating permit for any unit that meets the requirements in § 60.2885 and is required to obtain such a permit.

(3) If you deviate from the requirements to have a qualified operator accessible as specified in § 60.2911, you must meet the requirements of § 60.2959.

*    *    *    *    *

■ 42. Revise § 60.2958 to read as follows:

### § 60.2958 What must I include in the deviation report?

In each report required under § 60.2957, you must include the company name and address and the beginning and ending dates for the reporting period. For any pollutant or operating parameter that deviated from the emission limitations, operating limits or other requirement specified in this subpart, or for each CMS that experienced downtime or was out of control, include the items described in paragraphs (a) through (g) of this section, as applicable. If you are complying with the continuous compliance requirements in § 60.2932(d), you must also include the items described in paragraphs (h) and (i) of this section. You must identify the OSWI unit, and as applicable, the CMS, associated with the information required in paragraphs (a) through (i) of this section in your deviation report.

(a) Identification of the emission limit, operating parameter or other requirement except as provided in paragraphs (h) and (i), from which there was a deviation and the start date, start time, and duration in hours of each deviation.

(b) For each deviation identified in paragraph (a) of this section, the averaged and recorded data for those date, including, when applicable, the information recorded under § 60.2949(b)(9) and (c) through (e) for the calendar period being reported.

(c) For each deviation identified in paragraph (a) of this section, the cause of each deviation from the emission limitations, operating limits or other requirement and your corrective actions.

(d) For each CMS, the start date, start time, duration in hours, and cause for each instance of monitor downtime (other than downtime associated with zero, span, and other routine calibration checks).

(e) For each CMS, the start date, start time, duration in hours, and corrective action taken for each instance that the monitor is out of control.

(f) The start date, start time, and duration in hours of any bypass of the control device and your corrective actions.

(g) For batch OSWI units, the start date, start time, and duration in hours of any deviation from the requirements to have a qualified operator accessible as required in § 60.2911.

(h) If you are complying with the continuous compliance requirements for OSWI units in § 60.2932(d), you must identify each calendar quarter when your waste profile did not meet the requirements in § 60.2932(d)(1)(iii). For each deviation, you must identify each waste category that did not meet the percentage requirements, the established percentage of total waste burned on a mass basis for that waste category in your waste profile, and the actual percentage of total waste burned on a mass basis for that waste category during the calendar quarter.

(i) If you are complying with the continuous compliance requirements in § 60.2932(d), for each deviation of an operating parameter limit, identification of the operating parameter from which there was a deviation and the start date, start time, duration in hours, and cause for each deviation from the operating parameter limits established during the representative performance test identified in the information submitted as required in § 60.2929(b) or a performance test of the unit conducted using the test methods listed in table 1b to this subpart and the procedures in § 60.2922 as required in § 60.2927(a) or § 60.2935(b).

■ 43. Revise § 60.2961 to read as follows:

### § 60.2961 In what form can I submit my reports?

(a) You must submit annual and deviation reports electronically or in paper format, postmarked on or before the submittal due dates. Beginning on June 30, 2026, or once the report template for this subpart has been available on the Compliance and Emissions Data Reporting Interface (CEDRI) website (*https://www.epa.gov/electronic-reporting-air-emissions/cedri*) for one year, whichever date is later, you must submit all subsequent annual compliance reports and deviation reports using the appropriate electronic report template on the CEDRI website for this subpart and following the procedure specified in paragraph (c) of this section. The date report templates become available will be listed on the CEDRI website. Unless the Administrator or delegated state agency or other authority has approved a different schedule for submission of reports, the report must be submitted by the deadline specified in this subpart, regardless of the method in which the report is submitted.

(b) Beginning on December 29, 2025, within 60 days after the date of completing each performance test or CEMS performance evaluation that includes a relative accuracy test audit (RATA) required by this subpart, you must submit the results following the procedures specified in paragraph (c) of this section. You must submit the report in a file format generated using the EPA's Electronic Reporting Tool (ERT). Alternatively, you may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) accompanied by the other information required by § 60.8(f)(2) in portable document format (PDF). If your performance test consists solely of opacity measurements, the results do not need to be submitted in the format generated by the ERT. Instead, you may submit a PDF of the results of the opacity measurements to the EPA via CEDRI.

(c) If you are required to submit reports following the procedure specified in this paragraph (c), you must submit reports to the EPA via CEDRI, which can be accessed through the EPA's Central Data Exchange (CDX) (*https://cdx.epa.gov/*). The EPA will make all the information submitted through CEDRI available to the public without further notice to you. Do not use CEDRI to submit information you claim as CBI. Although we do not expect persons to assert a claim of CBI, if you wish to assert a CBI claim for some of the information in the report, you must submit a complete file in the format specified in this subpart, including information claimed to be CBI, to the EPA following the

procedures in paragraphs (c)(1) and (2) of this section. Clearly mark the part or all of the information that you claim to be CBI. Information not marked as CBI may be authorized for public release without prior notice. Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 CFR part 2. All CBI claims must be asserted at the time of submission. Anything submitted using CEDRI cannot later be claimed CBI. Furthermore, under CAA section 114(c), emissions data is not entitled to confidential treatment, and the EPA is required to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available. You must submit the same file submitted to the CBI office with the CBI omitted to the EPA via the EPA's CDX as described earlier in this paragraph (c).

(1) The preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol, or other online file sharing services. Electronic submissions must be transmitted directly to the OAQPS CBI Office at the email address *oaqps_cbi@epa.gov*, and as described above, should include clear CBI markings. ERT files should be flagged to the attention of the Group Leader, Measurement Policy Group; all other files should be flagged to the attention of the Other Solid Waste Incinerator Units Sector Lead. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email *oaqps_cbi@epa.gov* to request a file transfer link.

(2) If you cannot transmit the file electronically, you may send CBI information through the postal service to the following address: U.S. EPA, Attn: OAQPS Document Control Officer, Mail Drop: C404–02, 109 T.W. Alexander Drive, P.O. Box 12055, RTP, NC 27711. In addition to the OAQPS Document Control Officer, ERT files should also be sent to the attention of the Group Leader, Measurement Policy Group, and all other files should also be sent to the attention of the Other Solid Waste Incinerator Units Sector Lead. The mailed CBI material should be double wrapped and clearly marked. Any CBI markings should not show through the outer envelope.

(d) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of EPA system outage for failure to timely comply with the reporting requirement. To assert a claim of EPA system outage, you must meet

the requirements outlined in paragraphs (d)(1) through (7) of this section.

(1) You must have been or will be precluded from accessing CEDRI and submitting a required report within the time prescribed due to an outage of either the EPA's CEDRI or CDX systems.

(2) The outage must have occurred within the period beginning five business days prior to the date that the submission is due.

(3) The outage may be planned or unplanned.

(4) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(5) You must provide to the Administrator a written description identifying:

(i) The date(s) and time(s) when CDX or CEDRI was accessed and the system was unavailable;

(ii) A rationale for attributing the delay in reporting beyond the regulatory deadline to EPA system outage;

(iii) A description of measures taken or to be taken to minimize the delay in reporting; and

(iv) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(6) The decision to accept the claim of EPA system outage and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(7) In any circumstance, the report must be submitted electronically as soon as possible after the outage is resolved.

(e) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of force majeure for failure to timely comply with the reporting requirement. To assert a claim of force majeure, you must meet the requirements outlined in paragraphs (e)(1) through (5) of this section.

(1) You may submit a claim if a force majeure event is about to occur, occurs, or has occurred or there are lingering effects from such an event within the period beginning five business days prior to the date the submission is due. For the purposes of this section, a force majeure event is defined as an event that will be or has been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevents you from complying with the requirement to submit a report electronically within the time prescribed. Examples of such events are

acts of nature (*e.g.*, hurricanes, earthquakes, or floods), acts of war or terrorism, or equipment failure or safety hazard beyond the control of the affected facility (*e.g.*, large scale power outage).

(2) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(3) You must provide to the Administrator:

(i) A written description of the force majeure event;

(ii) A rationale for attributing the delay in reporting beyond the regulatory deadline to the force majeure event;

(iii) A description of measures taken or to be taken to minimize the delay in reporting; and

(iv) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(4) The decision to accept the claim of force majeure and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(5) In any circumstance, the reporting must occur as soon as possible after the force majeure event occurs.

**§ 60.2970  [Amended]**

■ 44. Amend § 60.2970 by removing and reserving paragraph (b) to read as follows:

■ 45. Revise § 60.2971(b) to read as follows:

**§ 60.2971  What are the emission limitations for air curtain incinerators that burn only wood waste, clean lumber, and yard waste?**

\*      \*      \*      \*      \*

(b) The limitations in paragraph (a) of this section apply at all times.

■ 46. Revise § 60.2972(a) to read as follows:

**§ 60.2972  How must I monitor opacity for air curtain incinerators that burn only wood waste, clean lumber, and yard waste?**

(a) Use EPA Method 9 of Appendix A to this part or ASTM D7520–16 (incorporated by reference, see § 60.17), to determine compliance with the opacity limitation.

\*      \*      \*      \*      \*

■ 47. Revise § 60.2973(e) to read as follows:

**§ 60.2973  What are the recordkeeping and reporting requirements for air curtain incinerators that burn only wood waste, clean lumber, and yard waste?**

\*      \*      \*      \*      \*

(e) Before December 29, 2025, submit initial and annual opacity test reports as electronic or paper copy on or before the applicable submittal date. On and after December 29, 2025, within 60 days after the date of completing the initial opacity test and each annual opacity test required by this subpart, you must submit the results of the opacity test following the procedures specified in § 60.2961(b).

\* \* \* \* \*

■ 48. Revise § 60.2975(d) to read as follows:

### § 60.2975  What equations must I use?

\* \* \* \* \*

(d) *Carbon monoxide pollutant rate.* When hourly average pollutant rates (E$_h$) are obtained (*e.g.*, CEMS values), compute the rolling average carbon monoxide pollutant rate (E$_a$) for each 12-hour period using the following equation:

**Equation 2 to Paragraph (d)**

$$E_a = \frac{1}{12}\sum_{j=1}^{12} E_{hj} \qquad \text{(Eq. 2)}$$

Where:

E$_a$ = Average carbon monoxide pollutant rate for the 12-hour period, parts per million (ppm) corrected to 7 percent O$_2$. Note that a 12-hour period may include CEMS data during startup and shutdown, as defined in the subpart, in which case the period will not consist entirely of data that have been corrected to 7 percent O$_2$.

E$_{hj}$ = Hourly arithmetic average pollutant rate for hour "j," ppm corrected to 7 percent O$_2$. CEMS data during startup and shutdown, as defined in the subpart, are not corrected to 7 percent oxygen, and are measured at stack oxygen content.

■ 49. Amend § 60.2977 by:
■ a. Revising the definition of "Administrator";
■ b. Adding the definition of "CEMS data during start up and shutdown";
■ c. Removing the definition of "Collected from";
■ d. Revising the definitions of "Deviation", "Low-level radioactive waste", "Modification or modified unit", "Particulate matter", and "Reconstruction";
■ e. Adding the definitions of "Rudimentary combustion device", and "Small remote incinerator";
■ f. Revising the definition of "Very small municipal waste combustion unit"; and
■ g. Adding the definition of "Waste profile".

The revisions and additions read as follows:

### § 60.2977  What definitions must I know?

\* \* \* \* \*

*Administrator* means:

(1) For approved and effective state section 111(d)/129 plans, the Director of the state air pollution control agency, or his or her delegate;

(2) For Federal section 111(d)/129 plans, the Administrator of the EPA, an employee of the EPA, the Director of the state air pollution control agency, or employee of the state air pollution control agency to whom the authority has been delegated by the Administrator of the EPA to perform the specified task; and

(3) For NSPS, the Administrator of the EPA, an employee of the EPA, the Director of the state air pollution control agency, or employee of the state air pollution control agency to whom the authority has been delegated by the Administrator of the EPA to perform the specified task.

\* \* \* \* \*

*CEMS data during startup and shutdown* means CEMS data collected during the first hours of a OSWI startup from a cold start until waste is fed to the unit and the hours of operation following the cessation of waste material being fed to the OSWI during a unit shutdown. For each startup event, the length of time that CEMS data may be claimed as being CEMS data during startup must be 48 operating hours or less. For each shutdown event, the length of time that CEMS data may be claimed as being CEMS data during shutdown must be 24 operating hours or less.

\* \* \* \* \*

*Deviation* means any instance in which a unit that meets the requirements in § 60.2885, or an owner or operator of such a source:

(1) Fails to meet any requirement or obligation established by this subpart, including but not limited to any emission limitation, operating limit, or operator qualification and accessibility requirements; and

(2) Fails to meet any term or condition that is adopted to implement an applicable requirement in this subpart and that is included in the operating permit for any unit that meets the requirements in § 60.2885 and is required to obtain such a permit.

\* \* \* \* \*

*Low-level radioactive waste* means waste material that contains radioactive nuclides emitting primarily beta or gamma radiation, or both, in concentrations or quantities that exceed applicable Federal or state standards for unrestricted release. Low-level radioactive waste is not high-level radioactive waste, spent nuclear fuel, or byproduct material as defined by the Atomic Energy Act of 1954 (42 U.S.C. 2014(e)(2)).

\* \* \* \* \*

*Modification or modified unit* means an incineration unit that meets one of two criteria:

(1) The cumulative cost of the changes over the life of the unit exceeds 50 percent of the original cost of building and installing the unit (not including the cost of land) updated to current costs (current dollars). For an OSWI unit, to determine what systems are within the boundary of the unit used to calculate these costs, see the definition of OSWI unit.

(2) Any physical change in the unit or change in the method of operating it that increases the amount of any air pollutant emitted for which section 129 or section 111 of the Clean Air Act has established standards.

\* \* \* \* \*

*Particulate matter* means total particulate matter emitted from OSWI units as measured by EPA Method 5 or EPA Method 29 of Appendix A to this part.

\* \* \* \* \*

*Reconstruction* means rebuilding an incineration unit where the cumulative cost of the construction over the life of the incineration unit exceeds 50 percent of the original cost of building and installing the incineration unit (not including land) updated to current costs (current dollars). For an OSWI unit, to determine what systems are within the boundary of the unit used to calculate these costs, see the definition of OSWI unit.

\* \* \* \* \*

*Rudimentary combustion device* means a combustion device with capacity less than or equal to 10 tons per day that is designed and constructed without one or more of the following elements: (1) a stack, chimney, or pipe designed for the purpose of discharging flue gases from combustion; (2) mechanical draft to provide airflow; (3) burners designed to initiate and/or assist the combustion process, including burners designed to burn supplementary fuel; or (4) an ancillary power supply to operate.

\* \* \* \* \*

*Small remote incinerator* means an incinerator that combusts 3 tons per day or less of municipal-type solid waste and is more than 25 miles driving distance to the nearest municipal solid waste landfill.

\* \* \* \* \*

*Very small municipal waste combustion unit* means any municipal waste combustion unit and small remote incinerator, as defined in this subpart,

that has the capacity to combust less than 35 tons per day of municipal solid waste or refuse-derived fuel, as determined by the calculations in § 60.2975. As of December 29, 2025 small remote incinerators are considered very small municipal waste combustion units.

\*　　\*　　\*　　\*　　\*

*Waste profile* means, for a very small municipal waste combustion unit or institutional waste incineration unit with a capacity less than or equal to 10 tons per day, the amount of each waste category burned as a percentage of total waste burned on a mass basis.

\*　　\*　　\*　　\*　　\*

■ 50. Revise table 1 to subpart EEEE of part 60 to read as follows:

**Table 1 to Subpart EEEE of Part 60— Emission Limitations for OSWI Units That Commenced Construction on or Before August 31, 2020**

As stated in § 60.2915, you must comply with the following:

| For the air pollutant | You must meet this emission limitation [a] | Using this averaging time | And determining compliance using this method |
|---|---|---|---|
| 1. Cadmium | 18 micrograms per dry standard cubic meter. | 3-run average (1 hour sample time per run). | Method 29 of Appendix A to this part. |
| 2. Carbon monoxide | 40 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run during performance test), and the 12-hour rolling averages measured using CEMS [b]. | Method 10, 10A, or 10B of Appendix A to this part and CEMS. |
| 3. Dioxins/furans (total basis). | 33 nanograms per dry standard cubic meter. | 3-run average (1 hour sample meter time per run). | Method 23 of Appendix A to this part. |
| 4. Hydrogen chloride | 15 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 26A of Appendix A to this part. |
| 5. Lead | 226 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |
| 6. Mercury | 74 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |
| 7. Opacity | 10 percent | 6-minute average (observe over three 1-hour test runs; *i.e.,* thirty 6-minute averages). | Method 9 of Appendix A to this part, or ASTM D7520–16 (incorporated by reference (IBR), see § 60.17) if the following conditions are met: <br> 1. During the digital camera opacity technique (DCOT) certification procedure outlined in Section 9.2 of ASTM D7520–16, you or the DCOT vendor must present the plumes in front of various backgrounds of color and contrast representing conditions anticipated during field use such as blue sky, trees, and mixed backgrounds (clouds and/or a sparse tree stand). <br> 2. You must also have standard operating procedures in place including daily or other frequency quality checks to ensure the equipment is within manufacturing specifications as outlined in Section 8.1 of ASTM D7520–16. <br> 3. You must follow the recordkeeping procedures outlined in § 63.10(b)(1) of this subchapter for the DCOT certification, compliance report, data sheets, and all raw unaltered JPEGs used for opacity and certification determination. <br> 4. You or the DCOT vendor must have a minimum of four independent technology users apply the software to determine the visible opacity of the 300 certification plumes. For each set of 25 plumes, the user may not exceed 15 percent opacity of any one reading and the average error must not exceed 7.5 percent opacity. |
| 8. Oxides of nitrogen | 103 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 7, 7A, 7C, 7D, or 7E of Appendix A to this part, or ASME/ANSI PTC 19.10–1981 (IBR, see § 60.17) in lieu of Methods 7 and 7C only. |
| 9. Particulate matter | 0.013 grains per dry standard cubic foot. | 3-run average (1 hour minimum sample time per run). | Method 5 or 29 of Appendix A to this part. |
| 10. Sulfur dioxide | 3.1 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 6 or 6C of Appendix A to this part, or ASME/ANSI PTC 19.10–1981 (IBR, see § 60.17) in lieu of Method 6 only. |

[a] All emission limitations (except for opacity and CEMS data during startup and shutdown) are measured at 7 percent oxygen, dry basis at standard conditions. CEMS data during startup and shutdown are measured at stack oxygen content.
[b] Calculated each hour as the average of the previous 12 operating hours.

■ 51. Add tables 1a and 1b to subpart EEEE of part 60 to read as follows:

**Table 1a to Subpart EEEE of Part 60— Emission Limitations for OSWI Units With Capacities Greater Than 10 Tons per Day That Commenced Construction After August 31, 2020 or Commenced Reconstruction or Modification on or After December 29, 2025**

As stated in § 60.2915, you must comply with the following:

| For the air pollutant | You must meet this emission limitation [a] | Using this averaging time | And determining compliance using this method |
|---|---|---|---|
| 1. Cadmium | 18 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |

**27952**      **Federal Register** / Vol. 90, No. 123 / Monday, June 30, 2025 / Rules and Regulations

| For the air pollutant | You must meet this emission limitation[a] | Using this averaging time | And determining compliance using this method |
|---|---|---|---|
| 2. Carbon monoxide ........... | 40 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run during performance test), and 12-hour rolling averages measured using CEMS[b]. | Method 10, 10A, or 10B of Appendix A to this part and CEMS. |
| 3. Dioxins/furans (total basis). | 33 nanograms per dry standard cubic meter. | 3-run average (1 hour minimum sample meter time per run). | Method 23 of Appendix A to this part. |
| 4. Hydrogen chloride ......... | 15 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 26A of Appendix A to this part. |
| 5. Lead ................................ | 226 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |
| 6. Mercury ......................... | 74 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |
| 7. Opacity .......................... | 10 percent ................................ | 6-minute average (observe over three 1-hour test runs; i.e., thirty 6-minute averages). | Method 9 of Appendix A to this part, or ASTM D7520–16 (IBR, see § 60.17), if the following conditions are met:  1. During the digital camera opacity technique (DCOT) certification procedure outlined in Section 9.2 of ASTM D7520–16, you or the DCOT vendor must present the plumes in front of various backgrounds of color and contrast representing conditions anticipated during field use such as blue sky, trees, and mixed backgrounds (clouds and/or a sparse tree stand).  2. You must also have standard operating procedures in place including daily or other frequency quality checks to ensure the equipment is within manufacturing specifications as outlined in Section 8.1 of ASTM D7520–16.  3. You must follow the recordkeeping procedures outlined in § 63.10(b)(1) of this subchapter for the DCOT certification, compliance report, data sheets, and all raw unaltered JPEGs used for opacity and certification determination.  4. You or the DCOT vendor must have a minimum of four independent technology users apply the software to determine the visible opacity of the 300 certification plumes. For each set of 25 plumes, the user may not exceed 15 percent opacity of any one reading and the average error must not exceed 7.5 percent opacity. |
| 8. Oxides of nitrogen ......... | 103 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 7, 7A, 7C, 7D, or 7E of Appendix A to this part, or ASME/ANSI PTC 19.10–1981 (IBR, see § 60.17) in lieu of Methods 7 and 7C only. |
| 9. Particulate matter ........... | 0.013 grains per dry standard cubic foot. | 3-run average (1 hour minimum sample time per run). | Method 5 or 29 of Appendix A to this part. |
| 10. Sulfur dioxide .............. | 3.1 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 6 or 6C of Appendix A to this part, or ASME/ANSI PTC 19.10–1981 (IBR, see § 60.17) in lieu of Method 6 only. |

[a] All emission limitations (except for opacity and CEMS data during startup and shutdown) are measured at 7 percent oxygen, dry basis at standard conditions. CEMS data during startup and shutdown are measured at stack oxygen content.
[b] Calculated each hour as the average of the previous 12 operating hours.

**Table 1b to Subpart EEEE of Part 60— Emission Limitations for OSWI Units With Capacities Less Than or Equal to 10 Tons per Day With That Commenced Construction After August 31, 2020 or Commenced Reconstruction or Modification on or After December 29, 2025**

As stated in § 60.2915, you must comply with the following:

| For the air pollutant | You must meet this emission limitation[a] | Using this averaging time | And determining compliance using this method |
|---|---|---|---|
| 1. Cadmium ....................... | 400 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |
| 2. Carbon monoxide ........... | 69 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run during performance test), and 12-hour rolling averages measured using CEMS[b]. | Method 10, 10A, or 10B of Appendix A to this part. |
| 3a. Dioxins/furans (total mass basis)[c]. | 3,100 nanograms per dry standard cubic meter. | 3-run average (1 hour minimum sample meter time per run). | Method 23 of Appendix A to this part. |
| 3b. Dioxins/furans (toxic equivalency basis)[c]. | 40 nanograms per dry standard cubic meter. | 3-run average (1 hour minimum sample meter time per run). | Method 23 of Appendix A to this part. |
| 4. Hydrogen chloride ......... | 210 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 26A of Appendix A to this part. |
| 5. Lead ............................... | 26,000 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |

| For the air pollutant | You must meet this emission limitation [a] | Using this averaging time | And determining compliance using this method |
|---|---|---|---|
| 6. Mercury | 12 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |
| 7. Opacity | 10 percent | 6-minute average (observe over three 1-hour test runs; i.e., thirty 6-minute averages). | Method 9 of Appendix A to this part, or ASTM D7520–16 (IBR, see § 60.17), if the following conditions are met: 1. During the digital camera opacity technique (DCOT) certification procedure outlined in Section 9.2 of ASTM D7520–16, you or the DCOT vendor must present the plumes in front of various backgrounds of color and contrast representing conditions anticipated during field use such as blue sky, trees, and mixed backgrounds (clouds and/or a sparse tree stand). 2. You must also have standard operating procedures in place including daily or other frequency quality checks to ensure the equipment is within manufacturing specifications as outlined in Section 8.1 of ASTM D7520–16. 3. You must follow the recordkeeping procedures outlined in § 63.10(b)(1) of this subchapter for the DCOT certification, compliance report, data sheets, and all raw unaltered JPEGs used for opacity and certification determination. 4. You or the DCOT vendor must have a minimum of four independent technology users apply the software to determine the visible opacity of the 300 certification plumes. For each set of 25 plumes, the user may not exceed 15 percent opacity of any one reading and the average error must not exceed 7.5 percent opacity. |
| 8. Oxides of nitrogen | 180 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 7, 7A, 7C, 7D, or 7E of Appendix A to this part, or ASME/ANSI PTC 19.10–1981 (IBR, see § 60.17) in lieu of Methods 7 and 7C only. |
| 9. Particulate matter | 210 milligrams per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 5 or 29 of Appendix A to this part. |
| 10. Sulfur dioxide | 38 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 6 or 6C of Appendix A to this part, or ASME/ANSI PTC 19.10–1981 (IBR, see § 60.17) in lieu of Method 6 only. |

[a] All emission limitations (except for opacity) are measured at 7 percent oxygen, dry basis at standard conditions.
[b] Calculated each hour as the average of the previous 12 operating hours.
[c] For dioxins/furans, you must meet either the total mass basis limit or the toxic equivalency basis limit.

■ 52. Revise tables 2, 3 and 4 to subpart EEEE of part 60 to read as follows:

**Table 2 to Subpart EEEE of Part 60—Operating Limits for Incinerators**

As stated in § 60.2916, you must comply with the following:

| For these operating parameters | You must establish these operating limits | And monitoring using these minimum frequencies | | |
|---|---|---|---|---|
| | | Data measurement | Data recording | Averaging time |
| 1. Charge rate | Maximum charge rate | Periodic | For batch units, each batch. For continuous or intermittent units, every hour. | Daily for batch units or units complying with § 60.2932(d). 3-hour rolling for continuous and intermittent units.[a] |
| 2. Combustion temperature | Minimum combustion chamber operating temperature. | Continuous | Every 15 minutes | 3-hour rolling.[a] |
| 3. Pressure drop across the wet scrubber or amperage to wet scrubber. | Minimum pressure drop or amperage. | Continuous | Every 15 minutes | 3-hour rolling.[a] |
| 4. Wet scrubber liquor flow rate | Minimum flow rate at inlet to the scrubber. | Continuous | Every 15 minutes | 3-hour rolling.[a] |
| 5. Wet scrubber liquor pH | Minimum pH at scrubber outlet | Continuous | Every 15 minutes | 3-hour rolling.[a] |
| 6. Dry scrubber sorbent injection | Minimum injection rate of each sorbent. | Continuous | Every 15 minutes | 3-hour rolling.[a] |
| 7. Electrostatic precipitator secondary electric power. | Minimum secondary electric power, calculated from the secondary voltage and secondary current. | Continuous | Every 15 minutes | 3-hour rolling.[a] |
| 8. Bag leak detection system alarm time. | Alarm time <5 percent of the operating time during a 6-month period. | Continuous | Each date and time of alarm start and stop. | Calculate alarm time as specified in § 60.2916(f). |
| 9. Waste profile | The amount of each waste category burned as a percentage of total waste burned on a mass basis. | Periodic | For batch units, each batch. For continuous or intermittent units, every hour. | Calendar quarter. |

[a] Calculated each hour as the average of the previous 3 operating hours.

**Table 3 to Subpart EEEE of Part 60—Requirements for Continuous Emission Monitoring Systems (CEMS)**

As stated in § 60.2940, you must comply with the following:

| For the following pollutants | Use the following span values for your CEMS | Use the following performance specifications (P.S.) in Appendix B of this part for your CEMS | If needed to meet minimum data requirements, use the following alternate methods in Appendix A of this part to collect data |
|---|---|---|---|
| 1. Carbon Monoxide ......... | 125 percent of the maximum hourly potential carbon monoxide emissions of the waste combustion unit. | P.S.4A ................................. | Method 10. |
| 2. Oxygen ........................ | 25 percent oxygen ................................................. | P.S.3 ................................... | Method 3A or 3B of Appendix A to this part, or ASME/ANSI PTC 19.10–1981 (IBR, see § 60.17) in lieu of Method 3B only. |

**Table 4 to Subpart EEEE of Part 60—Summary of Reporting Requirements**

As stated in § 60.2951, you must comply with the following:

| Report | Due date | Contents | Reference |
|---|---|---|---|
| 1. Preconstruction report ...... | a. Prior to commencing construction ........... | i. Statement of intent to construct; | § 60.2952. |
| | | ii. Anticipated date of commencement of construction; | § 60.2952. |
| | | iii. Documentation for siting requirements; | § 60.2952. |
| | | iv. Waste management plan; and | § 60.2952. |
| | | v. Anticipated date of initial startup. | § 60.2952. |
| 2. Startup notification ............ | a. Prior to initial startup ............................... | i. Types of waste to be burned; | § 60.2953. |
| | | ii. Maximum design waste burning capacity; | § 60.2953. |
| | | iii. Anticipated maximum charge rate; | § 60.2953. |
| | | iv. If applicable, the petition for site-specific operating limits; and | § 60.2953. |
| | | v. Anticipated date of initial startup. | § 60.2953. |
| 3. Initial test report ................ | a. No later than 60 days following the initial performance test. | i. Complete test report for the initial performance test; and | § 60.2954. |
| | | ii. The values for the site-specific operating limits. | § 60.2954. |
| 4. Annual report .................... | a. No later than 12 months following the submission of the initial test report. Subsequent reports are to be submitted no more than 12 months following the previous report | i. Company Name and address; | §§ 60.2955 and 60.2956. |
| | | ii. Statement and signature by the owner or operator; | §§ 60.2955 and 60.2956. |
| | | iii. Date of report; | §§ 60.2955 and 60.2956. |
| | | iv. Values for the operating limits; | §§ 60.2955 and 60.2956. |
| | | v. If no deviations or malfunctions were reported, a statement that no deviations occurred during the reporting period; | §§ 60.2955 and 60.2956. |
| | | vi. Highest and lowest recorded 12-hour averages, as applicable, for carbon monoxide emissions and highest and lowest recorded 3-hour averages, as applicable, for each operating parameter recorded for the calendar year being reported; | §§ 60.2955 and 60.2956. |
| | | vii. Information for deviations or malfunctions recorded under § 60.2949(b)(6) and (c) through (e); | §§ 60.2955 and 60.2956. |
| | | viii. If a performance test was conducted during the reporting period, the results of the test; | §§ 60.2955 and 60.2956. |
| | | ix. If a performance test was not conducted during the reporting period, a statement that the requirements of § 60.2934 (a) or (b) were met; and | §§ 60.2955 and 60.2956. |
| | | x. Documentation of periods when all qualified OSWI unit operators were unavailable for more than 12 hours but less than 2 weeks. | §§ 60.2955 and 60.2956. |
| | | xi. For each very small municipal waste combustion unit or institutional waste incineration unit for which you demonstrate continuous compliance according to § 60.2932(d), if no deviations from the percentages established for each waste category according to the waste profile required in § 60.2932(d)(1) and the OSWI unit has been operated within the operating parameter limits, a statement that there were no deviations from the waste profile requirements percentage and the OSWI unit has been operated within the operating parameter limits. | §§ 60.2955 and 60.2956. |

| Report | Due date | Contents | Reference |
|---|---|---|---|
| 5. Emission limitation or operating limit deviation report. | a. By August 1 of that year for data collected during the first half of the calendar year. By February 1 of the following year for data collected during the second half of the calendar year. | i. Dates and times of deviation; | §§ 60.2957 and 60.2958. |
| | | ii. Averaged and recorded data for those dates; | §§ 60.2957 and 60.2958. |
| | | iii. Duration and causes of each deviation and the corrective actions taken; | §§ 60.2957 and 60.2958. |
| | | iv. Copy of operating limit monitoring data and any test reports; | §§ 60.2957 and 60.2958. |
| | | v. Dates, times, and causes for monitor downtimes incidents; | §§ 60.2957 and 60.2958. |
| | | vi. Whether each deviation occurred during a period of startup, shutdown, or malfunction; and | §§ 60.2957 and 60.2958. |
| | | vii. Dates, times, and durations of any bypass of the control device. | §§ 60.2957 and 60.2958. |
| 6. Qualified operator deviation notification. | a. Within 10 days of deviation ................... | i. Statement of cause of deviation; | § 60.2959(a)(1). |
| | | ii. Description of efforts to have an accessible qualified operator; and | § 60.2959(a)(1). |
| | | iii. The date a qualified operator will be accessible. | § 60.2959(a)(1). |
| 7. Qualified operation deviation status report. | a. Every 4 weeks following deviation ......... | i. Description of efforts to have an accessible qualified operator; | § 60.2959(a)(2). |
| | | ii. The date a qualified operator will be accessible; and | § 60.2959(a)(2). |
| | | iii. Request to continue operation. | § 60.2959(a)(2). |
| 8. Qualified operator deviation notification of resumed operation. | a. Prior to resuming operation ................... | i. Notification that you are resuming operation ................ | § 60.2959(b). |

**Note:** This table is only a summary, see the referenced sections of the rule for the complete requirements.

### Subpart FFFF—Emission Guidelines and Compliance Times for Other Solid Waste Incineration Units

■ 53. Revise the heading of subpart FFFF to part 60 to read as set out above.

■ 54. Revise § 60.2980 to read as follows:

### § 60.2980 What is the purpose of this subpart?

This subpart establishes emission guidelines and compliance schedules for the control of emissions from other solid waste incineration (OSWI) units. The pollutants addressed by these emission guidelines are listed in tables 2 and 2a to this subpart. These emission guidelines are developed in accordance with sections 111(d) and 129 of the Clean Air Act and subpart B of this part.

■ 55. Revise § 60.2981 to read as follows:

### § 60.2981 Am I affected by this subpart?

(a) If you are the Administrator of an air quality program in a state or United States protectorate with one or more existing incineration units as defined in § 60.2992, you must submit a state plan to the U.S. Environmental Protection Agency (EPA) that implements the emission guidelines contained in this subpart.

(b) You must submit the state plan to the EPA by June 30, 2026.

■ 56. Revise § 60.2982 to read as follows:

### § 60.2982 Is a state plan required for all States?

No, you are not required to submit a state plan if there are no existing incineration units that are an OSWI unit as defined in §§ 60.2992 and 60.3078 or air curtain incinerators subject to this subpart as described in § 60.2994 in your state and you submit a negative declaration letter in place of the state plan.

■ 57. Amend § 60.2983 by revising the section heading and paragraph (b) to read as follows:

### § 60.2983 What must I include in my state plan?

*  *  *  *  *

(b) Your state plan may deviate from the format and content of the emission guidelines contained in this subpart. However, if your state plan does deviate, you must demonstrate that your state plan is at least as protective as the emission guidelines contained in this subpart. Your state plan must address regulatory applicability, compliance schedule, operator training and qualification, a waste management plan, emission limitations, stack testing or substitute means of compliance, operating parameter requirements, monitoring, recordkeeping and reporting, and air curtain incinerator requirements.

*  *  *  *  *

■ 58. Revise § 60.2985 to read as follows:

### § 60.2985 What if my state plan is not approvable?

(a) If you do not submit an approvable state plan (or a negative declaration letter) that meets the requirements of this subpart by July 1, 2026, the EPA will develop a Federal plan according to § 60.27, to implement the emission guidelines contained in this subpart.

(b) Owners and operators of incineration units not covered by an approved state plan must comply with the Federal plan. The Federal plan is an interim action and applies to units until a state plan covering those units is approved and becomes effective.

■ 59. Revise § 60.2986 to read as follows:

### § 60.2986 Is there an approval process for a negative declaration letter?

No, the EPA has no formal review process for negative declaration letters. Once we receive your negative declaration letter, we will place a copy in the public docket and publish a notice in the **Federal Register**. If, at a later date, an existing incineration unit as defined in § 60.2992 is found in your state, the Federal plan implementing the emission guidelines contained in this subpart would automatically apply to that unit until your state plan is approved.

■ 60. Revise § 60.2887 to read as follows:

### § 60.2987 What compliance schedule must I include in my state plan?

Your state plan must include compliance schedules that require existing incineration units as defined in § 60.2992 to achieve final compliance as expeditiously as practicable after approval of the state plan but not later than the earlier of the following dates:

(a) July 1, 2030.

(b) Three years after the effective date of state plan approval.

■ 61. Amend § 60.2988 by revising the section heading and paragraph (a) to read as follows:

### § 60.2988 Are there any state plan requirements for this subpart that apply instead of the requirements specified in subpart B of this part?

*  *  *  *  *

(a) State plans developed to implement this subpart must be as protective as the emission guidelines contained in this subpart. State plans must require all existing incineration units to comply with the emissions and operating limits at all times by July 1, 2030, or 3 years after the effective date of state plan approval, whichever is sooner. This applies instead of the option for case-by-case less stringent emission standards and longer compliance schedules in § 60.24(f).

\* \* \* \* \*

■ 62. Revise § 60.2989 to read as follows:

**§ 60.2989   Does this subpart directly affect incineration unit owners and operators in my state?**

(a) No, this subpart does not directly affect incineration unit owners and operators in your state. However, unit owners and operators must comply with the state plan you develop to implement the emission guidelines contained in this subpart.

(b) If you do not submit an approvable state plan to implement and enforce the guidelines contained in this subpart by June 30, 2027, the EPA will implement and enforce a Federal plan, as provided in § 60.2985, to ensure that each unit within your state reaches compliance with all the provisions of this subpart by July 1, 2030.

■ 63. Revise § 60.2990 to read as follows:

**§ 60.2990   What Authorities are withheld by EPA?**

The following authorities are withheld by the EPA and not transferred to the state, local or Tribal authority:

(1) The authority to approve alternatives to the emission limitations in tables 2 and 2a to this subpart and operating limits established under § 60.3023 and table 3 to this subpart.

(2) The authority to approve petitions for specific operating limits in accordance with the requirements in § 60.3024.

(3) The authority of the Administrator to receive and grant petitions under § 60.8(b)(3) to approve of major alternatives to test methods in § 60.3027.

(4) The authority to approve major alternatives to monitoring in §§ 60.3038 through 60.3044.

(5) The authority to approve major alternatives to recordkeeping and reporting in §§ 60.3046 through 60.3057.

(6) The authority to receive the required notices and to approve continued operation in connection with the status report requirements in § 60.3020(c)(2).

(7) The authority of the Administrator to receive and grant petitions under § 60.11(e)(6) through (8) to adjust opacity standards and establish opacity standards in accordance with § 60.3022 and §§ 60.3066 through 60.3068.

(8) The authority of the Administrator under § 60.8(b)(4) to waive performance test and § 60.8(b)(5) to approve shorter sampling times or smaller sample volumes.

(9) The authority to approve an alternative to any electronic reporting to the EPA required by this subpart.

■ 64. Revise and republish § 60.2991 to read as follows:

**§ 60.2991   What incineration units must I address in my state plan?**

Your state plan must address all incineration units in your state that meet all the requirements specified in paragraphs (a) through (c) of this section.

(a) The incineration unit is an existing incineration unit as defined in § 60.2992, except as specified in paragraph (d) of this section.

(b) The incineration unit is an OSWI unit as defined in § 60.3078 or an air curtain incinerator subject to this subpart as described in § 60.2994(b). OSWI units are very small municipal waste combustion units and institutional waste incineration units as defined in § 60.3078 and include very small municipal waste combustion units and institutional waste incineration units with capacities less than or equal to 10 tons per day.

(c) The incineration unit is not excluded under § 60.2993.

(d) This subpart does not apply to your unit if it is a rudimentary combustion device as defined in § 60.3078.

(e) If your existing incineration unit meets the requirements in § 60.2991(a) or (b), and you replace the unit or make changes to the unit that meet the definition of modification or reconstruction, the unit is subject to the requirements in § 60.2885, except § 60.2885(d) does not apply.

(f) If your existing incineration unit meets the requirements in § 60.2991(a) or (b), and you make physical or operational changes to the unit, that do not meet the definition of modification or reconstruction, the unit is still subject to the requirements in § 60.2991, except § 60.2991(d) does not apply.

■ 65. Revise § 60.2992 to read as follows:

**§ 60.2992   What is an existing incineration unit?**

(a) An existing incineration unit covered by state plan regulations under

this subpart is an OSWI unit as defined in § 60.3078 or air curtain incinerator as specified in § 60.2994, which meets the criteria in paragraph (a)(1) of this section except as provided in paragraph (b) of this section.

(1) The OSWI unit or air curtain incinerator subject to this subpart commenced construction on or before August 31, 2020.

(2) If your OSWI unit subject to this subpart is a very small municipal waste combustion unit or institutional waste incineration unit that:

(i) Commenced construction after December 9, 2004, and on or before August 31, 2020, and met the applicability of § 60.2886(a)(1) before December 29, 2025, the unit is considered a new incineration unit and remains subject to the emission limitations of table 1 and applicable requirements of subpart EEEE of this part (New Source Performance Standards for Other Solid Waste Incineration Units) until the unit becomes subject to an approved state plan or Federal plan that implements this subpart; or,

(ii) Commenced reconstruction or modification on and after June 16, 2006, and met the applicability of § 60.2886(a)(2) before December 29, 2025, the unit remains subject to the emission limitations of table 1 and applicable requirements of subpart EEEE of this part (New Source Performance Standards for Other Solid Waste Incineration Units) until the unit becomes subject to an approved state plan or Federal plan that implements this subpart.

(iii) Met the applicability of § 60.2015 or § 60.2550(a) as of December 29, 2025, then your unit remains subject to subpart CCCC or DDDD of this part, or subpart IIIa of part 62 until the unit becomes subject to the requirements of an approved state plan or Federal plan that implements subpart FFFF of this part (Emission Guidelines and Compliance Times for Other Solid Waste Incineration Units).

(b) If the owner or operator of an incineration unit that commenced construction on or before December 9, 2004, makes changes that meet the definition of modification or reconstruction on or after December 29, 2025, the unit becomes subject to subpart EEEE of this part (New Source Performance Standards for Other Solid Waste Incineration Units) and the state plan no longer applies to that unit.

(c) If the owner or operator of an existing incineration unit makes physical or operational changes to the unit primarily to comply with the state plan, then subpart EEEE of this part

does not apply to that unit. Such changes do not qualify as modifications or reconstructions under subpart EEEE of this part.

■ 66. Amend § 60.2993 by revising the section heading, paragraphs (b)(1) and (3), and paragraph (q) introductory text to read as follows:

### § 60.2993   Are any combustion units excluded from my state plan?

\*    \*    \*    \*    \*

(b) \* \* \*

(1) Has a federally enforceable permit limiting the combustion of municipal solid waste to 30 percent of the total fuel input by weight.

\*    \*    \*    \*    \*

(3) Provides the Administrator with a copy of the federally enforceable permit.

\*    \*    \*    \*    \*

(q) *Incinerators used for national security.* Your incineration unit is excluded if it meets the requirements specified in either paragraph (q)(1) or (2) of this section.

\*    \*    \*    \*    \*

■ 67. Amend § 60.2994 by revising paragraph (a) and paragraph (b) introductory text to read as follows:

### § 60.2994   Are air curtain incinerators regulated under this subpart?

(a) Air curtain incinerators that burn less than 35 tons per day of municipal solid waste or air curtain incinerators located at institutional facilities burning any amount of institutional waste generated at that facility are incineration units subject to all requirements of this subpart, including the emission limitations specified in tables 2 and 2a to this subpart.

(b) Air curtain incinerators that burn less than 35 tons per day and burn only the materials listed in paragraphs (b)(1) through (4) of this section collected from the general public and from residential, commercial, institutional, or industrial sources; or air curtain incinerators located at institutional facilities that burn only the materials listed in paragraphs (b)(1) through (4) of this section generated at that facility, are required to meet only the requirements in §§ 60.3062 through 60.3068 and are exempt from all other requirements of this subpart.

\*    \*    \*    \*    \*

■ 68. Amend § 60.2998 by revising the introductory paragraph and adding paragraphs (j) and (k) to read as follows:

### § 60.2998   What are the principal components of the model rule?

The model rule contains 11 major components, as follows:

\*    \*    \*    \*    \*

(j) Definitions.

(k) Tables.

■ 69. Under the heading ''Model Rule—Compliance Schedule'', add § 60.3003 to read as follows:

### § 60.3003   What else must I do prior to the compliance date if I meet the substitute means of compliance demonstration?

If you intend to meet the requirements for the substitute means of compliance demonstration requirements in § 60.3032, the requirements in § 60.3032(a) and (b) must be completed prior to the compliance date in table 1 to this subpart.

■ 70. Amend § 60.3014 by revising paragraphs (b), paragraph (c) introductory text, and paragraphs (c)(1)(iv), (viii), and (x) to read as follows:

### § 60.3014   What are the operator training and qualification requirements?

\*    \*    \*    \*    \*

(b) Operator training and qualification must be obtained through a state-approved program or by completing the requirements included in paragraph (c) of this section.

(c) Training must be obtained by completing an incinerator operator training course that includes, at a minimum, the three elements described in paragraphs (c)(1) through (3) of this section:

(1) \* \* \*

(iv) Combustion controls and monitoring, including good combustion practices and waste characterization procedures.

\*    \*    \*    \*    \*

(viii) Actions to prevent and correct malfunctions or to prevent conditions that may lead to malfunction.

\*    \*    \*    \*    \*

(x) Applicable Federal, state, and local regulations, including Occupational Safety and Health Administration workplace standards.

\*    \*    \*    \*    \*

■ 71. Amend § 60.3015 by revising the introductory paragraph and paragraph (b) to read as follows:

### § 60.3015   When must the operator training course be completed?

The operator training course must be completed by the latest of the dates specified in paragraphs (a) through (c) of this section.

\*    \*    \*    \*    \*

(b) Six months after your OSWI unit startup date.

\*    \*    \*    \*    \*

■ 72. Revise § 60.3017(d) to read as follows:

### § 60.3017   How do I maintain my operator qualification?

\*    \*    \*    \*    \*

(d) Prevention and correction of malfunctions or conditions that may lead to malfunction.

\*    \*    \*    \*    \*

■ 73. Amend § 60.3019 by:
■ a. Revising paragraph (a) introductory text, and paragraph (a)(4);
■ b. Adding paragraph (a)(10); and
■ c. Revising paragraph (c)(2).
The revisions and addition read as follows:

### § 60.3019   What site-specific documentation is required?

(a) Documentation must be available at the facility and readily accessible for all OSWI unit operators that addresses the ten topics described in paragraphs (a)(1) through (10) of this section. You must maintain this information and the training records required by paragraph (c) of this section in a manner that they can be readily accessed and are suitable for inspection upon request.

\*    \*    \*    \*    \*

(4) Procedures for maintaining good combustion practices, including proper combustion air supply levels.

\*    \*    \*    \*    \*

(10) Procedures for establishing initial and continuous compliance, including but not limited to, procedures to determine waste characterization.

\*    \*    \*    \*    \*

(c) \* \* \*

(2) Records showing the names of the OSWI unit operators who have completed the operator training requirements under § 60.3014, met the criteria for qualification under § 60.3016, and maintained or renewed their qualification under § 60.3017 or § 60.3018. Records must include documentation of training, the dates of the initial and refresher training, and the dates of their qualification and all subsequent renewals of such qualifications.

\*    \*    \*    \*    \*

■ 74. Amend § 60.3020 by revising the introductory text to read as follows:

### § 60.3020   What if all the qualified operators are temporarily not accessible?

For each batch OSWI unit, a qualified operator must always be accessible when the unit is operating. For each continuous OSWI unit or intermittent OSWI unit, if all qualified operators are temporarily not accessible (*i.e.,* not at the facility and not able to be at the facility within 1 hour), you must meet one of the three criteria specified in paragraphs (a) through (c) of this section, depending on the length of time

that a qualified operator is not accessible.

\* \* \* \* \*

■ 75. Revise § 60.3022 to read as follows:

**§ 60.3022   What emission limitations must I meet and by when?**

For OSWI units as defined that are very small municipal waste combustion units and institutional waste incineration units with capacities greater than 10 tons per day, you must meet the emission limitations specified in table 2 to this subpart, except as provided in § 60.2992(a)(2). For OSWI units that are very small municipal waste combustion units and institutional waste incineration units with capacities less than or equal to 10 tons per day, you must meet the emission limitations specified in table 2a to this subpart, except as provided in § 60.2992(a)(2). You must meet the emissions limitations on the date the initial performance test is required or completed (whichever is earlier). Section 60.3031 specifies the date by which you are required to conduct your performance test.

■ 76. Revise § 60.3023 to read as follows:

**§ 60.3023   What operating limits must I meet and by when?**

You must comply with the requirements in paragraphs (a) through (h) of this section, as applicable. If you own or operate a very small municipal waste combustion unit or institutional waste incineration unit using the substitute means of compliance demonstration under § 60.3032, the references in this section to the most recent performance test demonstrating compliance are not applicable and instead, refer to the limits established during the representative performance test identified in the information submitted as specified in § 60.3032(b).

(a) You must establish a maximum charge rate, calculated using the procedures in paragraph (a)(1) or (2) of this section, as appropriate.

(1) For continuous and intermittent units, maximum charge rate is the average charge rate measured during the most recent performance test demonstrating compliance with all applicable emission limitations.

(2) For batch units, maximum charge rate is the charge rate measured during the most recent performance test demonstrating compliance with all applicable emission limitations.

(b) You must establish a minimum combustion chamber operating temperature equal to the lowest 1-hour average combustion chamber operating temperature measured during the most recent performance test demonstrating compliance with all applicable emission limitations.

(c) If you use a wet scrubber to comply with the emission limitations, you must establish operating limits for the operating parameters as described in paragraphs (c)(1) through (3) of this section.

(1) Minimum pressure drop across the wet scrubber, which is calculated as the lowest 1-hour average pressure drop across the wet scrubber measured during the most recent performance test demonstrating compliance with the particulate matter emission limitations; or minimum amperage to the wet scrubber, which is calculated as the average amperage to the wet scrubber measured during the most recent performance test demonstrating compliance with the particulate matter emission limitations.

(2) Minimum scrubber liquor flow rate, which is calculated as the lowest 1-hour average liquor flow rate at the inlet to the wet scrubber measured during the most recent performance test demonstrating compliance with all applicable emission limitations.

(3) Minimum scrubber liquor pH, which is calculated as the lowest 1-hour average liquor pH at the outlet to the wet scrubber measured during the most recent performance test demonstrating compliance with the hydrogen chloride and sulfur dioxide emission limitations.

(d) If you use a dry scrubber to comply with the emission limitations, you must measure the injection rate of each sorbent during the performance test. The minimum operating limit for the injection rate of each sorbent is calculated as the lowest 1-hour average injection rate for each sorbent measured during the most recent performance test demonstrating compliance with the hydrogen chloride emission limitations.

(e) If you use an electrostatic precipitator to comply with the emission limitations, you must measure the (secondary) voltage and amperage of the electrostatic precipitator collection plates during the particulate matter performance test. Calculate the average electric power value (secondary voltage × secondary current = secondary electric power) for each test run. The minimum operating limit for the electrostatic precipitator is calculated as the lowest 1-hour average secondary electric power measured during the most recent performance test demonstrating compliance with the particulate matter emission limitations.

(f) If you use a fabric filter to comply with the emission limitations, you must operate each fabric filter system such that the bag leak detection system alarm does not sound more than 5 percent of the operating time during a 6-month period. Calculate the alarm time (*i.e.,* time that the alarm sounds) as specified in paragraphs (f)(1) and (2) of this section.

(1) If inspection of the fabric filter demonstrates that no corrective action is required, the alarm duration is not counted in the alarm time calculation.

(2) If corrective action is required and you take less than an hour to initiate corrective action, the alarm time is counted as 1 hour. If you take longer than 1 hour to initiate corrective action, the alarm time is counted as the actual amount of time taken to initiate corrective action.

(g) If you own or operate a very small municipal waste combustion unit or institutional waste incineration unit with capacity less than or equal to 10 tons per day and you demonstrate continuous compliance according to § 60.3033(d), you must establish the amount of waste burned in each waste category as a percentage of total waste burned on a mass basis. These percentages are your waste profile and must be based on the categories of waste fed to the incinerator (*e.g.,* food waste, paper waste, wood waste) during the most recent performance test.

(h) You must meet the operating limits established during the initial or representative performance test no later than the date specified in paragraph (h)(1) or (2) of this section, as applicable.

(1) For each OSWI unit with a capacity greater than 10 tons per day or for each very small municipal waste combustion unit or institutional waste incineration unit with a capacity less than or equal to 10 tons per day for which you conduct an initial performance test under § 60.3030(a), beginning on the date 180 days after your final compliance date in table 1 to this subpart.

(2) For each very small municipal waste combustion unit or institutional waste incineration unit for which you use the substitute means of compliance demonstration under § 60.3032, by the date you submit to the Administrator the information required in § 60.3032(b).

■ 77. Amend § 60.3024 by revising the section heading and the introductory text to read as follows:

**§ 60.3024   What if I do not use a wet scrubber, dry scrubber, electrostatic precipitator, or fabric filter to comply with the emission limitations?**

If you use an air pollution control device other than a wet scrubber, dry scrubber, electrostatic precipitator, or

fabric filter to comply with the emission limitations under § 60.3022, you must petition the EPA Administrator for specific operating limits to be established during the performance test and then continuously monitored thereafter. Additionally, unless you demonstrate continuous compliance according to § 60.3032(d), if you limit emissions in some manner other than an add-on control device to comply with the emission limitations under § 60.3022, such as by material balance, then you must submit a petition for approval of your means of limiting your emissions. You must submit the petition at least 60 days before the performance test is scheduled to begin and not conduct the initial performance test until after the petition has been approved by the EPA. Your petition must include the five items listed in paragraphs (a) through (e) of this section.

\* \* \* \* \*

### § 60.3025 [Removed and reserved].

■ 78. Remove and reserve § 60.3025.

■ 79. Revise and republish § 60.3027 to read as follows:

### § 60.3027 How do I conduct the initial and annual performance test?

(a) All performance tests must consist of a minimum of three test runs conducted under conditions representative of normal operations.

(b) All performance tests must be conducted using the methods in tables 2 and 2a to this subpart.

(c) All performance tests must be conducted using the minimum run duration specified in tables 2 and 2a to this subpart.

(d) EPA Method 1 of Appendix A to this part must be used to select the sampling location and number of traverse points.

(e) EPA Method 3A or 3B of Appendix A to this part or ASME/ANSI PTC 19.10–1981 (incorporated by reference, see § 60.17), in lieu of EPA Method 3B, must be used for gas composition analysis, including measurement of oxygen concentration. EPA Method 3A or 3B of Appendix A to this part or ASME/ANSI PTC 19.10–1981 must be used simultaneously with each method.

(f) All pollutant concentrations, except for opacity, must be adjusted to 7 percent oxygen using Equation 1 in § 60.3076.

(g) EPA Method 26A of Appendix A to this part must be used for hydrogen chloride concentration analysis, with the additional requirements specified in paragraphs (g)(1) through (3) of this section.

(1) The probe and filter must be conditioned prior to sampling using the procedure described in paragraphs (g)(1)(i) through (iii) of this section.

(i) Assemble the sampling train(s) and conduct a conditioning run by collecting between 14 liters per minute (0.5 cubic feet per minute) and 30 liters per minute (1.0 cubic feet per minute) of gas over a 1-hour period. Follow the sampling procedures outlined in section 8.1.5 of EPA Method 26A of Appendix A to this part. For the conditioning run, water can be used as the impinger solution.

(ii) Remove the impingers from the sampling train and replace with a fresh impinger train for the sampling run, leaving the probe and filter (and cyclone, if used) in position. Do not recover the filter or rinse the probe before the first run. Thoroughly rinse the impingers used in the preconditioning run with deionized water and discard these rinses.

(iii) The probe and filter assembly are conditioned using the stack gas and are not recovered or cleaned until the end of testing.

(2) For the duration of sampling, a temperature around the probe and filter (and cyclone, if used) between 120 °C (248 °F) and 134 °C (273 °F) must be maintained.

(3) If water droplets are present in the sample gas stream, the requirements specified in paragraphs (g)(3)(i) and (ii) of this section must be met.

(i) The cyclone described in section 6.1.4 of EPA Method 26A of Appendix A to this part must be used.

(ii) The post-test moisture removal procedure in section 8.1.6 of EPA Method 26A of Appendix A to this part must be used.

■ 80. Revise § 60.3028 to read as follows:

### § 60.3028 How are the performance test data used?

You use results of performance tests to demonstrate compliance with the emission limitations in tables 2 and 2a to this subpart.

■ 81. Revise § 60.3030 to read as follows:

### § 60.3030 How do I demonstrate initial compliance with the emission limitations and establish the operating limits?

(a) Except as provided in paragraph (b) of this section, you must conduct an initial performance test, as required under § 60.8, to determine compliance with the emission limitations in table 2 or 2a to this subpart and to establish operating limits using the procedures in § 60.3023 or § 60.3024. The initial performance test must be conducted

using the test methods listed in table 2 or 2a to this subpart and the procedures in § 60.3027. In the event of any conflict between § 60.8 and the provisions of this subpart, the provisions of this subpart shall apply.

(b) For very small municipal waste combustion units and institutional waste incineration units with a capacity less than or equal to 10 tons per day, you must demonstrate initial compliance according to paragraph (a) of this section, unless you comply with the requirements for the substitute means of compliance demonstration requirements in § 60.3032.

(c) For each OSWI unit with a capacity greater than 10 tons per day, as an alternative to conducting a performance test under paragraph (a) of this section for carbon monoxide, you may use a 12-hour rolling average of the 1-hour arithmetic average CEMS data to determine compliance with the emission limitations in tables 2 and 2a to this subpart. The initial performance evaluation required by § 60.3039(b) must be conducted prior to collecting CEMS data that will be used for the initial compliance demonstration.

■ 82. Under the heading "Model Rule— Initial Compliance Requirements", add § 60.3032 to read as follows:

### § 60.3032 What are the substitute means of compliance demonstration requirements for very small municipal waste combustion units and institutional waste incineration units with capacities less than or equal to 10 tons per day?

Instead of conducting the initial performance test in § 60.3030(a), very small municipal waste combustion units and institutional waste incineration units with capacities less than or equal to 10 tons per day may demonstrate initial compliance according to the requirements in paragraphs (a) through (d) of this section.

(a) For each very small municipal waste combustion unit or institutional waste incineration unit for which you are using the substitute means of compliance demonstration, beginning on the effective date of your state plan approval, or July 1, 2030 whichever date is earlier, you must collect the data in paragraphs (a)(1) through (7) of this section until you meet the requirements in paragraph (b) of this section.

(1) Identity and weight of each waste type (*e.g.*, lbs of paper waste, food waste, wood or yard waste) on a weekly total basis for the date range the information is collected.

(2) Identity and quantities (*e.g.*, flow rate or percentage of operating time) of supplemental fuels burned on a weekly

total basis for the date range the information is collected.

(3) Percentage of total waste burned for each waste type on a weekly average basis for the date range the information is collected.

(4) Temperature indicative of the combustion chamber and description of where temperature is measured. Record this information on a 3-hour rolling average basis for the date range the information is collected.

(5) Hours operated per day for the date range the information is collected.

(6) Charge rate each day in tons per day for the date range the information is collected.

(7) Operating parameter data for any air pollution control devices. For wet scrubbers, include pressure drop across the scrubber or amperage to the scrubber, scrubber liquor inlet flow rate, and scrubber liquor pH at the outlet of the scrubber. For dry scrubbers, include injection rate of each sorbent used. For electrostatic precipitators, include the secondary voltage, secondary amperage, and secondary power. Record this information on a 3-hour rolling average basis for the date range the information is collected.

(b) On or before 3 years after the effective date of state plan approval, or July 1, 2030, whichever is earlier, you must identify the results of a performance test in the EPA's WebFIRE database that is representative for your very small municipal waste combustion unit or institutional waste incineration unit using the criteria in paragraphs (b)(2)(i) through (viii) of this section and submit the information in paragraphs (b)(1) and (2) of this section. You must submit the information following the procedure in paragraph (b)(3) of this section. The performance test may be any test that meets the requirements in paragraph (c) of this section, regardless of location, that is representative of your OSWI unit.

(1) Identify the representative performance test used to demonstrate initial compliance with each very small municipal waste combustion unit or institutional waste incineration unit by submitting the information in paragraphs (b)(1)(i) through (vi) of this section as provided in the EPA's WebFIRE database for the performance test.

(i) Organization.
(ii) Facility.
(iii) City.
(iv) State.
(v) County.
(vi) Submission date.
(2) Describe how the test is representative for your unit, based on the following criteria, using the data

collected as specified in paragraph (a) of this section:

(i) Unit design, including type of unit and any associated air pollution control devices.

(ii) Charge rate.
(iii) Type of operation (batch, continuous, intermittent).
(iv) Combustion temperature and location of temperature measurement.
(v) Type(s) of waste burned.
(vi) Waste profile, as defined in §60.3078.
(vii) Type and amount of supplemental fuels.
(viii) Similarity of air pollution control devices and operation of the air pollution control devices, if the performance test was conducted on a unit with an air pollution control device.

(3) You must submit the information required in paragraphs (b)(1) and (2) of this section via CEDRI, which can be accessed through the EPA's Central Data Exchange (CDX) (*https://cdx.epa.gov/*). The EPA will make all the information submitted through CEDRI available to the public without further notice to you. Do not use CEDRI to submit information you claim as CBI. If you wish to assert a CBI claim, submit the information, including information claimed to be CBI, to the EPA following the procedures in paragraphs (b)(3)(i) and (ii) of this section. Clearly mark the part or all of the information that you claim as CBI. Information not marked as CBI may be authorized for public release without prior notice. Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 CFR part 2. All CBI claims must be asserted at the time of submission. Anything submitted using CEDRI cannot later be claimed CBI. Furthermore, under CAA section 114(c), emissions data is not entitled to confidential treatment, and the EPA is required to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available. You must submit the same file submitted to the CBI office with the CBI omitted to the EPA via the EPA's CDX as described earlier in this paragraph.

(i) The preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol, or other online file sharing services. Electronic submissions must be transmitted directly to the OAQPS CBI Office at the email address *oaqps_cbi@epa.gov*, and as described above, should include clear CBI markings and be flagged to the attention of the Other Solid Waste Incinerator Units Sector Lead. If

assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email *oaqps_cbi@epa.gov* to request a file transfer link.

(ii) If you cannot transmit the file electronically, you may send CBI information through the postal service to the following address: U.S. EPA, Attn: OAQPS Document Control Officer and Other Solid Waste Incinerator Units Sector Lead, Mail Drop: C404–02, 109 T.W. Alexander Drive, P.O. Box 12055, RTP, NC 27711. The mailed CBI material should be double wrapped and clearly marked. Any CBI markings should not show through the outer envelope.

(c) Any performance test used as a representative test in a substitute means of compliance demonstration under paragraph (b) of this section must be conducted according to the initial testing requirements of §60.3027 and demonstrate initial compliance with the emissions limits in table 2a to this subpart. In addition to the results of the performance test and the information required by §60.8(f)(2), the performance test report must contain the information in paragraphs (c)(1) through (8) of this section.

(1) Unit design, including type of unit and any associated air pollution control devices.

(2) Charge rate during the test.
(3) Type of operation (batch, continuous, intermittent).
(4) Combustion temperature and location of temperature measurement. The temperature must be recorded continuously for each run of the performance test. The performance test report must also identify the lowest 1-hour average combustion chamber operating temperature.

(5) Types of waste burned during the test.
(6) Waste profile, as defined in §60.3078, established during the test.
(7) Type and amount of supplemental fuels burned during the test and the timeframe that each supplemental fuel was burned during the test.
(8) If the performance test was conducted on a unit with an air pollution control device, the operating parameter data for the control device must be recorded continuously for each run of the performance test. The performance test report must also identify the lowest or highest, as applicable, 1-hour average for the operating parameter.

(i) For wet scrubbers, the performance test report must include data for pressure drop across the scrubber or amperage to the scrubber, scrubber

liquor inlet flow rate, and scrubber liquor pH at the outlet of the scrubber.

(ii) For dry scrubbers, the performance test report must include data for the injection rate of each sorbent used.

(iii) For electrostatic precipitators, the performance test report must include data for the secondary voltage, secondary amperage, and secondary power.

(d) If there are no results from a performance test that meet the requirements of paragraph (c) of this section that are representative of your OSWI unit, you must demonstrate initial compliance according to the requirements of § 60.3030(a).

■ 83. Revise § 60.3033 to read as follows:

### § 60.3033 How do I demonstrate continuous compliance with the emission limitations and the operating limits?

You must demonstrate continuous compliance according to the requirements in paragraphs (a) through (c) of this section, unless you own or operate a very small municipal waste combustion unit or institutional waste incineration unit with a capacity less than or equal to 10 tons per day. If you own or operate a very small municipal waste incineration unit with a capacity less than or equal to 10 tons per day, you must either comply with the requirements in paragraphs (a) and (c) of this section or the requirements in paragraph (d) of this section.

(a) You must conduct an annual performance test for all pollutants in table 2 or 2a to this subpart for each OSWI unit to determine compliance with the emission limitations, except if you own or operate an OSWI unit with a capacity greater than 10 tons per day you are not required to conduct an annual performance test for carbon monoxide. The annual performance test must be conducted using the test methods listed in table 2 or 2a to this subpart and the procedures in § 60.3027.

(b) You must continuously monitor carbon monoxide emissions to determine compliance with the carbon monoxide emissions limitation. Twelve-hour rolling average values, including CEMS data during startup and shutdown as defined in this subpart, are used to determine compliance. A 12-hour rolling average value above the carbon monoxide emission limit in table 2 or 2a to this subpart constitutes a deviation from the emission limitation.

(c) You must continuously monitor the operating parameters specified in § 60.3023(a) through (f) or established under § 60.3024. Three-hour rolling

average values are used to determine compliance with the operating limits, except for bag leak detection system alarm time, unless a different averaging period is established under § 60.3024. A 3-hour rolling average value (unless a different averaging period is established under § 60.3024) above the established maximum or below the established minimum operating limits constitutes a deviation from the established operating limits. For bag leak detection systems, an alarm time of more than 5 percent of the operating time during a 6-month period constitutes a deviation from the operating limit. Operating limits do not apply during performance tests.

(d) For each very small municipal waste combustion unit or institutional waste incineration unit with capacity less than or equal to 10 tons per day, unless you comply with the requirements in paragraphs (a) and (c) of this section, you must comply with the requirements in paragraphs (d)(1) through (3) of this section.

(1) You must maintain the percentage of waste burned in each waste category within +/− 15 percent of the percentage of total waste burned on a mass basis as established for that waste category according to the waste profile established under § 60.3023(g). You must demonstrate that the percentage of waste burned in each waste category is maintained within +/− 15 percent of the percentage of total waste burned on a mass basis as established for that waste category according to the waste profile established under § 60.3023(g) according to paragraphs (d)(1)(i)(i) through (iii) of this section.

(i) At the end of each calendar quarter, you must determine the mass of waste burned in each waste category for that quarter. You must determine the total waste burned during the quarter by summing the quarterly totals for all the waste categories. You must then determine the amount of waste burned in each waste category as a percentage of the total waste burned on a mass basis by dividing the quarterly total in each waste category by the quarterly total waste burned.

(ii) You must also maintain records as required in § 60.3046(p).

(iii) The values calculated in (d)(1)(i) must be +/− 15 percent of the percentage of total waste burned on a mass basis as established for that waste category according to the waste profile established under § 60.3023(g). Failure to maintain the percentage of waste burned in each waste category within +/− 15 percent of the percentage established for that waste category in any calendar quarter constitutes a deviation.

(2) If you want to establish new operating parameter limits or establish a different waste profile, you must comply with § 60.3036(b).

(3) You must continuously monitor the operating parameters specified in § 60.3023(b) through (f), as applicable. The total daily charge rate is used to determine compliance with the charge rate limit in § 60.3023(a). For the operating parameters in § 60.3023(b) through (f), determine compliance as described in paragraph (d)(3)(i) or (ii) of this section. Failure to meet the operating parameters specified in § 60.3023(a) through (f) is a deviation.

(i) Three-hour rolling average values are used to determine compliance with the operating parameter limits, unless your unit operates on a batch basis and it is operated for less than three hours.

(ii) If your unit operates on a batch basis, and you operate for less than three hours, compliance with the operating parameter limits is determined by averaging the operating parameter over the length of the batch operation.

■ 84. Revise § 60.3034 to read as follows:

### § 60.3034 By what date must I conduct the annual performance test?

For each OSWI unit that is subject to the annual performance test requirement in § 60.3033(a), you must conduct an annual performance test no later than 14 calendar months following the initial performance test. Conduct subsequent annual performance tests no later than 14 calendar months following the previous annual performance test.

■ 85. Amend § 60.3035 by adding paragraph (d) to read as follows:

### § 60.3035 May I conduct performance testing less often?

\*   \*   \*   \*   \*

(d) For very small municipal waste combustion units and institutional waste incineration units with capacities less than or equal to 10 tons per day demonstrating initial compliance following the substitute means of compliance demonstration requirements in § 60.3032, the requirements in paragraphs (a) through (c) of this section do not apply.

■ 86. Revise § 60.3036 to read as follows:

### § 60.3036 May I conduct a repeat performance test to establish new operating limits?

(a) Yes, you may conduct a repeat performance test at any time to establish new values for the operating limits. The Administrator may request a repeat performance test at any time.

(b) For each very small municipal waste combustion unit or institutional waste incineration unit for which you opt to demonstrate continuous compliance according to the requirements in § 60.3033(d), if you want to establish new operating parameter limits or establish a different waste profile, you must comply with either paragraph (b)(1) or (2) of this section.

(1) You must conduct a new performance test of the unit using the test methods listed in table 2a to this subpart and the procedures in § 60.3027 with a waste stream representative of the new waste profile or under the new operating limits.

(2) You must identify a representative performance test that meets the requirements in § 60.3032(c). You must submit the information in § 60.3032(b)(1) and (2) to the Administrator.

■ 87. Revise § 60.3038(a) to read as follows:

### § 60.3038 What continuous emission monitoring systems must I install?

(a) For each OSWI unit with a capacity greater than 10 tons per day, you must install, calibrate, maintain, and operate continuous emission monitoring systems for carbon monoxide and for oxygen. You must monitor the oxygen concentration at each location where you monitor carbon monoxide.

*    *    *    *    *

■ 88. Amend § 60.3039 by revising paragraphs (b) and (c) to read as follows:

### § 60.3039 How do I make sure my continuous emission monitoring systems are operating correctly?

*    *    *    *    *

(b) Complete your initial performance evaluation of the continuous emission monitoring systems within 180 days after your final compliance date in table 1 to this subpart.

(c) For initial and annual performance evaluations, collect data concurrently (or within 30 to 60 minutes) using your carbon monoxide and oxygen continuous emission monitoring systems. To validate carbon monoxide concentration levels, use EPA Method 10, 10A, or 10B of Appendix A to this part. Use EPA Method 3A or 3B of Appendix A to this part or ASME/ANSI PTC 19.10–1981 (incorporated by reference, see § 60.17), in lieu of Method 3B, to measure oxygen. Collect the data during each initial and annual evaluation of your continuous emission monitoring systems following the applicable performance specifications in Appendix B to this part. Table 4 to this

subpart shows the required span values and performance specifications that apply to each continuous emission monitoring system.

*    *    *    *    *

■ 89. Amend § 60.3041 by revising the section heading and paragraphs (a) and (f) to read as follows:

### § 60.3041 What is the minimum amount of monitoring data I must collect with my continuous emission monitoring systems?

(a) Where continuous emission monitoring systems are required, obtain 1-hour arithmetic averages. Except for CEMS data during startup and shutdown as defined in this subpart, the 1-hour arithmetic averages for carbon monoxide must be expressed in parts per million by dry volume corrected to 7 percent oxygen. The CEMS data during startup and shutdown are not corrected to 7 percent oxygen and are measured at stack oxygen content. Use the 1-hour averages of oxygen data from your CEMS to determine the actual oxygen level and to calculate emissions at 7 percent oxygen. Use Equation 2 in § 60.3076 to calculate the 12-hour rolling averages from the 1-hour arithmetic averages.

*    *    *    *    *

(f) If continuous emission monitoring systems are temporarily unavailable to meet the data collection requirements, refer to table 4 to this subpart. It shows alternate methods for collecting data when systems malfunction or when repairs, calibration checks, or zero and span checks keep you from collecting the minimum amount of data. Failure to collect required data is a deviation of the monitoring requirements.

■ 90. Revise and republish § 60.3043 to read as follows:

### § 60.3043 What operating parameter monitoring equipment must I install, or what operating parameters must I monitor?

(a) You must install, calibrate (to manufacturers' specifications at the frequency recommended by the manufacturer), maintain, and operate devices (or establish methods) for monitoring the value of the operating parameters used to determine compliance with the operating limits listed in table 3 to this subpart, as applicable. These devices (or methods) must measure and record the values for these operating parameters at the frequencies indicated in table 3 to this subpart at all times. The devices must be positioned to provide a representative measurement of the parameter monitored.

(b) You must install, calibrate (to manufacturers' specifications), maintain, and operate a device or

method for measuring the use of any stack that could be used to bypass the control device. The measurement must include the date, time, and duration of the use of the bypass stack.

(c) If you are using a fabric filter to comply with the requirements of this subpart, you must install, calibrate, maintain, and continuously operate a bag leak detection system as specified in paragraphs (c)(1) through (8) of this section:

(1) You must install and operate a bag leak detection system for each exhaust stack of the fabric filter. The bag leak sensor(s) must be installed in a position(s) that will be representative of the relative or absolute particulate matter loadings for each exhaust stack, roof vent, or compartment of the fabric filter;

(2) Each bag leak detection system must be installed, operated, calibrated, and maintained in a manner consistent with the manufacturer's written specifications and recommendations; and in accordance with the guidance provided in EPA–454/R–98–015 (incorporated by reference, see § 60.17);

(3) The bag leak detection system must be certified by the manufacturer to be capable of detecting particulate matter emissions at concentrations of 1 milligrams per actual cubic meter or less;

(4) The bag leak detection system sensor must provide output of relative or absolute particulate matter loadings;

(5) The bag leak detection system must be equipped with a device to continuously record the output signal from the sensor;

(6) The bag leak detection system must be equipped with an alarm system that will alert automatically an operator when an increase in relative particulate matter emissions over a preset level is detected. The alarm must be located where it is observed easily by operating personnel;

(7) For positive pressure fabric filter systems, a bag leak detection system must be installed in each baghouse compartment or cell. For negative pressure or induced air fabric filters, the bag leak detector must be installed downstream of the fabric filter; and

(8) Where multiple detectors are required, the system's instrumentation and alarm may be shared among detectors.

(d) If you are required to petition the EPA for operating limits under § 60.3024, you must install, calibrate (to the manufacturers' specifications), maintain, and operate the equipment necessary to monitor compliance with the site-specific operating limits

established using the procedures in § 60.3024.

■ 91. Amend § 60.3046 by revising the introductory text, paragraphs (b) through (e), and (g), and adding paragraphs (o) (p), (q), and (r) to read as follows:

### § 60.3046   What records must I keep?

You must maintain the information specified in paragraphs (a) through (q) of this section, as applicable, for a period of at least 5 years.

\* \* \* \* \*

(b) Records of the data described in paragraphs (b)(1) through (10) of this section.

(1) The OSWI unit charge dates, times, weights, and total daily charge rates.

(2) The combustion chamber operating temperature every 15 minutes of operation.

(3) For each OSWI unit with a wet scrubber, the liquor flow rate to the wet scrubber inlet; pressure drop across the wet scrubber system or amperage to the wet scrubber; and liquor pH at the outlet of the wet scrubber, every 15 minutes of operation.

(4) For each OSWI unit with a dry scrubber, the injection rate of each sorbent, every 15 minutes of operation.

(5) For each OSWI unit with an electrostatic precipitator, the secondary voltage, secondary current, and secondary electric power, every 15 minutes of operation.

(6) For each OSWI unit with a fabric filter, the date, time, and duration of each alarm; the times corrective action was initiated and completed; and a brief description of the cause of the alarm and the corrective action taken. You must also record the percent of the operating time during each 6-month period that the alarm sounds, calculated as specified in § 60.3023(f).

(7) For OSWI units that establish operating limits for controls under § 60.3024, you must maintain data collected for all operating parameters used to determine compliance with the operating limits.

(8) For OSWI units that use a carbon monoxide CEMS, all 1-hour average concentrations of carbon monoxide and oxygen.

(9) All 12-hour rolling average values of carbon monoxide emissions, corrected to 7 percent oxygen (except during periods of startup and shutdown), and all 3-hour rolling average values of continuously monitored operating parameters, and total daily charge rates, as applicable.

(10) Records of the dates, times, and durations of any bypass of the control device.

(c) Records of the start date and time and duration in hours of each malfunction of operation (*i.e.,* process equipment) or the air pollution control and monitoring equipment and description of the malfunction.

(d) Records of actions taken during periods of malfunction to minimize emissions in accordance with § 60.11(d), including corrective actions to restore malfunctioning process and air pollution control and monitoring equipment to its normal or usual manner of operation.

(e) Start date, start time, and duration in hours for each period for which monitoring data show a deviation from the carbon monoxide emissions limit in table 2 or 2a to this subpart, a deviation from the operating limits in table 3 to this subpart, or a deviation from other operating limits established under § 60.3024. Include a description of the deviation, reasons for the deviation, and a description of corrective actions taken. You must record the start date, start time, and duration in hours for each period when all qualified operators were not accessible in accordance with § 60.3020.

\* \* \* \* \*

(g) For carbon monoxide continuous emissions monitoring systems, document the results of your annual performance evaluations, daily drift tests and quarterly accuracy determinations according to Procedure 1 of Appendix F of this part.

\* \* \* \* \*

(o) If you comply with the substitute means of compliance demonstration requirements in § 60.3032, you must keep the records specified in paragraphs (o)(1) through (3) of this section.

(1) Records of data collected as required in § 60.3032(a)(2).

(2) Copy of the representative performance test used to demonstrate initial compliance; and

(3) Documentation of how the test in paragraph (o)(2) of this section is representative of the unit as required in § 60.3032(b)(2).

(p) If you comply with the continuous compliance requirements in § 60.3033(d), you must keep records of the following elements:

(1) Start and end times the unit is operated when waste is being combusted.

(2) Total mass of waste burned for each waste category (*i.e.,* identity and weight of each waste category such as solid waste, food waste, wood or yard waste), summed for each calendar quarter.

(3) Total mass of waste burned each calendar quarter.

(4) The amount of waste burned in each waste category as a percentage of total waste burned each calendar quarter.

(5) Waste profile established under § 60.3023(g).

(6) Temperature of unit combustion chamber and description of where temperature is measured, as a 3-hour average for each batch operation.

(7) Charge rate (in tons per day) of each operation.

(8) For each very small municipal waste combustion unit or institutional waste incineration unit with a capacity less than or equal to 10 tons per day using a wet scrubber, dry scrubber, electrostatic precipitator, or fabric filter, the records specified in paragraph (b)(3) through (10) of this section, as applicable.

(9) For each calendar quarter, you must record whether your waste profile meets the requirement in paragraph § 60.3033(d)(1)(iii).

(q) Copies of any notifications submitted pursuant to §§ 60.2993 and 60.3061.

■ 92. Amend § 60.3049 by revising the introductory text to read as follows:

### § 60.3049   What information must I submit following my initial performance test?

Unless you choose to comply with the substitute means of compliance demonstration requirements in § 60.3032, you must submit the information specified in paragraphs (a) through (c) of this section no later than 60 days following the initial performance test. All reports must be signed by the facilities manager.

\* \* \* \* \*

■ 93. Revise § 60.3050 to read as follows:

### § 60.3050   When must I submit my annual report?

You must submit an annual report no later than 12 months following the submission of the information in § 60.3049, unless you choose to comply with the substitute means of compliance demonstration requirements in § 60.3032. If you choose to comply with the substitute means of compliance demonstration requirements in § 60.3032, you must submit an annual report no later than 12 months following the submission of the information in § 60.3032(b). You must submit subsequent reports no more than 12 months following the previous report. The permit will address the submittal of annual reports for a unit with an operating permit required under title V of the Clean Air Act.

■ 94. Revise and republish § 60.3051 to read as follows:

## § 60.3051 What information must I include in my annual report?

The annual report required under § 60.3050 must include the items listed in paragraphs (a) through (k) of this section. If you have a deviation from the operating limits or the emission limitations, you must also submit deviation reports as specified in §§ 60.3052 through 60.3054.

(a) Company name and address.

(b) Statement by the owner or operator, with their name, title, and signature, certifying the truth, accuracy, and completeness of the report. Such certifications must also comply with the requirements of 40 CFR 70.5(d) or 40 CFR 71.5(d). If your report is submitted via CEDRI, the certifier's electronic signature during the submission process replaces this requirement.

(c) Date of report and beginning and ending dates of the reporting period. You are no longer required to provide the date of report when the report is submitted via CEDRI.

(d) Identification of each OSWI unit, and for each OSWI unit, the parameters monitored and values for the operating limits established pursuant to § 60.3023 or § 60.3024.

(e) If no deviations from any emission limitation or operating limit that applies to you have occurred during the annual reporting period, a statement that there were no deviations from the emission limitations or operating limits during the reporting period. If you use a CMS to monitor emissions or operating parameters and there were no periods during which any CMS was inoperative, inactive, malfunctioning or out of control, a statement that no monitoring system used to determine compliance with the emission limitations or operating limits was inoperative, inactive, malfunctioning or out of control.

(f) The highest recorded 12-hour average and the lowest recorded 12-hour average, as applicable, for carbon monoxide emissions if you are using a CEMS to demonstrate continuous compliance and the highest recorded 3-hour average and the lowest recorded 3-hour average, as applicable, for each operating parameter recorded for the calendar year being reported.

(g) [Reserved]

(h) If a performance test was conducted during the reporting period, identification of the OSWI unit tested, the pollutant(s) tested, and the date of the performance test. Submit, following the procedure specified in § 60.3056(b), the performance test report no later than the date that you submit the annual report.

(i) If you met the requirements of § 60.3035(a) or (b) and did not conduct a performance test during the reporting period, you must state that you met the requirements of § 60.3035(a) or (b), and, therefore, you were not required to conduct a performance test during the reporting period.

(j) The start date, start time, and duration in hours for each period of operation when all qualified OSWI unit operators were unavailable for more than 12 hours, but less than 2 weeks.

(k) If you are complying with the continuous compliance requirements in § 60.3033(d) and have had no deviations from maintaining the percentage of waste burned in each waste category within +/− 15 percent of the percentage established for that waste category for each calendar quarter for the reporting period, and the OSWI unit has been operated within the operating parameter limits established during the representative performance test identified in the information submitted as required in § 60.3032(b) or the performance test conducted by the source using the test methods listed in table 2a to this subpart and the procedures in § 60.3027, a statement that there were no deviations from the percentage of waste burned in each category and the OSWI unit has been operated within the established operating parameter limits.

■ 95. Amend § 60.3052 by revising the section heading and paragraph (a) to read as follows:

## § 60.3052 What other reports must I submit if I have a deviation?

(a) You must submit a deviation report as specified in paragraphs (a)(1) through (3) of this section:

(1) If your OSWI unit fails to meet any requirement or obligation established by this subpart, including but not limited to any emission limitation, operating limit, or operator qualification and accessibility requirements.

(2) If your OSWI unit fails to meet any term or condition that is adopted to implement an applicable requirement in this subpart and that is included in the operating permit for any unit that meets the requirements in § 60.2991 and is required to obtain such a permit.

(3) If you deviate from the requirements to have a qualified operator accessible as specified in § 60.3020, you must meet the requirements of § 60.3054.

*        *        *        *        *

■ 96. Revise § 60.3053 to read as follows:

## § 60.3053 What must I include in the deviation report?

In each report required under § 60.3052, you must include the company name and address and the beginning and ending dates for the reporting period. For any pollutant or operating parameter that deviated from the emission limitations, operating limits or other requirement specified in this subpart, or for each CMS that experienced downtime or was out of control, include the items described in paragraphs (a) through (g) of this section, as applicable. If you are complying with the continuous compliance requirements in § 60.3033(d), you must also include the items described in paragraphs (h) and (i) of this section. You must identify the OSWI unit, and as applicable, the CMS, associated with the information required in paragraphs (a) through (i) of this section in your deviation report.

(a) Identification of the emission limit, operating parameter or other requirement, except as provided in paragraphs (h) and (i) of this section, from which there was a deviation and the start date, start time, and duration in hours of each deviation.

(b) For each deviation identified in paragraph (a) of this section, the averaged and recorded data for those dates, including, when applicable, the information recorded under § 60.3046(b)(9) and (c) through (e) for the calendar period being reported.

(c) For each deviation identified in paragraph (a) of this section, the cause of each deviation from the emission limitations, operating limits or other requirement and your corrective actions.

(d) For each CMS, the start date, start time, duration in hours, and cause for each instance of monitor downtime (other than downtime associated with zero, span, and other routine calibration checks).

(e) For each CMS, the start date, start time, duration in hours, and corrective action taken for each instance that the monitor is out of control.

(f) The start date, start time, and duration in hours of any bypass of the control device and your corrective actions.

(g) For batch OSWI units, the start date, start time, and duration in hours of any deviation from the requirements to have a qualified operator accessible as required in § 60.3014.

(h) If you are complying with the continuous compliance requirements in § 60.3033(d), you must identify each calendar quarter when your waste profile did not meet the requirements in § 60.3033(d)(1)(iii). For each deviation, you must identify each waste category

that did not meet the percentage requirements, the established percentage of total waste burned on a mass basis for that waste category in your waste profile, and the actual percentage of total waste burned on a mass basis for that waste category during the calendar quarter.

(i) If you are complying with the continuous compliance requirements in § 60.3033(d), for each deviation of an operating parameter limit, identification of the operating parameter from which there was a deviation and the start date, start time, duration in hours, and cause for each deviation from the operating parameter limits established during the representative performance test identified in the information submitted as required in § 60.3032(b) or a performance test of the unit conducted using the test methods listed in table 2a to this subpart and the procedures in § 60.3027 as required in § 60.3030(d) or § 60.3036(b).

■ 97. Revise § 60.3056 to read as follows:

### § 60.3056  In what form can I submit my reports?

(a) You must submit annual and deviation reports electronically or in paper format, postmarked on or before the submittal due dates. Beginning on June 30, 2026, or once the reporting template for this subpart has been available on the Compliance and Emissions Data Reporting Interface (CEDRI) website (*https://www.epa.gov/electronic-reporting-air-emissions/cedri*) for one year, whichever date is later, you must submit all subsequent annual compliance reports and deviation reports using the appropriate electronic report template on the CEDRI website for this subpart and following the procedure specified in paragraph (c) of this section. The date report templates become available will be listed on the CEDRI website. Unless the Administrator or delegated state agency or other authority has approved a different schedule for submission of reports, the report must be submitted by the deadline specified in this subpart, regardless of the method in which the report is submitted.

(b) Beginning on December 29, 2025, within 60 days after the date of completing each performance test or CEMS performance evaluation that includes a relative accuracy test audit (RATA) required by this subpart, you must submit the results following the procedures specified in paragraph (c) of this section. You must submit the report in a file format generated using the EPA's Electronic Reporting Tool (ERT). Alternatively, you may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) accompanied by the other information required by § 60.8(f)(2) in portable document format (PDF). If your performance test consists solely of opacity measurements, the results do not need to be submitted in the format generated by the ERT. Instead, you may submit a PDF of the results of the opacity measurements to the EPA via CEDRI.

(c) If you are required to submit reports following the procedure specified in this paragraph (c), you must submit reports to the EPA via CEDRI, which can be accessed through the EPA's Central Data Exchange (CDX) (*https://cdx.epa.gov/*). The EPA will make all the information submitted through CEDRI available to the public without further notice to you. Do not use CEDRI to submit information you claim as CBI. Although we do not expect persons to assert a claim of CBI, if you wish to assert a CBI claim for some of the information in the report, you must submit a complete file in the format specified in this subpart, including information claimed to be CBI, to the EPA following the procedures in paragraphs (c)(1) and (2) of this section. Clearly mark the part or all of the information that you claim to be CBI. Information not marked as CBI may be authorized for public release without prior notice. Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 CFR part 2. All CBI claims must be asserted at the time of submission. Anything submitted using CEDRI cannot later be claimed CBI. Furthermore, under CAA section 114(c), emissions data is not entitled to confidential treatment, and the EPA is required to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available. You must submit the same file submitted to the CBI office with the CBI omitted to the EPA via the EPA's CDX as described earlier in this paragraph (c).

(1) The preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol, or other online file sharing services. Electronic submissions must be transmitted directly to the OAQPS CBI Office at the email address *oaqps_cbi@epa.gov,* and as described above, should include clear CBI markings. ERT files should be flagged to the attention of the Group Leader, Measurement Policy Group; all other files should be flagged to the attention of the Other Solid Waste Incinerator Units Sector Lead. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email *oaqps_cbi@epa.gov* to request a file transfer link.

(2) If you cannot transmit the file electronically, you may send CBI information through the postal service to the following address: U.S. EPA, Attn: OAQPS Document Control Officer, Mail Drop: C404–02, 109 T.W. Alexander Drive, P.O. Box 12055, RTP, NC 27711. In addition to the OAQPS Document Control Officer, ERT files should also be sent to the attention of the Group Leader, Measurement Policy Group, and all other files should also be sent to the attention of the Other Solid Waste Incinerator Units Sector Lead. The mailed CBI material should be double wrapped and clearly marked. Any CBI markings should not show through the outer envelope.

(d) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of EPA system outage for failure to timely comply with the reporting requirement. To assert a claim of EPA system outage, you must meet the requirements outlined in paragraphs (d)(1) through (7) of this section.

(1) You must have been or will be precluded from accessing CEDRI and submitting a required report within the time prescribed due to an outage of either the EPA's CEDRI or CDX systems.

(2) The outage must have occurred within the period beginning five business days prior to the date that the submission is due.

(3) The outage may be planned or unplanned.

(4) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(5) You must provide to the Administrator a written description identifying:

(i) The date(s) and time(s) when CDX or CEDRI was accessed and the system was unavailable;

(ii) A rationale for attributing the delay in reporting beyond the regulatory deadline to EPA system outage;

(iii) A description of the measures taken or to be taken to minimize the delay in reporting; and

(iv) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

USCA Case #25-1182    Document #2132983    Filed: 08/29/2025    Page 65 of 70

(6) The decision to accept the claim of EPA system outage and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(7) In any circumstance, the report must be submitted electronically as soon as possible after the outage is resolved.

(e) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of force majeure for failure to timely comply with the reporting requirement. To assert a claim of force majeure, you must meet the requirements outlined in paragraphs (e)(1) through (5) of this section.

(1) You may submit a claim if a force majeure event is about to occur, occurs, or has occurred or there are lingering effects from such an event within the period beginning five business days prior to the date the submission is due. For the purposes of this section, a force majeure event is defined as an event that will be or has been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevents you from complying with the requirement to submit a report electronically within the time prescribed. Examples of such events are acts of nature (*e.g.,* hurricanes, earthquakes, or floods), acts of war or terrorism, or equipment failure or safety hazard beyond the control of the affected facility (*e.g.,* large scale power outage).

(2) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(3) You must provide to the Administrator:

(i) A written description of the force majeure event;

(ii) A rationale for attributing the delay in reporting beyond the regulatory deadline to the force majeure event;

(iii) A description of the measures taken or to be taken to minimize the delay in reporting; and

(iv) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(4) The decision to accept the claim of force majeure and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(5) In any circumstance, the reporting must occur as soon as possible after the force majeure event occurs.

■ 98. Amend § 60.3062 by removing and reserving paragraph (b) to read as follows:

### § 60.3062 What is an air curtain incinerator?

\*    \*    \*    \*    \*

(b) [Reserved].

■ 99. Revise § 60.3066(b) to read as follows:

### § 60.3066 What are the emission limitations for air curtain incinerators that burn only wood waste, clean lumber, and yard waste?

\*    \*    \*    \*    \*

(b) The limitations in paragraph (a) of this section apply at all times.

■ 100. Revise § 60.3067(a) to read as follows:

### § 60.3067 How must I monitor opacity for air curtain incinerators that burn only wood waste, clean lumber, and yard waste?

(a) Use EPA Method 9 of Appendix A to this part or ASTM D7520–16 (incorporated by reference, see § 60.17), to determine compliance with the opacity limitation.

\*    \*    \*    \*    \*

■ 101. Revise § 60.3068(d) to read as follows:

### § 60.3068 What are the recordkeeping and reporting requirements for air curtain incinerators that burn only wood waste, clean lumber, and yard waste?

\*    \*    \*    \*    \*

(d) Before December 29, 2025, submit initial and annual opacity test reports as electronic or paper copy on or before the applicable submittal date. On and after December 29, 2025, within 60 days after the date of completing the initial opacity test and each annual opacity test required by this subpart, you must submit the results of the opacity test following the procedures specified in § 60.3056(b).

\*    \*    \*    \*    \*

### § 60.3069 [Removed and reserved].

■ 102. Remove and reserve § 60.3069.

■ 103. Revise § 60.3076(d) to read as follows:

### § 60.3076 What equations must I use?

\*    \*    \*    \*    \*

(d) *Carbon monoxide pollutant rate.* When hourly average pollutant rates ($E_h$) are obtained (*e.g.,* CEMS values), compute the rolling average carbon monoxide pollutant rate ($E_a$) for each 12-hour period using the following equation:

Equation 2 to Paragraph (d)

$$E_a = \frac{1}{12}\sum_{j=1}^{12} E_{hj} \qquad (Eq.\ 2)$$

Where:

$E_a$ = Average carbon monoxide pollutant rate for the 12-hour period, parts per million (ppm) corrected to 7 percent $O_2$. Note that a 12-hour period may include CEMS data during startup and shutdown, as defined in the subpart, in which case the period will not consist entirely of data that have been corrected to 7 percent $O_2$.

$E_{hj}$ = Hourly arithmetic average pollutant rate for hour "j," ppm corrected to 7 percent $O_2$. CEMS data during startup and shutdown, as defined in the subpart, are not corrected to 7 percent oxygen, and are measured at stack oxygen content.

■ 104. Amend § 60.3078 by:
■ a. Revising the definition of "Administrator";
■ b. Adding the definition of "CEMS data during start up and shutdown";
■ c. Removing the definition of "Collected from";
■ d. Revising the definitions of "Deviation", "Low-level radioactive waste", "Modification or modified unit", "Particulate matter", and "Reconstruction";
■ e. Adding the definitions of "Rudimentary combustion device" and "Small, remote incinerator";
■ f. Revising the definition of "Very small municipal waste combustion unit"; and
■ g. Adding the definition of "Waste profile".

The revisions and additions read as follows:

### § 60.3078 What definitions must I know?

\*    \*    \*    \*    \*

*Administrator* means:

(1) For approved and effective state section 111(d)/129 plans, the Director of the state air pollution control agency, or his or her delegate;

(2) For Federal section 111(d)/129 plans, the Administrator of the EPA, an employee of the EPA, the Director of the state air pollution control agency, or employee of the state air pollution control agency to whom the authority has been delegated by the Administrator of the EPA to perform the specified task; and

(3) For NSPS, the Administrator of the EPA, an employee of the EPA, the Director of the state air pollution control agency, or employee of the state air pollution control agency to whom the authority has been delegated by the Administrator of the EPA to perform the specified task.

\*    \*    \*    \*    \*

*CEMS data during startup and shutdown* means CEMS data collected

during the first hours of a OSWI startup from a cold start until waste is fed to the unit and the hours of operation following the cessation of waste material being fed to the OSWI during a unit shutdown. For each startup event, the length of time that CEMS data may be claimed as being CEMS data during startup must be 48 operating hours or less. For each shutdown event, the length of time that CEMS data may be claimed as being CEMS data during shutdown must be 24 operating hours or less.

\*      \*      \*      \*      \*

*Deviation* means any instance in which a unit that meets the requirements in § 60.2991, or an owner or operator of such a source:

(1) Fails to meet any requirement or obligation established by this subpart, including but not limited to any emission limitation, operating limit, or operator qualification and accessibility requirements; and

(2) Fails to meet any term or condition that is adopted to implement an applicable requirement in this subpart and that is included in the operating permit for any unit that meets requirements in § 60.2991 and is required to obtain such a permit.

\*      \*      \*      \*      \*

*Low-level radioactive waste* means waste material that contains radioactive nuclides emitting primarily beta or gamma radiation, or both, in concentrations or quantities that exceed applicable Federal or state standards for unrestricted release. Low-level radioactive waste is not high-level radioactive waste, spent nuclear fuel, or byproduct material as defined by the Atomic Energy Act of 1954 (42 U.S.C. 2014(e)(2)).

\*      \*      \*      \*      \*

*Modification or modified unit* means an incineration unit that meets one of two criteria:

(1) The cumulative cost of the changes over the life of the unit exceeds 50 percent of the original cost of building and installing the unit (not including

the cost of land) updated to current costs (current dollars). For an OSWI unit, to determine what systems are within the boundary of the unit used to calculate these costs, see the definition of OSWI unit.

(2) Any physical change in the unit or change in the method of operating it that increases the amount of any air pollutant emitted for which section 129 or section 111 of the Clean Air Act has established standards.

\*      \*      \*      \*      \*

*Particulate matter* means total particulate matter emitted from OSWI units as measured by EPA Method 5 or EPA Method 29 of Appendix A of this part.

\*      \*      \*      \*      \*

*Reconstruction* means rebuilding an incineration unit where the cumulative cost of the construction over the life of the incineration unit exceeds 50 percent of the original cost of building and installing the unit (not including land) updated to current costs (current dollars). For an OSWI unit, to determine what systems are within the boundary of the unit used to calculate these costs, see the definition of OSWI unit.

\*      \*      \*      \*      \*

*Rudimentary combustion device* means a combustion device with capacity less than or equal to 10 tons per day that is designed and constructed without one or more of the following elements: (1) a stack, chimney, or pipe designed for the purpose of discharging flue gases from combustion; (2) mechanical draft to provide airflow; (3) burners designed to initiate and/or assist the combustion process, including burners designed to burn supplementary fuel; or (4) an ancillary power supply to operate.

\*      \*      \*      \*      \*

*Small, remote incinerator* means an incinerator that combusts 3 tons per day or less of municipal-type solid waste and is more than 25 miles driving distance to the nearest municipal solid waste landfill.

\*      \*      \*      \*      \*

*Very small municipal waste combustion unit* means any municipal waste combustion unit and small remote incinerator, as defined in this subpart, that has the capacity to combust less than 35 tons per day of municipal solid waste or refuse-derived fuel, as determined by the calculations in § 60.3076. As of December 29, 2025 small remote incinerators are considered very small municipal waste combustion units.

\*      \*      \*      \*      \*

*Waste profile* means, for a very small municipal waste combustion unit or institutional waste incineration unit with a capacity less than or equal to 10 tons per day, the amount of each waste category burned as a percentage of total waste burned on a mass basis.

\*      \*      \*      \*      \*

■ 105. Revise tables 1 and 2 to subpart FFFF of part 60 to read as follows:

**Table 1 to Subpart FFFF of Part 60—Model Rule—Compliance Schedule**

As stated in § 60.3000, you must comply with the following:

| Complete this action | By this date [a] |
|---|---|
| Final compliance [b] ..... | (Dates to be specified in state plan).[c] |

[a] Site-specific schedules can be used at the discretion of the state.

[b] Final compliance means that you complete all process changes and retrofit of control devices so that, when the incineration unit is brought on line, all process changes and air pollution control devices necessary to meet the emission limitations operate as designed.

[c] The date can be no later than 3 years after the effective date of state plan approval or July 1, 2030, whichever is earlier.

**Table 2 to Subpart FFFF of Part 60—Model Rule—Emission Limitations for That Apply to OSWI Units With Capacities Greater Than 10 Tons per Day**

As stated in § 60.3022, you must comply with the following:

| For the air pollutant | You must meet this emission limitation [a] | Using this averaging time | And determining compliance using this method |
|---|---|---|---|
| 1. Cadmium ...................... | 18 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |
| 2. Carbon monoxide .......... | 40 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run during performance test), and 12-hour rolling averages measured using CEMS [b]. | Method 10, 10A, or 10B of Appendix A to this part and CEMS. |
| 3. Dioxins/furans (total basis). | 33 nanograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 23 of Appendix A to this part. |
| 4. Hydrogen chloride .......... | 15 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 26A of Appendix A to this part. |
| 5. Lead ........................... | 226 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |
| 6. Mercury ......................... | 74 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |

**27968**   **Federal Register** / Vol. 90, No. 123 / Monday, June 30, 2025 / Rules and Regulations

| For the air pollutant | You must meet this emission limitation [a] | Using this averaging time | And determining compliance using this method |
|---|---|---|---|
| 7. Opacity ........................... | 10 percent ............................... | 6-minute average (observe over three 1-hour test runs); *i.e.,* thirty 6-minute averages). | Method 9 of Appendix A to this part, or ASTM D7520–16 (incorporated by reference (IBR), see § 60.17), if the following conditions are met:<br>1. During the digital camera opacity technique (DCOT) certification procedure outlined in Section 9.2 of ASTM D7520–16, you or the DCOT vendor must present the plumes in front of various backgrounds of color and contrast representing conditions anticipated during field use such as blue sky, trees, and mixed backgrounds (clouds and/or a sparse tree stand).<br>2. You must also have standard operating procedures in place including daily or other frequency quality checks to ensure the equipment is within manufacturing specifications as outlined in Section 8.1 of ASTM D7520–16.<br>3. You must follow the recordkeeping procedures outlined in § 63.10(b)(1) of this subchapter for the DCOT certification, compliance report, data sheets, and all raw unaltered JPEGs used for opacity and certification determination.<br>4. You or the DCOT vendor must have a minimum of four independent technology users apply the software to determine the visible opacity of the 300 certification plumes. For each set of 25 plumes, the user may not exceed 15 percent opacity of any one reading and the average error must not exceed 7.5 percent opacity. |
| 8. Oxides of nitrogen ......... | 103 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 7, 7A, 7C, 7D, or 7E of Appendix A to this part, or ASME/ANSI PTC 19.10–1981 (IBR, see § 60.17) in lieu of Methods 7 and 7C only. |
| 9. Particulate matter .......... | 0.013 grains per dry standard cubic foot. | 3-run average (1 hour minimum sample time per run). | Method 5 or 29 of Appendix A to this part. |
| 10. Sulfur dioxide .............. | 3.1 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 6 or 6C of Appendix A to this part, or ASME/ANSI PTC 19.10–1981 (IBR, see § 60.17) in lieu of Method 6 only. |

[a] All emission limitations (except for opacity and CEMS data during startup and shutdown) are measured at 7 percent oxygen, dry basis at standard conditions. CEMS data during startup and shutdown are measured at stack oxygen content.
[b] Calculated each hour as the average of the previous 12 operating hours.

■ 106. Add new table 2a to subpart FFFF of part 60 to read as follows:

**Table 2a to Subpart FFFF of Part 60—Model Rule—Emission Limitations That Apply to OSWI Units With Capacities Less Than or Equal to 10 Tons per Day On or After [Date To Be Specified in State Plan] [a]**

As stated in § 60.3022, you must comply with the following:

| For the air pollutant | You must meet this emission limitation [b] | Using this averaging time | And determining compliance using this method |
|---|---|---|---|
| 1. Cadmium ...................... | 2,000 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |
| 2. Carbon monoxide .......... | 220 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run during performance test), and 12-hour rolling averages measured using CEMS [c]. | Method 10, 10A, or 10B of Appendix A to this part and CEMS. |
| 3a. Dioxins/furans (total mass basis) [d]. | 4,700 nanograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 23 of Appendix A to this part. |
| 3b. Dioxins/furans (toxic equivalency basis) [d]. | 86 nanograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 23 of Appendix A to this part. |
| 4. Hydrogen chloride ......... | 500 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 26A of Appendix A to this part. |
| 5. Lead ............................. | 32,000 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |
| 6. Mercury ........................ | 69 micrograms per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 29 of Appendix A to this part. |

| For the air pollutant | You must meet this emission limitation [b] | Using this averaging time | And determining compliance using this method |
|---|---|---|---|
| 7. Opacity ........................... | 10 percent ...................... | 6-minute average (observe over three 1-hour test runs; *i.e.,* thirty 6-minute averages). | Method 9 of Appendix A to this part, or ASTM D7520–16(IBR, see § 60.17), if the following conditions are met: 1. During the digital camera opacity technique (DCOT) certification procedure outlined in Section 9.2 of ASTM D7520–16, you or the DCOT vendor must present the plumes in front of various backgrounds of color and contrast representing conditions anticipated during field use such as blue sky, trees, and mixed backgrounds (clouds and/or a sparse tree stand). 2. You must also have standard operating procedures in place including daily or other frequency quality checks to ensure the equipment is within manufacturing specifications as outlined in Section 8.1 of ASTM D7520–16. 3. You must follow the recordkeeping procedures outlined in § 63.10(b)(1) of this subchapter for the DCOT certification, compliance report, data sheets, and all raw unaltered JPEGs used for opacity and certification determination. 4. You or the DCOT vendor must have a minimum of four independent technology users apply the software to determine the visible opacity of the 300 certification plumes. For each set of 25 plumes, the user may not exceed 15 percent opacity of any one reading and the average error must not exceed 7.5 percent opacity. |
| 8. Oxides of nitrogen ......... | 210 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 7, 7A, 7C, 7D, or 7E of Appendix A to this part, or ASME/ANSI PTC 19.10–1981 (IBR, see § 60.17) in lieu of Methods 7 and 7C only. |
| 9. Particulate matter .......... | 280 milligrams per dry standard cubic meter. | 3-run average (1 hour minimum sample time per run). | Method 5 or 29 of Appendix A to this part. |
| 10. Sulfur dioxide .............. | 130 parts per million by dry volume. | 3-run average (1 hour minimum sample time per run). | Method 6 or 6C of Appendix A to this part, or ASME/ANSI PTC 19.10–1981(IBR, see § 60.17) in lieu of Method 6 only. |

[a] The date can be no later than 3 years after the effective date of state plan approval or July 1, 2030, whichever is earlier.
[b] All emission limitations (except for opacity) are measured at 7 percent oxygen, dry basis at standard conditions. CEMS data during startup and shutdown are measured at stack oxygen content.
[c] Calculated each hour as the average of the previous 12 operating hours.
[d] For dioxins/furans, you must meet either the total mass basis limit or the toxic equivalency basis limit.

■ 107. Revise tables 3, 4 and 5 to subpart FFFF of part 60 to read as follows:

**Table 3 to Subpart FFFF of Part 60— Model Rule—Operating Limits for Incinerators**

As stated in § 60.3023, you must comply with the following:

| For these operating parameters | You must establish operating limits | And monitoring using these minimum frequencies | | |
|---|---|---|---|---|
| | | Data measurement | Data recording | Averaging time |
| 1. Charge rate ................................. | Maximum charge rate ................. | Periodic ................. | For batch units, each batch. For continuous or intermittent units, every hour. | Daily for batch units or units complying with § 60.3033(d). 3-hour rolling for continuous and intermittent units.[a] |
| 2. Combustion temperature .......... | Minimum combustion chamber operating temperature. | Continuous ............. | Every 15 minutes ......................... | 3-hour rolling.[a] |
| 3. Pressure drop across the wet scrubber or amperage to wet scrubber. | Minimum pressure drop or amperage. | Continuous ............. | Every 15 minutes ......................... | 3-hour rolling.[a] |
| 4. Wet scrubber liquor flow rate .... | Minimum flow rate at inlet to the scrubber. | Continuous ............. | Every 15 minutes ......................... | 3-hour rolling.[a] |
| 5. Wet scrubber liquor pH .............. | Minimum pH at scrubber outlet ... | Continuous ............. | Every 15 minutes ......................... | 3-hour rolling.[a] |
| 6. Dry scrubber sorbent injection .. | Minimum injection rate of each sorbent. | Continuous ............. | Every 15 minutes ......................... | 3-hour rolling.[a] |
| 7. Electrostatic precipitator secondary electric power. | Minimum secondary electric power, calculated from the secondary voltage and secondary current. | Continuous ............. | Every 15 minutes ......................... | 3-hour rolling.[a] |
| 8. Bag leak detection system alarm time. | Alarm time <5 percent of the operating time during a 6-month period. | Continuous ............. | Each date and time of alarm start and stop. | Calculate alarm time as specified in § 60.3023(f). |
| 9. Waste profile ............................... | The amount of each waste category burned as a percentage of total waste burned on a mass basis. | Periodic ................. | For batch units, each batch. For continuous or intermittent units, every hour. | Calendar quarter. |

[a] Calculated each hour as the average of the previous 3 operating hours.

**Table 4 to Subpart FFFF of Part 60—Model Rule—Requirements for Continuous Emission Monitoring Systems (CEMS)**

As stated in § 60.3039, you must comply with the following:

| For the following pollutants | Use the following span values for your CEMS | Use the following performance specifications (P.S.) in Appendix B of this part for your CEMS | If needed to meet minimum data requirements, use the following alternate methods in Appendix A of this part to collect data |
|---|---|---|---|
| 1. Carbon Monoxide ......... | 125 percent of the maximum hourly potential carbon monoxide emissions of the waste combustion unit. | P.S.4A ................................. | Method 10. |
| 2. Oxygen ........................ | 25 percent oxygen ..................................................... | P.S.3 .................................... | Method 3A or 3B of Appendix A to this part, or ASME/ANSI PTC 19.10–1981 (IBR, see § 60.17)) in lieu of Method 3B only. |

**Table 5 to Subpart FFFF of Part 60—Model Rule—Summary of Reporting Requirements**

As stated in § 60.3048, you must comply with the following:

| Report | Due date | Contents | Reference |
|---|---|---|---|
| 1. Initial test report ................ | a. No later than 60 days following the initial performance test. | i. Complete test report for the initial performance test; and | § 60.3049. |
| | | ii. The values for the site-specific operating limits | § 60.3049. |
| 2. Waste management plan .. | a. No later than 60 days following the initial performance test. | i. Reduction or separation of recyclable materials; and | §§ 60.3010 through 60.3012. |
| | | ii. Identification of additional waste management measures and how they will be implemented | §§ 60.3010 through 60.3012. |
| 3. Annual Report ................... | a. No later than 12 months following the submission of the initial test report. Subsequent reports are to be submitted no more than 12 months following the previous report. | i. Company Name and address; | §§ 60.3050 and 60.3051. |
| | | ii. Statement and signature by the owner or operator; | §§ 60.3050 and 60.3051. |
| | | iii. Date of report; | §§ 60.3050 and 60.3051. |
| | | iv. Values for the operation limits; | §§ 60.3050 and 60.3051. |
| | | v. If no deviations or malfunctions were reported, a statement that no deviations occurred during the reporting period; | §§ 60.3050 and 60.3051. |
| | | vi. Highest and lowest recorded 12-hour averages, as applicable, for carbon monoxide emissions and highest and lowest recorded 3-hour averages, as applicable, for each operating parameter recorded for the calendar year being reported; | §§ 60.3050 and 60.3051. |
| | | vii. Information for deviations or malfunctions recorded under § 60.3046(b)(6) and (c) through (e); | §§ 60.3050 and 60.3051. |
| | | viii. If a performance test was conducted during the reporting period, the results of the test; | §§ 60.3050 and 60.3051. |
| | | ix. If a performance test was not conducted during the reporting period, a statement that the requirements of § 60.3035(a) or (b) were met; and | §§ 60.3050 and 60.3051. |
| | | x. Documentation of periods when all qualified OSWI unit operators were unavailable for more than 12 hours but less than 2 weeks. | §§ 60.3050 and 60.3051. |
| | | xi. For each very small municipal waste combustion unit or institutional waste incineration unit for which you demonstrate continuous compliance according to § 60.3033(d), if no deviations from the percentages established for each waste category according to the waste profile required in § 60.3033(d)(1) and the OSWI unit has been operated within the operating parameter limits, a statement that there were no deviations from the waste profile percentage requirements and the OSWI unit has been operated within the operating parameter limits. | §§ 60.3050 and 60.3051. |
| 4. Emission limitation or operating limit deviation report. | a. By August 1 of that year for data collected during the first half of the calendar year. By February 1 of the following year for data collected during the second half of the calendar year. | i. Dates and times of deviation; | §§ 60.3052 and 60.3053. |
| | | ii. Averaged and recorded data for those dates; | §§ 60.3052 and 60.3053. |
| | | iii. Duration and causes of each deviation and the corrective actions taken. | §§ 60.3052 and 60.3053. |
| | | iv. Copy of operating limit monitoring data and any test reports; | §§ 60.3052 and 60.3053. |
| | | v. Dates, times, and causes for monitor downtime incidents; | §§ 60.3052 and 60.3053. |
| | | vi. Whether each deviation occurred during a period of startup, shutdown, or malfunction; and | §§ 60.3052 and 60.3053. |
| | | vii. Dates, times, and duration of any bypass of the control device. | §§ 60.3052 and 60.3053. |

**Federal Register** / Vol. 90, No. 123 / Monday, June 30, 2025 / Rules and Regulations **27971**

| Report | Due date | Contents | Reference |
|---|---|---|---|
| 5. Qualified operator deviation notification. | a. Within 10 days of deviation | i. Statement of cause of deviation; | § 60.3054(a)(1). |
| | | ii. Description of efforts to have an accessible qualified operator; and | § 60.3054(a)(1). |
| | | iii. The date a qualified operator will be accessible | § 60.3054(a)(1). |
| 6. Qualified operation deviation status report. | a. Every 4 weeks following deviation ......... | i. Description of efforts to have an accessible qualified operator; | § 60.3054(a)(2). |
| | | ii. The date a qualified operator will be accessible; and | § 60.3054(a)(2). |
| | | iii. Request to continue operation. | § 60.3054(a)(2). |
| 7. Qualified operator deviation notification of resumed operation. | a. Prior to resuming operation .................... | i. Notification that you are resuming operation.  ................ | § 60.3054(b). |

**Note:** This table is only a summary, see the referenced sections of the rule for the complete requirements.

[FR Doc. 2025–11446 Filed 6–27–25; 8:45 am]

**BILLING CODE 6560–50–P**