**<u>ORAL ARGUMENT NOT YET SCHEDULED</u>**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-1182

---

SIERRA CLUB and CALIFORNIA COMMUNITIES AGAINST TOXICS,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency,
*Respondents*.

---

Petition for Review of Final Administrative Action of the United States Environmental Protection Agency

---

# PETITIONERS' PROOF OPENING BRIEF

---

John E. Bies
James S. Pew
Earthjustice
1250 I Street NW, Fourth Floor
Washington, D.C. 20005
(202) 667-4500
jbies@earthjustice.org
jpew@earthjustice.org

*Counsel for Sierra Club and California Communities Against Toxics*

March 20, 2026

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| SIERRA CLUB and CALIFORNIA COMMUNITIES AGAINST TOXICS,<br><br>Petitioners,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency,<br><br>Respondents. | No. 25-1182 |

**PETITIONERS' CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to this D.C. Circuit Rule 28(a)(1), Petitioners Sierra Club and California Communities Against Toxics submit this Certificate as to Parties, Rulings, and Related Cases.

**(A) Parties and *Amici***

**(i) Parties, Intervenors, and *Amici* Who Appeared in the District Court**

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

**(ii) Parties to this Case**

Petitioners:

Petitioners are Sierra Club and California Communities Against Toxics.

Respondents:

Respondents are the United States Environmental Protection Agency ("EPA") and Lee Zeldin, in his official capacity as Administrator of the EPA.

Intervenors:

There are currently no Intervenors in this matter.

**(iii) *Amici* in this Case**

None at present.

**(iv) Circuit Rule 26.1 Disclosures**

See Petitioners' disclosure statement filed herewith.

**(B) Rulings Under Review**

Petitioners seek review of the final action taken by EPA in the final rule entitled "Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review; Final Rule," and published at 90 Fed. Reg. 27910 (June 30, 2025).

**(C) Related Cases**

None at present.

Dated: March 20, 2026

Respectfully submitted,

*<u>/s/ John E. Bies</u>*
John E. Bies
James Pew
Earthjustice
1250 I Street NW, Fourth Floor
Washington, D.C. 20005
Phone: (202) 667-4500
jbies@earthjustice.org
jpew@earthjustice.org

*Counsel for Sierra Club and California Communities Against Toxics*

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| SIERRA CLUB AND CALIFORNIA COMMUNITIES AGAINST TOXICS,<br><br>Petitioners,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency,<br><br>Respondents. | No. 25-1182 |

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 28(a)(1), and D.C. Circuit Rule 26.1, Petitioners Sierra Club and California Communities Against Toxics make the following disclosures:

**Sierra Club**

Non-Governmental Corporate Party to this Action: Sierra Club.

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party’s Stock: None.

Party's General Nature and Purpose: Sierra Club is a nonprofit corporation organized and existing under the laws of the State of California, dedicated to the protection and enjoyment of the environment.

**California Communities Against Toxics**

Non-Governmental Corporate Party to this Action: California Communities Against Toxics.

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: California Communities Against Toxics is a nonprofit organization organized and existing under the laws of California. The general nature and purpose of the organization is an environmental justice network that aims to reduce exposure to pollution, to expand knowledge about the effects of toxic chemicals on human health and the environment, and to protect the most vulnerable people from harm.

Dated: March 20, 2026

Respectfully submitted,

/s/ John E. Bies

John E. Bies
Earthjustice
1250 I Street NW, Fourth Floor
Washington, D.C. 20005
Phone: (202) 667-4500
jbies@earthjustice.org

*Counsel for Sierra Club and California Communities Against Toxics*

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... iii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS .......... vii

JURISDICTIONAL STATEMENT .......... 1

STATUTES AND REGULATIONS .......... 1

INTRODUCTION .......... 2

STATEMENT OF ISSUES .......... 4

STATEMENT OF THE CASE .......... 5

I. Statutory background .......... 5

A. The Clean Air Act & the 1990 Clean Air Act Amendments .......... 5

B. Section 129 of the Clean Air Act .......... 6

II. Factual background .......... 9

III. Procedural background .......... 13

A. Litigation forces EPA to adopt a schedule to regulate OSWI .......... 13

B. Litigation compels EPA to promulgate the 2005 OSWI Rule by November 30, 2005 .......... 14

C. The 2005 OSWI Rule .......... 15

D. EPA seeks voluntary remand of the 2005 OSWI Rule to address legal challenges .......... 18

E. Litigation forces EPA to undertake a five-year review of the 2005 OSWI Rule .......... 19

F. The 2025 OSWI rulemaking .......... 20

SUMMARY OF ARGUMENT ....................................................................................26

STANDARD OF REVIEW ......................................................................................28

STANDING ........................................................................................................29

ARGUMENT ......................................................................................................34

I. The Final Rule unlawfully excludes solid waste incineration units from regulation under section 129 of the Clean Air Act. ..........................34

A. Section 129 requires EPA to establish emission standards for *all* other solid waste incineration units. ......................................34

B. The Final Rule unlawfully excludes specific categories of other solid waste. ............................................................................42

II. The Final Rule unlawfully regulates units that combust municipal waste as OSWI. ...........................................................................46

CONCLUSION ....................................................................................................48

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.................49

CERTIFICATE OF SERVICE ..........................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**


*Blue Ridge Env't. Def. League v. Pruitt*,
261 F. Supp. 3d 53 (D.D.C. 2017) .....5

*Clean Wisconsin v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020) .....33

*Davis Cty. Solid Waste Mgmt. v. EPA*,
101 F.3d 1395 (D.C. Cir. 1996) .....9, 47

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .....43

*Friends of the Earth v. Laidlaw Env't Servs.*,
528 U.S. 167 (2000) .....33

*LaShawn A. v. Barry*,
87 F.3d 1389 (D.C. Cir. 1996) (en banc) .....28

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .....28, 34, 39

*Louisiana Environmental Action Network v. EPA*,
955 F.3d 1088 (D.C. Cir. 2020) .....40, 41

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .....28, 42, 43

**Nat. Res. Def. Council v. EPA*,
489 F.3d 1250 (D.C. Cir. 2007) ..... 7, 18, 19, 35, 36, 37, 38, 39, 43, 44, 45, 47

*Nat. Res. Def. Council v. EPA*,
489 F.3d 1364 (D.C. Cir. 2007) .....36

*Nat. Res. Def. Council v. EPA*,
749 F.3d 1055 (D.C. Cir. 2014) .....32

*New Jersey v. EPA*,
517 F.3d 574 (D.C. Cir. 2008) .......................................................................5, 6

*Northeast Md. Waste Disposal Auth. v. EPA*,
358 F.3d 936 (D.C. Cir. 2004) ..........................................................................9

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .............................................................................34, 39, 41

*Sierra Club v. EPA*,
294 F.3d 155 (D.C. Cir. 2002) ........................................................................37

**Sierra Club v. EPA*,
479 F.3d 875 (D.C. Cir. 2007) ....................................................................9, 19

**Sierra Club v. EPA*,
551 F.3d 1019 (D.C. Cir. 2008) .....................................................5, 8, 14, 19, 44

*Sierra Club v. Wheeler*,
330 F.Supp.3d 407 (D.D.C. 2018) ..................................................................20

*SSM Litig. Group v. EPA*,
150 F.4th 593 (D.C. Cir. 2025) .......................................................................33

**U.S. Sugar v. EPA*,
830 F.3d 579 (D.C. Cir. 2016) .............................. 7, 8, 35, 37, 38, 39, 40, 43, 44

**Statutes**

5 U.S.C. § 706(2)(A) ......................................................................................28

5 U.S.C. § 706(2)(C) ......................................................................................28

42 U.S.C. § 7401 ..............................................................................................5

42 U.S.C. § 7401(b)(1) ......................................................................................5

42 U.S.C. § 7412(a)(1)(e) ................................................................................36

42 U.S.C. § 7412(d)(6) ...............................................................................40, 41

42 U.S.C. § 7429(a)(1) .................................................................................7, 36

42 U.S.C. § 7429(a)(1)(A) ...................................................................6, 34, 36

42 U.S.C. § 7429(a)(1)(C) ....................................................................4, 27, 46

42 U.S.C. § 7429(a)(1)(E)............................................................................16

42 U.S.C. § 7429(a)(2)....................................................................................9

42 U.S.C. § 7429(a)(5)...........................................................................7, 20, 40

42 U.S.C. § 7429(a)(B)–(D) ..........................................................................13

42 U.S.C. § 7429(g)(1)....................................................................7, 8, 34, 36, 45

42 U.S.C. § 7429(g)(5)(B) ..............................................................................46

42 U.S.C. § 7602(k) ....................................................................................8, 43

42 U.S.C. § 7607(b)(1)....................................................................................1

42 U.S.C. § 7607(d)(7)(B) ..............................................................................17

42 U.S.C. § 7607(d)(9)(A)..............................................................................28

42 U.S.C. § 7607(d)(9)(C) .............................................................................. 28

**FEDERAL REGISTER NOTICES**

58 Fed. Reg. 31358 (June 2, 1993) ...............................................................14

58 Fed. Reg. 58498 (Nov. 2, 1993)...........................................................14, 43

62 Fed. Reg. 1868 (Jan. 14, 1997) .................................................................14

62 Fed. Reg. 48348 (Sept. 15, 1997) ..............................................................37

65 Fed. Reg. 67357 (Nov. 9, 2000).................................................................14

69 Fed. Reg. 71472 (Dec. 9, 2004) .................................................................15

70 Fed. Reg. 74870 (Dec. 16, 2005)............................................................16, 17

71 Fed. Reg. 36726 (June 28, 2006)...............................................................17

72 Fed. Reg. 2620 (Jan. 22, 2007) ..................................................................17

76 Fed. Reg. 15372 (Mar. 21, 2011)................................................................17

85 Fed. Reg. 54178 (Aug. 31, 2020) ....................................................................20

88 Fed. Reg. 36524 (June 5, 2023) ......................................................................23

89 Fed. Reg. 27392 (Apr. 17, 2024) .....................................................................23

89 Fed. Reg. 60342 (July 25, 2024)......................................................................23

89 Fed. Reg. 89928 (Nov. 14, 2024) ....................................................................23

90 Fed. Reg. 27910 (June 30, 2025) .............................................1, 24, 34, 35, 41, 42

**REGULATIONS**

40 C.F.R. § 60.2977 ..........................................................................................24, 44

40 C.F.R. § 60.3078 ..............................................................................................24

**OTHER AUTHORTIES**

S. Rep. No. 101-228 (1989) ......................................................................................5

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to D.C. Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| 2005 OSWI Rule (or "2005 Rule") | "Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units," 70 Fed. Reg. 74870 (Dec. 16, 2005) |
| APA | Administrative Procedure Act |
| CISWI | Commercial and industrial solid waste incinerators, *see* 42 U.S.C. § 7429(a)(1)(D). |
| EPA | U.S. Environmental Protection Agency |
| Final Rule | "Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review; Final Rule," 90 Fed. Reg. 27910 (June 30, 2025) |
| IWI | Institutional Waste Incinerator, *see* 40 CFR § 60.3078 |
| OSWI | Other solid waste incinerators, *see* 42 U.S.C. § 7429(a)(1)(E). |
| Petitioners | Sierra Club and California Communities Against Toxics |
| Proposed Rule | *Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review; Proposed Rule*, 85 Fed. Reg. 54178 (Aug. 31, 2020) |
| Public Comment | Comment submitted by Earthjustice and Sierra Club (EPA-HQ-OAR-2003-0156-0185) |
| VSMWC | Very Small Municipal Waste Combustor, *see* 40 CFR § 60.3078 |

## JURISDICTIONAL STATEMENT

**Agency.** Respondents U.S. Environmental Protection Agency, *et al.* (EPA) have authority to promulgate emission standards and amendments to emission standards for other solid waste incinerators under section 129 of the Clean Air Act, 42 U.S.C. § 7429. EPA lacks authority to exempt other solid waste incinerators from emission standards.

**Court of Appeals.** This Court has jurisdiction pursuant to Clean Air Act section 307(b)(1), 42 U.S.C. § 7607(b)(1), to review the final action taken by EPA at 90 Fed. Reg. 27910 (June 30, 2025), JA___–___ (EPA-HQ-OAR-2003-0156-0230), and titled "Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review; Final Rule."

**Timeliness.** The petition for review was timely filed within the 60-day period provided by Clean Air Act section 307(b)(1), 42 U.S.C. § 7607(b)(1), on August 29, 2025.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in an addendum to this brief.

## INTRODUCTION

In 1990, Congress amended the Clean Air Act to require the Environmental Protection Agency (EPA) to establish emission standards for all solid waste incineration units. Congress enacted statutory deadlines for EPA to promulgate standards for four statutorily defined categories of incinerators and directed EPA to publish a schedule by May 15, 1992, establishing when EPA would promulgate standards for all other categories of solid waste incinerators (OSWI). EPA did not meet this deadline, was sued, and ultimately published a schedule committing to promulgate OSWI standards by November 15, 2000. Now—more than a third of a century after Congress's command and a quarter century after EPA first promised to promulgate OSWI standards—EPA continues to unlawfully exclude incinerators from the application of any OWSI emission standards, exposing the American people to harmful air pollutants Congress directed the agency to regulate.

Petitioners Sierra Club and California Communities Against Toxics (Petitioners) challenge EPA's Final Rule governing emission standards for OSWI. The Rule contravenes the Clean Air Act and flouts binding Circuit precedent by unlawfully excluding solid waste incineration units from the coverage of any emission standards. As this Court has repeatedly held, the plain text of section 129 requires EPA to establish emission standards for *any* facility which combusts *any* solid waste material. Indeed, it was to address the issues raised by this clear Circuit

precedent that EPA requested from this Court and received a voluntary remand of its prior OSWI rule, promulgated in 2005. Rather than correct this error, however, the Final Rule instead doubles down on EPA's unlawful claim that the agency can pick and choose which solid waste incineration units it wishes to regulate. Exercising this self-claimed authority, EPA continues to refuse to impose any section 129 emission standards on numerous categories of incinerators, including contraband incinerators, pathological waste incinerators, crematories, agricultural waste incinerators, and contaminated soil treatment facilities; relieves incineration units temporarily used for disaster debris from the continuous application of emission standards; and even invents new categories of incineration units that have the effect of excusing units from the application of any emission standards. The EPA's selective approach is contrary to law.

These unlawful exclusions are consequential for public health. Small, uncontrolled, and lower temperature incinerators can emit more harmful air pollutants than a large capacity, professionally-run, and appropriately controlled incinerator. And the incentives created by these unlawful exclusions for our country's system for managing solid waste are all the more troubling, as they encourage handlers of solid waste to shift to a network of smaller units and thereby evade the requirements to meet any emission standards.

Petitioners therefore seek an order from this Court vacating the Final Rule.

## STATEMENT OF ISSUES

1. Whether, by excluding solid waste incineration units from the coverage of any section 129 emissions standards, the Final Rule contravenes the Clean Air Act and binding Circuit precedent requiring section 129 standards that apply on a continuous basis for any facility that combusts any solid waste material.

2. Whether, by regulating units that combust municipal waste as other solid waste incinerators, the Final Rule contravenes section 129(a)(1)(C), which requires municipal waste emission standards for any facility that combusts 250 tons or less per day of municipal solid waste.

## STATEMENT OF THE CASE

### I. Statutory background

#### A. The Clean Air Act & the 1990 Clean Air Act Amendments

In 1963, Congress enacted the Clean Air Act, 42 U.S.C. § 7401, *et seq.*, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." *Id.* § 7401(b)(1). Lackadaisical regulation of air pollution by EPA prompted Congress to amend the Clean Air Act in 1990. *New Jersey v. EPA*, 517 F.3d 574, 578 (D.C. Cir. 2008) (noting Congress's "concern[] about the slow pace" of EPA's regulation of hazardous air pollutants); S. Rep. No. 101-228 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 3385, 3389 (referring to air as a "national resource," and noting that "[t]o protect this resource a strong national control strategy is needed"). Recognizing that the law was "work[ing] poorly," S. Rep. No. 101-228, (1989), *as reprinted in* 1990 U.S.C.C.A.N. 3385, 3513, Congress passed the Clean Air Act Amendments of 1990, creating an "aggressive regime of new control requirements" to address air pollution problems. *Blue Ridge Env't. Def. League v. Pruitt*, 261 F. Supp. 3d 53, 56 (D.D.C. 2017) (cleaned up).

The 1990 amendments limited EPA's discretion because Congress recognized that the previous discretionary regime had failed to result in sufficiently stringent emission standards to make Americans healthy again. *See Sierra Club v.*

*EPA*, 551 F.3d 1019, 1027–28 (D.C. Cir. 2008) (explaining why Congress confined EPA discretion in the 1990 amendments); *New Jersey v. EPA*, 517 F.3d 574, 578 (D.C. Cir. 2008) ("In 1990, Congress, concerned about the slow pace of EPA's regulation of [hazardous air pollutants], altered section 112 by eliminating much of EPA's discretion in the process."). Troubled by the slow pace of EPA's discretionary actions to address air pollution, Congress amended the Clean Air Act to direct EPA to regulate emissions of specific harmful air pollutants identified by statute and to impose objective, evidence-based floors for applicable emission limitations.

**B. Section 129 of the Clean Air Act**

Prior to 1990, despite being a source for a wide range of harmful pollutants, solid waste incinerators were subject to a patchwork of varying state and federal regulations depending on their size, age, and the type of waste burned. Congress amended the Clean Air Act in 1990 to address the public health issues associated with harmful emissions from solid waste incineration, directing EPA to establish stringent emission standards for any facility that combusts any solid waste.

Section 129 of the Act (entitled "Solid Waste Combustion") directs EPA to establish performance standards for new sources and emission guidelines for existing sources for "each category of solid waste incineration units," 42 U.S.C. § 7429(a)(1)(A), and defines "solid waste incineration unit" broadly to mean "a

distinct operating unit of *any* facility which combusts *any* solid waste material from commercial or industrial establishments or the general public (including single and multiple residences, hotels, and motels)," *id.* § 7429(g)(1) (emphasis added). Interpreting this language in section 129, this Court held that "EPA [has] a nondiscretionary duty to promulgate standards for *all* solid waste combustion units." *U.S. Sugar v. EPA*, 830 F.3d 579, 644 (D.C. Cir. 2016) (emphasis original); *see also Nat. Res. Def. Council v. EPA* ("*NRDC*"), 489 F.3d 1250, 1257–58 (D.C. Cir. 2007) (holding, in a challenge to emission standards for commercial or industrial solid waste incinerators, that section 129 requires appropriate pollution control standards for "*any* facility that combusts *any* commercial or industrial solid waste material at all") (emphasis added).

Congress identified five distinct categories of solid waste incinerators—(1) municipal waste combustors with capacity greater than 250 tons per day; (2) municipal waste combustors with capacity equal to or less than 250 tons per day; (3) units combusting hospital, medical and infectious waste; (4) commercial and industrial solid waste incinerators; and (5) a catch-all category for all other solid waste incinerators—and established a schedule by which it directed EPA to promulgate emission standards for each category. 42 U.S.C. § 7429(a)(1). Congress directed EPA to review and revise the standards for each category every five years. *Id.* § 7429(a)(5) ("Not later than 5 years following the initial

promulgation of any performance standards and other requirements under this section … to a category of solid waste incineration units, and at 5 year intervals thereafter, the Administrator shall review, and in accordance with this section and section 7411 of this title, revise such standards and requirements.”). Congress also carefully considered whether to make any exceptions to its broad definition of covered solid waste incineration units and established four limited and highly specific exclusions from this definition. 42 U.S.C. § 7429(g)(1).

Congress directed EPA to establish “emissions standards” and “emission limitations” for solid waste incineration units. By the Clean Air Act’s definition, these emission requirements apply “on a continuous basis.” 42 U.S.C. § 7602(k). This Court has found this statutory language to require that emission standards and limitations established under the Act apply on a continuous basis and assure continuous emission reduction. *See*, *e.g.*, *Sierra Club*, 551 F.3d at 1027–28; *U.S. Sugar*, 830 F.3d at 607.

Consistent with the 1990 amendments’ general approach, instead of giving EPA discretion in section 129, Congress directed EPA to apply objective criteria to determine appropriate emission standards for incinerators. Congress required EPA to establish emissions standards for incinerators based on evidence-based analysis of what is achievable through application of the full range of potential control measures, and further limited EPA’s discretion to determine what is “achievable”

by establishing mandatory minimum stringency ("floor") requirements to ensure standards cannot be less stringent than emission level actually "achieved" in practice by the best performing units. 42 U.S.C. § 7429(a)(2); *Northeast Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 954–55 (D.C. Cir. 2004); *Sierra Club v. EPA*, 479 F.3d 875, 878–80 (D.C. Cir. 2007).

## II. Factual background

Toxic pollutants discharged by solid waste incinerators harm the environment and threaten human health. *See Davis Cty. Solid Waste Mgmt. v. EPA*, 101 F.3d 1395, 1397 (D.C. Cir. 1996) ("Combustion … results in the emission of various air pollutants, such as acid gases, organics, metals, nitrogen oxides and ash, some of which are considered to be carcinogens or to have other adverse effects when inhaled."). Concern with the harmful effects of such toxic air pollutants is precisely why Congress required EPA to establish objective, evidence-based emission standards for all solid waste incineration units, with narrow exception.

Although some of the solid waste incineration units excluded by the Final Rule may have a smaller capacity than at least some of the covered units, this does not necessarily mean that they are less likely to produce harmful emissions. The air pollutants emitted by an incinerator are a function of both the type of solid waste incinerated and the time, temperature, and turbulence with which that waste is combusted. *See* Williams Declaration, Addendum at DEC003. One of the most

effective ways to reduce the creation and subsequent release of incomplete combustion byproducts is to optimize the time, temperature, and turbulence of combustion. *See id.* For that reason, permit conditions for incinerators often specify that fuels be burned in the combustion unit until it gets up to the desired temperature for the desired destruction efficiency *prior to* solid waste being introduced into the combustion unit. *See id.* Because of the importance of the residence time, the temperature, and the turbulence of the combustion conditions, the extent of harmful air pollutants released by an incinerator is not simply a function of the size or capacity of the incineration unit. *See id.* In fact, a small incinerator operating at lower temperature, with inadequate residence time for the waste, and inadequate turbulence in the combustion chamber, can emit as many, if not more, harmful air pollutants than a larger capacity incinerator that is professionally operated and has appropriate operational procedures and components designed to optimize the time, temperature, and turbulence of combustion. *See id.*, Addendum at DEC003–004.

In addition, by establishing a regulatory framework in which there are numerous exceptions and exclusions, the Final Rule creates incentives that will shape future efforts to manage solid waste. Experience shows that when regulations carve out exceptions from emission control requirements, those excepted units are what gets built. *See* Williams Declaration, Addendum

at DEC005. For example, when EPA set less stringent standards for small municipal waste combustors (with a capacity less than 250 tons per day) than for large municipal waste combustors, an Arizona city proposed to build a facility with four separate incineration units each with a capacity below the 250 ton per day threshold and subject to less stringent standards, even though the city expected to combust more than 500 tons per day of municipal waste, instead of building a larger incineration unit sufficient to meet disposal demand but subject to more protective emission controls. *See id.*, Addendum at DEC005–006. The array of exceptions of exclusions in the Final Rule fosters a future in which more solid waste is combusted in smaller, uncontrolled incineration units that collectively will result in increased emissions and exposure to harmful air pollutants.

There are reasons to be particularly concerned about the categories of solid waste incineration that are excluded from the application of any section 129 standards by the Final Rule. To begin with, the Final Rule authorizes these incineration units to operate without any federal permitting requirements, which means that their operation will not be subject to permit conditions such as start-up requirements regarding the operating temperature before commencing solid waste combustion. *See* Williams Declaration, Addendum at DEC003.

The nature of the materials that will be burned in these units also give rise to concerns. For example, units that combust contraband and prohibited goods are

often called upon to combust complex chemicals comprising illicit drugs as well as metal and other materials associated with firearms. The combustion of such material results in the emission of harmful air pollutants such as lead, cadmium, arsenic, and chromium, and the products of incomplete combustion such as polycyclic aromatic hydrocarbons, dioxins, furans, and PCBs. *See* Williams Declaration, Addendum at DEC004. Similarly, crematories may seem routine, but human remains incinerated in crematories often contain metals such as dental filings, which when combusted results in the emission of harmful air pollutants such as mercury, and metal prosthetic devices which emit metals when incinerated. *See id.*, Addendum at DEC004–005. Strict state laws safeguarding the sanctity of corpses generally make it impermissible to remove the sources of metals prior to cremation. Likewise, the combustion of municipal solid wastes, even in "very small" incineration units, can result in the emission of harmful air pollutants such as products of incomplete combustion, metals, and acid gases. *See id.*, Addendum at DEC005. And EPA's own study regarding the uncontrolled incineration of demolition debris following natural disasters in air curtain incinerators found that allowing air curtain incinerators to burn demolition debris instead of just clean vegetative waste causes their emissions of metals, dioxins/furans, polyaromatic hydrocarbons, and other highly toxic pollutants to increase dramatically—in some instances by orders of magnitude. *See id.*, Addendum at DEC006.

## III. Procedural background

Congress provided clear direction to EPA to regulate emissions of statutorily identified air pollutants resulting from the combustion of solid waste, whether generated by commercial or industrial establishments or the general public. The past thirty-six years of regulatory history concerning OSWI underscores EPA's recalcitrance in implementing Congress's command.

### A. Litigation forces EPA to adopt a schedule to regulate OSWI

Section 129 establishes explicit statutory deadlines for EPA to establish emission standards for the four statutorily defined categories of incineration units. *See* 42 U.S.C. § 7429(a)(B)–(D). For Congress's catch-all category of OSWI, section 129 required EPA to "publish a schedule for the promulgation of standards … applicable to other categories of solid waste incineration units" by May 15, 1992. *Id.* § 7429(a)(E).

After EPA shirked this plain statutory obligation, Sierra Club and others sued to compel EPA to comply with this requirement. JA___–___ (Complaint in *Waxman v Reilly*, Case No. 92-cv-1320 HHG (D.D.C.)); JA___–___ (Complaint in *Sierra Club v Reilly*, Case No 92-cv-1749 HHG (D.D.C.)). In January 1993, the district court entered a consent decree agreed to by EPA and the other parties to these cases under which EPA committed to publish an OSWI source category list by June 30, 1993, and to publish the OSWI promulgation schedule by

December 31, 1993. JA___–___ (Consent Decree in *Waxman* and *Sierra Club*). EPA proposed a source category list and promulgation schedule in June 1993, 58 Fed. Reg. 31358 (June 2, 1993), and subsequently issued a final rule identifying seven categories of OSWI for which EPA "decided to pursue regulatory development": (1) small municipal waste combustion units with a capacity of 35 metric tons per day or less; (2) residential incinerators; (3) agricultural waste incinerators; (4) wood waste incinerators; (5) construction and demolition waste incinerators; (6) crematories; and (7) contaminated soil treatment facilities. *See Notice of Listing of Categories and Regulatory Schedule for Air Emissions from Other Solid Waste Incinerators*, 58 Fed. Reg. 58498, 58499, 58501 (Nov. 2, 1993). The notice committed to promulgating new source performance standards and emission guidelines for OSWI by November 15, 2000. *Id.* at 58501. Later, EPA announced its intent to add sewage sludge incinerators to the list of OSWI categories. 62 Fed. Reg. 1868, 1869/2 (Jan. 14, 1997). To obtain dismissal of the consolidated district court matters EPA represented to the court and the other parties that by publishing the regulatory schedule, the agency had fulfilled its obligations under the consent decree. JA___–___ (Stipulation for Dismissal).

### B. Litigation compels EPA to promulgate the 2005 OSWI Rule by November 30, 2005

On November 9, 2000, EPA published a notice purporting to revise the deadline for promulgating OSWI standards to November 15, 2005. *Notice of*

*revised schedule for promulgation*, 65 Fed. Reg. 67357 (Nov. 9, 2000). Sierra Club petitioned for review of EPA's decision to extend the deadline, and this Court dismissed the petition on the grounds that the schedule revision did not qualify as a reviewable "final agency action." JA___–___ (Order, *Sierra Club v. EPA*, Case No. 01-1008 (D.C. Cir. April 20, 2001)). Sierra Club then filed a deadline suit in district court seeking to compel EPA to meet its legal obligation to promulgate OSWI emission standards, JA___–___ (Complaint, *Sierra Club v. EPA*, Case No. 01-1578 (D.D.C. July 20, 2001)). This case ultimately resulted in a consent decree in which EPA, *inter alia*, committed to promulgating a proposed rule establishing OSWI standards by November 30, 2004, and to finalizing that rule by November 30, 2005. JA___–___ (Consent Decree, *Sierra Club v. EPA*, ECF 45, Case No. 01-1537 (consolidated with Case No. 01-1578) (D.D.C. May 22, 2003)).

**C. The 2005 OSWI Rule**

EPA published a notice of proposed rulemaking on OSWI emission standards in December 2004. *See* 69 Fed. Reg. 71472 (Dec. 9, 2004). Sierra Club and others submitted public comments highlighting the shortcomings of the proposed rule, including the fact that the proposal improperly failed to include emission standards covering all other incineration units contrary to the requirements of section 129. *See* JA___–___ (2005 Public Comment). Finally, in December 2005, more than fifteen years after Congress enacted the 1990

amendments to the Clean Air Act, EPA promulgated its first final rule on OWSI emission standards, *see Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units,* 70 Fed. Reg. 74870 (Dec. 16, 2005) (the 2005 OSWI Rule). The 2005 Rule asserted that the Clean Air Act "is ambiguous regarding what categories of solid waste incineration units must be regulated under section 129(a)(1)(E)," and therefore EPA claimed discretion to decide which categories of other solid waste incinerators should have emission standards, *id.* at 74874–75 (arguing that "the instructions to EPA to promulgate standards for 'other categories' of solid waste incinerators inherently include the authority for EPA to reasonably delineate those 'other' categories of solid waste incineration units"). Exercising this claimed discretion, the 2005 Rule established emission standards for only two categories of OSWI: small municipal waste combustion units with a capacity less than 35 metric tons per day (so-called Very Small Municipal Waste Combustors, or VSMWC) and institutional waste incinerators (IWI) at institutions such as schools or prisons, but excluding such incinerators to the extent that they recover energy. *See id.* at 74871–72, 74875.

The 2005 OWSI Rule expressly or implicitly excludes several other categories of solid waste incineration units, including categories EPA itself had previously identified for regulation. To begin with, the Rule excludes even the

covered incineration units from otherwise applicable emission standards for temporary use combusting disaster debris following a qualifying disaster declaration.[1] *Id.* at 74879–80, 74894, 74901. The 2005 Rule also has express regulatory exclusions for several categories of OSWI that had been previously identified by EPA, including crematories, pathological waste incinerators, incineration units that combust contraband or prohibited goods, incinerators used for national security materials, animal waste incinerators, and contaminated soil treatment facilities. *Id.* at 74881, 74893–94.[2]

---

[1] Units that engage in the uncontrolled incineration of disaster debris under this provision do not even need to provide any notice to state or federal authorities or the public unless the incineration operations continue for more than 8 weeks. 70 Fed. Reg. at 74879–80, 74901.

[2] Sierra Club filed a petition for administrative reconsideration with EPA under Clean Air Act section 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B), to raise objections to aspects of the challenged rule on which EPA had provided no opportunity for comment. EPA granted reconsideration regarding the treatment of sewage sludge incinerators, *see* 71 Fed. Reg. 36726 (June 28, 2006), and ultimately concluded that no changes to the 2005 final rule were required, *see Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units: Reconsideration*, 72 Fed. Reg. 2620 (Jan. 22, 2007). EPA later promulgated separate standards for sewage sludge. *See Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Sewage Sludge Incineration Units*, 76 Fed. Reg. 15372 (Mar. 21, 2011).

### D. EPA seeks voluntary remand of the 2005 OSWI Rule to address legal challenges

Sierra Club timely petitioned this Court for review of the 2005 OSWI Rule, challenging the Rule in light of the shortcomings identified in its comments. JA___–___ (Petition, *Sierra Club v. EPA*, D.C. Cir. No. 06-1066 (subsequently consolidated with D.C. Cir. No. 07-1063[3])). This consolidated petition matter was stayed at the parties' request pending the Court's resolution of the issue of whether EPA had discretion to exclude some solid waste incineration units from section 129 regulations for commercial and industrial waste incinerators (CISWI) in *NRDC v. EPA*, 489 F.3d 1250 (D.C. Cir. 2007). Citing section 129(g)(1)'s definition of solid waste incineration unit to mean any unit that combusts any solid waste, with only four narrow and very specific exemptions, the Court held that "section 129 … unambiguously include[s] among the incineration units subject to its standards any facility that combusts any commercial or industrial solid waste material at all …" *Id.* at 1257–1258 (citing 42 U.S.C. § 7429(g)(1). Shortly thereafter this Court issued two additional opinions interpreting the requirements of the Clean Air Act, *Sierra Club v. EPA*, 479 F.3d 875 (D.C. Cir. 2007) (holding

[3] This Court stayed the initial petition matter pending EPA's resolution of the petition for reconsideration. After EPA reached its decision on reconsideration, Sierra Club timely petitioned for review of the reconsideration petition, *see* JA___–___ (Petition, *Sierra Club v. EPA*, D.C. Cir. Case No. 07-1063), and this Court consolidated the two appeals.

that EPA had to apply objective statutory criteria in establishing emission standards for brick and ceramics kilns), and *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008) (holding that EPA's exemption of major sources from normal emission standards during periods of startup, shutdown, and malfunctions violated the Clean Air Act requirement that emission standards apply continuously).

After an extended period during which the petition matter was held in abeyance, first for EPA to evaluate its position in light of these developments and then for the parties to undertake settlement discussions, EPA filed an unopposed motion for voluntary remand of the 2005 OSWI Rule. *See* JA___–___ (Mot. for Voluntary Remand, *Sierra Club v. EPA*, D.C. Cir. Nos. 06-1066, 07-1063). In that motion, EPA represented to this Court that the agency had "determined that it should reconsider the Final Rule in light of relevant decisions including the *Sierra Club* (2007), *NRDC*, and *Sierra Club* (2008) decisions, and accordingly asks this Court to issue an order remanding, without vacating, the Final Rule and Reconsideration Decision, for this purpose." JA___–___ (*Id.* at 2). This Court granted EPA's request for voluntary remand on April 21, 2016. JA___–___ (Order, *Sierra Club v. EPA*, D.C. Cir. Nos. 06-1066, 07-1063).

### E. Litigation forces EPA to undertake a five-year review of the 2005 OSWI Rule

At that point, EPA's statutorily mandated review of the standards established in the 2005 OSWI Rule was already long overdue. Section 129(a)(5) directs EPA

to "review[] and … revise" any performance standards and other requirements promulgated under section 129 "in accordance with" the requirements of sections 129 and 111 of the Clean Air Act "[n]ot later than 5 years following [their] initial promulgation … and at 5 year intervals thereafter." 42 U.S.C. § 7429(a)(5). Sierra Club filed suit, *inter alia*, to compel EPA to undertake the required five-year review and revise its OSWI standards and requirements in accordance with Clean Air Act requirements. JA___–___ (Complaint, *Sierra Club v. McCarthy*, D.D.C. Case No. 16-cv-2461). The district court ultimately held that EPA had failed to comply with its nondiscretionary duty to undertake a five-year review of the emission standards for OSWI since the promulgation of the 2005 OSWI Rule and required EPA "to publish a notice of a proposed rulemaking by August 31, 2020" and "to promulgate a final rule by May 31, 2021." *Sierra Club v. Wheeler*, 330 F.Supp.3d 407, 421–23 (D.D.C. 2018). The district court subsequently granted three extensions to EPA's deadline to promulgate a final rule, first to October 31, 2021, then to March 1, 2024, and finally to June 30, 2025.

### F. The 2025 OSWI rulemaking

In August 2020, EPA published a proposed rule updating OSWI emission standards. *See Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review; Proposed Rule*, 85 Fed. Reg. 54178 (August 31, 2020) (Proposed Rule). In the

Proposed Rule, EPA stated that it had not identified "any new developments in practices, processes, or control technologies" for OWSI units covered by the 2005 Rule and so concluded that no changes to the emissions standards were "appropriate." *Id.* at 54183. But EPA did propose several changes, including relaxing the emission standards for VSMWC and IWI with a capacity of 10 tons per day or less; excluding pyrolysis/combustion units; removing the requirement that air curtain incinerators that only burn clean vegetative waste obtain a Title V permit; and treating small remote incinerators at commercial and industrial sites in Alaska as VSMWC rather than commercial and industrial waste incinerators. *Id.* at 54184–88, 54194. The Proposed Rule also included other assorted changes to the start-up, shutdown, and malfunction provisions; the testing, monitoring, recordkeeping, and reporting requirements; and miscellaneous other technical and editorial changes to the regulatory text. *Id.* at 54188–96.

Petitioners and others submitted timely comments on the Proposed Rule on October 15, 2020. JA___–___ (EPA-HQ-OAR-2003-0156-0185 (Public Comment)). Sierra Club again explained that EPA's refusal to cover numerous categories of other solid waste incinerators with the OSWI emission standards contravened the Clean Air Act and was unlawful and arbitrary. JA___–___ (*Id.* at 2–4). The comments reminded EPA, once again, that the plain text of section 129 and binding Circuit precedent require the agency to establish emission

standards under the OSWI category covering all the incinerators that are not covered by the standards for the incinerator categories enumerated in section 129(a)(1)(A)-(D). JA___–___ (*Id.*). They further highlighted how EPA's proposed regulations unlawfully exempt or exclude a wide variety of other solid waste combustion units, including "agricultural waste incinerators," "crematories," "contaminated soil treatment facilities," "incinerators and air curtain incinerators in isolated areas of Alaska" or "located on remote islands," "temporary use incinerators used in disaster or emergency recovery efforts," "units that combust contraband or prohibited goods," "units burning national security documents," and "pathological waste incineration units." JA___ (*Id.* at 3). The comments also explained that "institutional waste incinerators that recover energy are combusting solid waste" and qualify as OSWI under section 129 and applicable D.C. Circuit precedent. JA___ (*Id.*).

In addition to this problem with the scope of the Proposed Rule's coverage, Sierra Club's comments identified other ways in which the proposal was unlawful or arbitrary. The comments explained why the new exemption EPA suggested in the Proposed Rule for pyrolysis/combustion units was unlawful and arbitrary.[4]

---

[4] Following public comment, EPA withdrew its proposal regarding the treatment of pyrolysis/combustion units. *See Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste*

JA___–___ (*Id.* at 4–6). And the comments also described how EPA's proposed rule would perpetuate the unlawful exclusion of units that undisputedly burn municipal waste from the agency's section 129 regulations for municipal waste combustors and would improperly exempt some units burning municipal waste from regulation as incinerators entirely. JA___–___ (*Id.* at 6).[5]

In 2024, EPA proposed an additional change from the 2005 OSWI Rule, publishing a supplemental notice of proposed rulemaking that proposed revising the definition of OSWI to reclassify a number of VSMWC and IWI previously covered by the 2005 Rule into a new category, "rudimentary combustion device[s]," and excluding them from the coverage of previously applicable emission standards. *See Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Revisions to Definitions*, 89 Fed. Reg. 60342 (July 25, 2024). Although EPA stated the proposal was motivated by the requirements of municipal waste management in remote areas of rural Alaska, EPA proposed to define "rudimentary combustion

*Incineration Units Review; Withdrawal of Proposed Provision Removing Pyrolysis/Combustion Unit*, 88 Fed. Reg. 36524 (June 5, 2023).

[5] In April 2024, EPA issued a limited final rule finalizing the elimination of Title V permitting requirements for air curtain incinerators that burn only clean vegetative waste and are not otherwise located at a Title V major source. 89 Fed. Reg. 27392 (Apr. 17, 2024); *see also* 89 Fed. Reg. 89928 (Nov. 14, 2024) (technical corrections).

device” in a generic fashion as any combustion device “with capacity less than or equal to 10 [tons per day] that is designed and constructed without one or more of the following elements: (1) a stack, chimney, or pipe designed for the purpose of managing air flow and discharging flue gases from combustion; (2) mechanical draft to provide airflow; (3) burners designed to manage the combustion process; (4) an ancillary power supply to operate; or (5) supplemental fuel burners or nozzles.” *Id.* at 60346–47. The agency acknowledged that units meeting these conditions exist in locations other than rural Alaska.

Notwithstanding the shortcomings of the proposal highlighted in public comments, the Final Rule continues to define OWSI to include *only* certain VSMWC and IWI. *See Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Other Solid Waste Incineration Units Review; Final Rule*, 90 Fed. Reg. 27910, 27912 (June 30, 2025), JA____; *see also* 40 C.F.R. § 60.2977 (defining “*Other solid waste incineration (OSWI) unit*” for Subpart EEEE to mean “either a very small municipal waste combustion unit or an institutional waste incineration unit, as defined in this subpart”); 40 C.F.R. § 60.3078 (same for Subpart FFFF). The primary changes made by the Final Rule have the effect of weakening even the limited emission standards for OSWI contained in the 2005 Rule. First, the Final Rule relaxed the standards applicable to VSMWC where those units have a capacity of 10 tons per day or less. *See* 90 Fed.

Reg. at 27914, 27917, JA____, ____. Second, the Final Rule reclassifies small remote incinerators previously subject to regulation as commercial and industrial solid waste incinerators as VSMWC subject to these relaxed standards. *See id.* at 27914, JA____. Third, the Final Rule adopted the proposed definition of "rudimentary combustion device," which has the effect of reclassifying numerous VSMWC and IWI previously subject to the 2005 Rule's emission standards and excluding them from the coverage of any OSWI emission standards. *See id.* at 28914–15, JA____–____.

Petitioners timely filed a petition for review of the Final Rule on August 29, 2025.

## SUMMARY OF ARGUMENT

1. The Final Rule unlawfully excludes solid waste incineration units from the coverage of any emission standards, flouting the requirements of section 129 of the Clean Air Act and repeated decisions by this Court.

a. Section 129 of the Clean Air Act requires EPA to set emissions standards for each category of solid waste incineration units. As this Court has repeatedly recognized, Congress directed EPA in section 129 to promulgate standards for *all* solid waste combustion units as defined by the Act apart from those that fall within four narrow and tightly defined exceptions determined by Congress. In the Final Rule, EPA nonetheless continues to assert that it has discretion to decide which other categories of solid waste incineration units should have emission standards and which should not. This claimed discretion to exclude solid waste incineration units from the coverage of section 129 standards is contrary to the plain text, structure, and settled judicial understandings of the Clean Air Act.

b. The Final Rule also excludes several specific categories of other solid waste from the coverage of any section 129 standards. This was contrary to law and arbitrary. First, EPA continues to refuse to apply section 129 standards to several other categories of incineration units that it had identified for regulatory development, including pathological waste incinerators, units that burn contraband

and prohibited goods, units that burn national security materials, animal waste incinerators, contaminated soil treatment, and the newly invented category of "rudimentary combustion devices." But as discussed above, section 129 requires EPA to set OSWI standards for all solid waste incineration units not covered by standards under one of the four statutorily defined categories. Second, the Final Rule continues to excuse incineration units from complying with otherwise applicable emission standards when temporarily used to combust disaster debris. But this Court has repeatedly recognized that Congress required emission standards and limitations implemented under section 129 to apply "on a continuous basis." Third, the Final Rule excludes institutional waste incinerators that recover energy from the Rule's requirements, but this Court has already rejected EPA's argument that it can exclude incinerators from section 129 standards just because they recover energy.

2. The Final Rule is also unlawful because it regulates as OSWI solid waste incineration units that combust municipal waste as defined by the Clean Air Act. Solid waste incineration units that burn municipal waste are municipal waste combustors and must be regulated as such under the Act. The Act defines what solid waste qualifies as municipal waste and provides that EPA must establish section 129 standards that apply to "with capacity equal to or less than 250 tons per day" that combust such waste. 42 U.S.C. § 7429(a)(1)(C). The Final Rule instead

regulates units that undisputedly burn municipal waste as OWSI, which means that different emission standards apply, and further reclassifies many of these units as "rudimentary combustion devices," with the effect of removing them from any applicable emission limitations.

## STANDARD OF REVIEW

The Administrative Procedure Act and Clean Air Act require a court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); 42 U.S.C. § 7607(d)(9)(A), (C). To assess whether an agency "acted within its statutory authority," a court must exercise its own "independent judgment," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024), in order "to determine the best reading of the statute," *id.* at 400. Agency action is arbitrary when the agency has not provided a reasoned explanation for its decision, including a cogent explanation for why it has exercised its discretion in a given manner. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43–44, 48-49 (1983). This petition raises several issued previously addressed by this Court. Prior opinions of this Court are binding precedent. *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).

## STANDING

Petitioners are national and regional nonprofit organizations that advocate for clean air and healthy living environments for their members and the general public. *See* Williams and Carman Declarations, Addendum at DEC001, 018–022. Petitioners' members and their families live, work, and recreate near solid waste incineration units that were unlawfully excluded from the coverage of emissions standards or that were improperly regulated as OSWI rather than as municipal waste combustors by the Final Rule. *See* Suwol, Kelley, Smith, and Figueroa Declarations, Addendum at DEC024–025, 028, 032–033, 038–039.

Petitioners' members are exposed to emissions from OSWI by breathing the air where they live, work, and recreate. In addition, because some incinerator emissions are persistent and bioaccumulative, Petitioners' members are also exposed to them through the contact with soil and water and through the food they eat. Petitioners' members are reasonably concerned about their exposure to harmful air pollutants resulting from the incineration of solid waste in these units. *See* Suwol, Kelley, Smith, and Figueroa Declarations, Addendum at DEC024, 028–029, 032–033, 038–039. Some of Petitioners' members and their family members have underlying health conditions that make them especially sensitive to air pollution. *See* Williams, Suwol, Kelley, Smith, and Andrew Declarations, DEC012, 023, 027, 034, 044. Petitioners' members engage in outdoor activities—

including walking for exercise and enjoyment, swimming, hiking, horseback riding, cycling, playing games such as soccer, basketball, and lawn game, engaging in gardening, yardwork, and taking advantage of indoor-outdoor living on their patios, porches, hot tubs, pools, and decks—and enjoy having open windows for cooling their homes. *See* Williams, Suwol, Kelley, Smith, Figueroa, and Andrew Declarations, Addendum at DEC009–011, 023–024, 027–028, 031–032, 037, 043–044. Members' reasonable concerns about exposure to harmful air pollutants resulting from the emissions of these solid waste incineration units have diminished their enjoyment of these outdoor activities, and members have altered their behavior to their detriment as a result of these concerns, including spending less time outdoors, avoiding outdoor dining, closing their windows more often, incurring the expense of more often changing air filters in the heating and cooling system for their residence, and using a face mask when engaging in outdoor activities, all to reduce their exposure to these air pollutants. *See id*, Addendum at DEC009–012, 025–026, 029, 033–035, 039, 044–045.

Petitioners' members, constituents, and their families also live, work, and recreate in areas prone to natural disasters where disaster debris can be incinerated without emission controls under the Final Rule's temporary use exclusion. *See* Williams and Andrew Declarations, DEC007–008, 042. Their communities include areas where natural disasters have recently occurred. *See id.*, Addendum at

DEC007, 042. Petitioners' members have witnessed the accumulation of disaster debris in their neighborhoods and larger communities. *See id.*, Addendum at DEC007, 042. Their neighborhoods and communities are places that, by virtue of their location and topological and geographic features, are particularly vulnerable to natural disasters and are likely to experience natural disasters in the future. *See id.*, Addendum at DEC008–009, 043. These members are reasonably concerned about exposure to harmful air pollutants from such incineration. *See id.*, Addendum at DEC010–011, 044. Some of these members live in communities where the state has indicated it plans to employ temporary use incinerators to handle disaster debris, including in areas of North Carolina affected by recent flooding following Hurricane Helene. *See* Andrew Declaration, Addendum at DEC045, 066. Petitioners' members include individuals whose neighborhoods and communities still have remaining accumulations of disaster debris from prior natural disasters, including Hurricane Helene. *Id.*, Addendum at DEC043.

Exposure to harmful emissions from the uncontrolled incineration of disaster debris will harm these individuals, their wellbeing, and their aesthetic and recreational interests. In addition, because pollutants emitted into the air from the uncontrolled incineration of disaster debris will eventually be deposited into the communities where Petitioners' members live, work and recreate, they will contaminate soil, water, and food for decades to come. As noted above,

Petitioners' members engage in outdoor activities—including walking for exercise and enjoyment, hiking, horseback riding, gardening, yardwork, and taking advantage of indoor-outdoor living on their patios, porches, pools, and decks — and enjoy having open windows for cooling their homes. *See* Williams and Andrew Declarations, Addendum at DEC009–011, 044.

When uncontrolled incinerators burn disaster debris in their communities, as the Rule allows, Petitioners' members will be exposed to the emissions. They will be harmed by this exposure, and it will detract from their enjoyment of everyday life and the outdoor activities that they enjoy. These members are reasonably concerned about such exposure to harmful air pollutants. *See id.*, Addendum at DEC010–011, 044. Petitioners' members who live close to locations where uncontrolled incineration of disaster debris occurs will need to take numerous precautions to protect themselves from harmful emissions, including wearing masks, staying indoors with the windows closed, curtailing their outdoor activities, and even driving to out-of-town locations for relief from polluted air. *See id.*, Addendum at DEC009–012, 044–045. Some of Petitioners' members and their family members have underlying health conditions that make them especially sensitive to air pollution. *See id.*, Addendum at DEC012, 044.

These injuries to Petitioners and their members would be remedied by vacatur of the Final Rule. *See Nat. Res. Def. Council v. EPA*, 749 F.3d 1055, 1062

(D.C. Cir. 2014) (finding standing where environmental groups' members alleged they would be harmed by higher emissions allowed by affirmative defense provision in challenged air rule); *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020) (finding petitioners are injured by EPA actions that "expose them to higher [pollution] levels"); *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000) (finding standing based on "aesthetic and recreational" injuries); *SSM Litig. Group v. EPA*, 150 F.4th 593, 597–98 (D.C. Cir. 2025) (finding standing for organizations that were potentially exposed to future liability by rule rescinding affirmative defense for violations attributable to emergencies).

## ARGUMENT

### I. The Final Rule unlawfully excludes solid waste incineration units from regulation under section 129 of the Clean Air Act.

The Clean Air Act unambiguously requires EPA to promulgate section 129 standards for *all* solid waste incineration units. Nonetheless, ignoring the statute and binding Circuit precedent, EPA insists it has discretion to not set section 129 standards for any category of solid waste incineration unit that is not expressly enumerated in section 129(a)(1)(B)–(D). 90 Fed. Reg. at 27927, JA____. Because EPA's view of its authority conflicts with "the best reading of the statute," *Loper Bright Enters.*, 603 U.S. at 400, the Final Rule is contrary to law and must be vacated. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("an order may not stand if the agency has misconceived the law").

#### A. Section 129 requires EPA to establish emission standards for *all* other solid waste incineration units.

Section 129 of the Clean Air Act expressly requires EPA to "establish performance standards and other requirements pursuant to section 7411 of this title and this section for each category of solid waste incineration units." 42 U.S.C. § 7429(a)(1)(A). With just four narrowly tailored exceptions, the Act defines "solid waste incineration unit" to mean "a distinct operating unit of any facility which combusts any solid waste material from commercial or industrial establishments or the general public." *Id.* § 7429(g)(1). Read together, as they must be, these

provisions make clear that EPA must set section 129 standards for any unit that combusts any solid waste.

This Court has twice confirmed this point in the context of EPA attempts to avoid regulating all commercial and industrial solid waste incinerators (CISWI) under section 129. In *NRDC*, this Court addressed EPA's argument that it could decline to set standards for CISWI units that recover energy from the combustion process. 489 F.3d at 1257–58. The Court found that because the Clean Air Act makes clear that EPA must set section 129 standards for all units that fall within the Act's broad definition of solid waste incineration unit, EPA's actions contravened the plain meaning of the statute. *Id.*

Next, in *U.S. Sugar*, the Court rejected EPA argument that it could decline to regulate cyclonic burn barrels "given how little information it had on them." 830 F.3d at 644. This Court held that "in light of the unambiguous statutory command to promulgate numeric standards for *all* solid waste incineration units, the EPA had no discretion to avoid regulating any such units—even if its choice to avoid regulating these units would have been otherwise reasonable." *Id.*

EPA still insists it is free to leave OSWI unregulated. 90 Fed. Reg. at 27927, JA____. Disregarding the text of section 129 and this Court's holding in *U.S. Sugar*, EPA argues that *NRDC* is a narrow holding that merely directs EPA to set section 129 standards for all CISWI and that "Congress left 'the promulgation of

standards under section 7411 of this title and this section applicable to other categories of solid waste incineration units' (CAA section 112(a)(1)(e)) [*sic*] up to the Administrator's discretion." *Id.* EPA therefore denies that it "is required to establish emissions standards for all 'other categories' of solid waste incineration units." *Id.*

EPA's argument ignores the statutory text. Sections 129(a)(1)(A) expressly states that EPA must set section 129 standards for "each" category of solid waste incinerator. 42 U.S.C. § 7429(a)(1). Because of this command, section 129 "on its face applies to 'solid waste incineration units' generally." *NRDC*, 489 F.3d at 1257 (citing 42 U.S.C. § 7429(a)(1)(A)). Moreover, section 129(g)(1) defines incinerator broadly to mean "any" facility that combusts "any" solid waste with just a few carefully tailored exceptions. 42 U.S.C. § 7429(g)(1). That Congress itself considered whether to exclude any categories of incineration units from section 129's broad requirements and chose to exclude only these four narrow categories demonstrates that Congress knew how to craft exclusions when it wished to do so, and "in fact did so for four specific classes of combustion units." *NRDC*, 489 F.3d at 1259.[6] Section 129's broad and unambiguous definition of

[6] *See also Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent.") (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 28

covered incinerators and mandate to set section 129 standard for each category of incinerator together make clear that EPA must set standards for "all" incinerators. *U.S. Sugar*, 830 F.3d at 644. In short, the Act does not leave EPA "discretion" to decline to set section 129 standards for any incinerators.[7]

EPA also misreads *NRDC*. Although that case addressed a refusal by EPA to set section 129 standards for units in a particular category of incinerator, CISWI, its rejection of EPA's view of the law does not turn on the meaning of CISWI. Rather, it rests on the statutory definition of "solid waste incineration unit" as "a distinct operating unit of *any* facility which combusts *any* solid waste material from commercial or industrial establishments or the general public" and Congress's decision to make just four specific exceptions to this definition. *Id.* at 1257–1258. As the Court explained, the word "any" in this definition has its all-

---

(2001)); *Sierra Club v. EPA*, 294 F.3d 155, 160 (D.C. Cir. 2002) (inferring from the Clean Air Act's inclusion of certain transport-based exemptions from ozone attainment requirements "that the absence of any other exemption for the transport of ozone was deliberate").

[7] Indeed, this is how EPA itself previously understood the scope of section 129. In a prior rulemaking, EPA addressed why it had authority under section 129 to regulate cement kilns burning medical waste. EPA explained that "[s]ection 129(g)(1) broadly defines solid waste incineration unit as 'a distinct operating unit of *any* facility which combusts *any* solid waste material' … This definition clearly indicates Congress' intent to regulate more than just incinerators because the definition sweeps within its scope <u>any</u> facility that is combusting <u>any</u> solid waste." 62 Fed. Reg. at 48358/2 (Sept. 15, 1997) (italics original, underscoring added).

inclusive "usual meaning." *Id.* at 1257 ("The word 'any' is usually understood to be all inclusive.") (quoting *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 488 (D.C. Cir. 2007)). Section 129(g)(1)'s broad definition applies to all incineration units, not just CISWI. Indeed, *NRDC* rejects EPA's attempt to rely on the absence of a specific definition for CISWI precisely because the Act's broader definition of solid waste incineration units made clear that all solid waste incinerators—including all CISWI—are subject to section 129 standards. *Id.* at 1258.

Further, EPA ignores *U.S. Sugar*, which confirms that because EPA has a clear obligation based in this definition "to promulgate numeric standards for *all* solid waste incineration units, the EPA had no discretion to avoid regulating any such units—even if its choice to avoid regulating these units would have been otherwise reasonable." 830 F.3d at 644. Indeed, the Court emphasized this point by repeating it: "As we have explained, the EPA had a nondiscretionary duty to promulgate standards for *all* solid waste combustion units." *Id.*

Reading section 129 to require EPA to set emission standards for all solid waste incineration units also makes sense given that Congress enacted the 1990 amendments, including section 129, because it was dissatisfied with the progress on clean air under the prior discretionary regime. Congress itself made the policy decision here on which incineration units required emission standards and delineated itself which units that might otherwise fall under that definition should

be excepted. "Here, the statutory definition of 'solid waste incineration unit' is clear and unambiguous as written." *NRDC*, 489 F.3d at 1258. Where Congress did not create an exception, "EPA may not … create an additional exception on its own." *Id.* at 1260. "When the Congress commanded the EPA to regulate units that burn 'any' solid waste, the Congress meant what it said." *U.S. Sugar*, 830 U.S. at 618. EPA's claimed discretion is not "the best reading of the statute." *See Loper Bright Enters.*, 603 U.S. at 400. This Court should "effectuate the will of Congress" as expressed by the Clean Air Act's text. *Id.* Because the Final Rule is premised on EPA's mistaken view of the law, the Court should vacate the Final Rule on this ground alone. *See Chenery Corp.*, 318 U.S. at 94 ("an order may not stand if the agency has misconceived the law").

Perhaps recognizing that its claim of discretion to leave some incinerators unregulated cannot be reconciled with either the text of the Clean Air Act or Circuit precedent, EPA states that, almost 20 years after this Court decided *NRDC*, it still "is continuing to assess" that decision and that it has no obligation to set standards for unregulated OSWI in the course of its review of the OSWI standards under section 129(a)(5). *Id.* This claim is independently unlawful because it mistakes EPA's obligation, when undertaking periodic reviews, to ensure that its emission standards comport with the Act's requirements.

Contrary to EPA's view, it had an obligation to fix the fundamental flaws in its 2005 OSWI Rule—including its failure to set standards for all OSWI—in the challenged rule. Section 129(a)(5) requires EPA to review its "standards and requirements" under section 129 every five years and revise them "*in accordance with* this section." 42 U.S.C. § 7429(a)(5) (emphasis added). Emission standards can be "in accordance with" section 129 only if they satisfy the legal requirements section 129 imposes. One of those requirements, as this Court has already held, is to set section 129 standards for all incinerators. *E.g.*, *U.S. Sugar*, 830 F.3d at 644. Because section 129 unambiguously requires EPA to set standards for all incinerators, revising EPA's OSWI standards "in accordance with" section 129 means ensuring they include standards for all OSWI, not just the ones for which EPA has previously chosen to set standards.

That EPA's refusal to establish standards for these otherwise unregulated incinerators is not "in accordance with" section 129 is clear from this Court's closely on point interpretation of the analogous language in section 112(d)(6). *See Louisiana Environmental Action Network v. EPA*, 955 F.3d 1088, 1096–1100 (D.C. Cir. 2020) ("*LEAN*"). Like section 129, section 112 requires periodic reviews, and it directs EPA—in the course of these reviews—to revise its section 112 standards "as necessary (taking into account developments in practices, processes, and control technologies)." 42 U.S.C. § 7412(d)(6). Rejecting EPA's

claim that this provision allowed it to leave unlawful standards unchanged, *LEAN* makes clear that when EPA conducts its periodic reviews of emission standards EPA "must conform them to the basic requisites of 'emission standards' under section 112, *including* by setting controls on previously unaddressed hazardous air pollutants." *Id.* at 1098 (emphasis added). The Court emphasized that, although the statutory text was reason enough to reject EPA's claim that it could decline to revise unlawful standards, accepting that claim would also defeat the statute's purpose. *Id.* at 1098–99 ("implausibly leaves no statutory prompt for the completion of statutorily deficient controls.").

EPA's attempt to distinguish *LEAN* by arguing that the operative language in section 112(d)(6) differs from that in section 129, 90 Fed. Reg. at 27927, JA____, misses the point. Because it directs EPA to revise standards "in accordance with this section," section 129(a)(5) is even more explicit that EPA must conform unlawful standards to the core demands of the statute than section 112(d)(6)'s requirement to revise standards "as necessary." *LEAN*'s reasoning applies *a fortiori* here. EPA's misconception of its obligations under section 129(a)(5) provides an additional ground to vacate the Final Rule. *See Chenery Corp.*, 318 U.S. at 94.

### B. The Final Rule unlawfully excludes specific categories of other solid waste.

In addition, the Final Rule also excludes several specific categories of solid waste incineration units from the OWSI emission standards. As discussed above, these exclusions are contrary to law. Further, while EPA claims to have discretion to determine which other categories of solid waste incineration units it wants to regulate, 90 Fed. Reg. at 27927, JA____, EPA also failed to explain why it exercised that alleged discretion to not set emission standards for these incinerators. *State Farm*, 463 U.S. at 48-49 ("We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner."). So, at a minimum, these exclusions are arbitrary and capricious.

First, the Final Rule excludes pathological waste incinerators, units that burn contraband and prohibited goods, units that burn national security materials, animal waste incinerators, and contaminated soil treatment facilities from the coverage of section 129 standards. 90 Fed. Reg. 27926–27, JA____–____. In addition, the Final Rule perpetuates a decision to improperly exclude crematories from the coverage of section 129 by maintaining the fiction that human remains are not a form of solid waste. *Id.* Finally, the Final Rule also creates a new category of other solid waste incineration units called "rudimentary combustion devices" and excuses these devices from any emission controls. *Id.* at 27914–15, JA____–____. These various exclusions will result in significant releases of harmful air

pollutants, as discussed above. Because the Clean Air Act requires EPA to set section 129 standards for any incinerator that combusts any solid waste material at all, EPA's refusal to apply section 129 emission standards to these solid waste incineration units is contravenes the Clean Air Act. *See NRDC*, 489 F.3d at 1257–58; *U.S. Sugar*, 830 F.3d at 643–44.

Indeed, EPA itself previously identified many of these types of incinerators as other categories of solid waste incineration units that required regulatory development, *see* 58 Fed. Reg. at 58499, 58501, and has not offered a rational basis for its change in position or its refusal to set emission standards for them. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (Where an agency reverses a prior position, it must offer a "reasoned explanation . . . for disregarding facts and circumstances" that underlay the prior position); *State Farm*, 463 U.S. at 43–44 (An agency "must … articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."). These exclusions are contrary to law and arbitrary.

Second, the Final Rule also perpetuates an unlawful exclusion of incineration units from applicable emission standards when temporarily used to combust disaster debris. But Congress required that emission standards and limitations implemented under section 129 apply "on a continuous basis." 42 U.S.C. § 7602(k). As this Court has explained, this language reflects Congress's

requirement that emission limitations under the Clean Air Act apply on a continuous basis and assure continuous emission reduction. *See*, *e.g.*, *Sierra Club*, 551 F.3d at 1027–28; *U.S. Sugar*, 830 F.3d at 607. Indeed, *Sierra Club* expressly rejects EPA's claim to have discretion to make reasonable distinctions about when emission limitations apply. *See* 551 F.3d at 1028. The Final Rule violates this statutory requirement without legal basis by continuing to provide for so-called temporary exemptions from the continuous application of emission limitations for purposes of disaster recovery, and so is contrary to law.

Third, the Final Rule improperly excludes from the coverage of section 129 standards any institutional waste incinerators that recover energy.[8] But this Court has already expressly rejected the notion that EPA can exclude incinerators from section 129 standards just because they recover energy when they combust solid waste. *NRDC*, 489 F.3d at 1258–60. Institutional waste incinerators that recover energy are nonetheless combusting solid waste and therefore must be regulated

---

[8] EPA exempts institutional waste incineration units that recover energy from the section 129 standards established in the Final Rule by defining the term "institutional waste" to mean only "solid waste" "combusted at any institutional facility … whose design does not provide for energy recovery[;] … operated without energy recovery[;] …; or operated with only waste heat recovery …" 40 C.F.R. § 60.2977.

under section 129.[9] This Court confirmed as much in *NRDC*, because "[h]ad the Congress intended to exempt all units that combust waste for the purpose of recovering thermal energy, it could likewise have expressly provided for their exemption in the statute." *Id.* at 1259–60. Accordingly, the Final Rule's refusal to impose OSWI emission standards on institutional waste incinerators that recover energy contravenes the Clean Air Act.

[9] Unless, of course, they properly fall within Congress's narrow exception for "qualifying small power production facilities, … or qualifying cogeneration facilities" that combust waste to produce energy, *see* 42 U.S.C. § 7429(g)(1).

## II. The Final Rule unlawfully regulates units that combust municipal waste as OSWI.

The Final Rule also contravenes the Clean Air Act by regulating municipal waste combustors as OSWI. Congress directed EPA to establish standards applicable to small municipal waste combustors—"units with capacity equal to or less than 250 tons per day combusting municipal waste"—as municipal waste combustors under section 129(a)(1)(C).[10] 42 U.S.C. § 7429(a)(1)(C). Defying this mandate, the Final Rule nonetheless excludes "very small" incineration units from regulation as municipal waste combustors even though they burn municipal waste.

EPA asserts that it can regulate as OSWI—and, thus, not as municipal waste combustors—units that combust municipal waste and have a capacity of less than 35 tons per day.[11] Because the Act expressly requires any incineration units with capacity equal to or less than 250 tons per day that burn municipal waste to be subject to municipal waste combustor standards under section 129(a)(1)(C), EPA's regulation of these units as OSWI is unlawful.

---

[10] The Act defines "municipal waste" in a way that excludes incineration units combusting municipal waste where the unit "combusts a fuel feed stream, 30 percent or less of the weight of which is comprised, in aggregate, of municipal waste." 42 U.S.C. § 7429(g)(5)(B).

[11] The Final Rule regulates two categories of VSMWC as OSWI and also reclassifies some incineration units as "rudimentary combustion devices" that were previously regulated as VSMWC, effectively excluding those units from the coverage of any section 129 standards.

The Act establishes mandatory minimum stringency ("floor") requirements that ensure standards cannot be less stringent than the emission level actually "achieved" in practice by the best performing units in each category, and so EPA's improper regulation of these units as OSWI independently requires vacatur of the Rule. This Court has twice previously considered final rules in which EPA attempted to regulate sources under the wrong category and vacated both rules, including a directly on-point case concerning the statutory categories of municipal waste combustors. *See Davis Cty. Solid Waste Mgmt.*, 101 F.3d at 1411 (vacating EPA rule because units that fell within the statutory category for small municipal waste combustors were wrongly included in the large municipal waste combustor category when setting emission standards); *NRDC*, 489 F.3d at 1261–62 (vacating EPA rules for both commercial and industrial waste incinerators and industrial boilers because the agency wrongfully included commercial and industrial solid waste incinerators in the boiler category when setting emission standards).

## CONCLUSION

For the reasons set forth above, Petitioners respectfully ask that the Court vacate the Final Rule.

Dated: March 20, 2026

Respectfully submitted,


*/s/ John E. Bies*

John E. Bies
James Pew
Earthjustice
1250 I Street NW, Fourth Floor
Washington, D.C. 20005
Phone: (202) 667-4500
jbies@earthjustice.org
jpew@earthjustice.org

*Counsel for Sierra Club and California Communities Against Toxics*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), counsel hereby certifies that the foregoing document contains **10,331** words, as counted by counsel's word processing system, and thus complies with the 13,000-word limit. *See* Fed. R. App. P. 32(a)(7)(B)(i).

Further, this document complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure, 32(a)(5) and (a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 using size 14 Times New Roman font.

Dated: March 20, 2026

*/s/ John E. Bies*
John E. Bies

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of March, 2026, I filed the foregoing brief with the Court's CMS/ECF system, which will notify each party.

*/s/ John E. Bies*
John E. Bies